## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VIP CINEMA HOLDINGS, INC., *et al.*,[1] | ) Case No. 20-10345 (MFW) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

### MOTION OF THE DEBTORS FOR (A) AUTHORIZATION TO (I) OBTAIN POSTPETITION FINANCING, (II) USE CASH COLLATERAL, (III) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANT ADEQUATE PROTECTION, (V) MODIFY THE AUTOMATIC STAY, AND (VI) SCHEDULE A FINAL HEARING; AND (B) RELATED RELIEF

VIP Cinema Holdings, Inc. ("VIP") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), submit this motion (the "Motion"), by and through their undersigned proposed counsel, for entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and for entry of a final order (the "Final Order"[2] and, together with the Interim Order, the "DIP Orders") granting:

(i)    authorization for (a) VIP Cinema Holdings, Inc. (the "Borrower") to obtain and (b) HIG Cinema Intermediate Holdings, Inc. ("Holdings") and all direct and indirect domestic subsidiaries of Holdings, other than the Borrower, who are Debtors, (collectively, the "Guarantors" and, together with the Borrower, the "Credit Parties") to guarantee, in each case, postpetition financing in an aggregate principal amount of up to $33.00 million (the "DIP Facility" and the obligations thereunder, the "DIP Obligations") as evidenced by the DIP Credit Agreement (as defined below), to be provided by certain Prepetition First Lien Lenders (the "DIP 1L Lenders") and the Prepetition Second Lien Lenders (the "DIP 2L Lenders" and, together with the DIP 1L Lenders, collectively, the "DIP Lenders"), comprising (1) $11.00 million in principal

---

[1]    The Debtors in these Chapter 11 Cases, for which joint administration has been requested, along with the last four digits of their federal tax identification numbers, are as follows:  VIP Cinema Holdings, Inc. (2049); HIG Cinema Intermediate Holdings, Inc. (4710); VIP Components, LLC (4648); VIP Cinema, LLC (7167); and VIP Property Management II, LLC (1421).

[2]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

amount of new money term loan commitments from the DIP 1L Lenders (the "DIP New Money 1L Commitments" and, the term loans thereunder, the "DIP New Money 1L Loans"); (2) $2.00 million in principal amount of new money term loan commitments from the DIP 2L Lenders (the "DIP New Money 2L Commitments" and, the term loans thereunder, the "DIP New Money 2L Loans" and, the DIP New Money 1L Loans together with the DIP New Money 2L Loans, the "New Money DIP Loans"); and (3) upon entry of the Final Order (as defined below) roll-up term loans in an aggregate principal amount of up to $20.00 million (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans") representing the roll-up of $20.00 million in aggregate principal amount of Prepetition First Lien Loans (as defined below) held by the DIP 1L Lenders and allocated based on their pro rata share of DIP New Money 1L Commitments;

(ii)    authorization for the Credit Parties to (a) execute, deliver and enter into (1) that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement, to be dated as of the as of the closing date of the DIP Facility (the "Closing Date") (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement"), among the Borrower, the Guarantors, the DIP Lenders and Wilmington Savings Fund Society, FSB, as the administrative agent and collateral agent (collectively, solely in such capacities, the "DIP Facility Agent," and, together with the DIP Lenders, the "DIP Secured Parties"), substantially in the form attached hereto as **Exhibit B** and (2) any other agreements, instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, notes and other Loan Documents (as defined in the DIP Credit Agreement) and documents related thereto (as each document may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, collectively with the DIP Credit Agreement, the "DIP Documents") and (b) perform their respective obligations under the DIP Documents and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(iii)    authorization for the Credit Parties (a) upon entry of the Interim Order, to incur in a single draw on the Closing Date New Money DIP Loans in an aggregate principal amount of up to $10.00 million (the "Initial Draw Amount") comprising (1) $8,461,538.00 of DIP New Money 1L Loans and (2) $1,538,462 of DIP New Money 2L Loans and (b) subject to the Court's approval as may be set forth in the Final Order (as defined below): (1) to incur a single draw of New Money DIP Loans in an aggregate principal amount of up to $3.00 million comprising (A) $2,538,462 of DIP New Money 1L Loans and (B) $461,538 of DIP New Money 2L Loans, which amounts for the avoidance of doubt shall be in addition to the Initial Draw Amount; and (2) to borrow (or to be deemed to borrow), subject to the entry of the Final Order, Roll-Up Loans in an aggregate principal amount of up to $20.00

million, in each case subject to the terms and conditions set forth in the DIP Documents, this Interim Order, and the Final Order;

(iv) authorization for the Credit Parties, upon entry of the Final Order, to use the Roll-Up Loans to (or be deemed to) refinance and discharge $20.00 million in an aggregate principal amount of Prepetition First Lien Loans held by the DIP 1L Lenders, allocated among the DIP 1L Lenders based on their pro rata share of the DIP New Money 1L Commitments (such refinancing, the "Prepetition Debt Refinancing");

(v) authorization to use the proceeds of the DIP Facility in accordance with this Interim Order and, as applicable, the Final Order (as defined below) and DIP Credit Agreement, including (a) to pay certain costs, fees and expenses related to the Chapter 11 Cases, (b) to fund the Carve-Out in accordance with the terms of the DIP Orders and (c) to fund the working capital needs and expenditures of the Debtors during the Chapter 11 Cases, including the Prepetition Debt Refinancing;

(vi) subject to the restrictions set forth in the DIP Documents and this Interim Order, authorization for the Credit Parties to continue to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") and all other Prepetition Collateral (as defined below) in which any of the Prepetition Secured Parties (as defined in the Interim Order) has an interest, and to grant adequate protection to the Prepetition Secured Parties with respect to, inter alia, such use of Cash Collateral and other Prepetition Collateral;

(vii) authorization for the Credit Parties to pay, on a final and irrevocable basis principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable, including, but not limited to, any upfront fees, original issue discount, backstop fees, commitment premiums, closing date fees, exit fees, prepayment fees, agency fees, administrative agent's fees, the Carve-Out, the reasonable fees and disbursements of the DIP Facility Agent's and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(viii) approval of certain stipulations by the Debtors with respect to the Prepetition Credit Documents and the liens and security interests arising therefrom;

(ix) subject and subordinate in all respects to the Carve-Out, granting to the DIP Secured Parties of an allowed superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code payable from, and having recourse to, all prepetition and postpetition property of the Credit Parties' estates and all

proceeds thereof (other than Avoidance Actions,[3] but upon entry of the Final Order, including Avoidance Proceeds[4]);

(x)   granting to the DIP Facility Agent (for the benefit of the DIP Secured Parties) liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Credit Parties' estates and all proceeds thereof (other than the Avoidance Actions, but including, subject to the Court's approval to the extent set forth in the Final Order, any Avoidance Proceeds), in each case subject and subordinate in all respect to the Carve-Out and the Prepetition Permitted Prior Liens;

(xi)   a waiver of (a) the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, and (b) subject to the entry of the Final Order, any right of the Debtors under the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xii)  modification of the automatic stay to the extent set forth herein and in the DIP Documents;

(xiii) scheduling of a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, as set forth in the Motion and the DIP Documents filed with this Court; and

(xiv) granting related relief;

and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors commenced these Chapter 11 Cases with the support of, among other parties, (a) over 50% in number and over 66.6% in amount of Prepetition First Lien Claims and (b) the Prepetition Second Lien Lenders holding 100% of the claims arising under the Prepetition Second Lien Credit Agreement to pursue and consummate a value-maximizing restructuring of the Company.

---

[3]   "Avoidance Actions" means, collectively, claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

[4]   "Avoidance Proceeds" means any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.

The Restructuring Support Agreement[5] and the Plan[6] contemplate a restructuring (the "Restructuring"), which will (a) significantly deleverage the Debtors' balance sheet through the conversion of approximately $164 million of Prepetition First Lien Claims to equity and an exit facility; (b) discharge approximately $45 million of Prepetition Second Lien Claims; (c) provide the Debtors with working capital to fund ongoing operations post-emergence, including through a $7 million new money capital infusion; (d) minimize the risk, and therefore costs, of litigation; (e) enable a prompt emergence from chapter 11; and (f) maximize recoveries for all stakeholders.

2.      The requested debtor in possession financing (the "DIP Financing") package, including the consensual use of cash collateral in connection therewith, is an integral part of the agreed-upon Restructuring.  Immediate and adequate financing is necessary to ensure the Debtors have sufficient liquidity to pay their ordinary course operating expenses, finance these Chapter 11 Cases and, ultimately, provide the Debtors with the ability to consummate the transactions contemplated by the Restructuring Support Agreement and Plan.   The Debtors require immediate access to the DIP Facility and authority to use the Cash Collateral to ensure they have sufficient liquidity to fund the Debtors' operations.

3.      As further discussed herein, the Debtors firmly believe that approval of the DIP Facilities will maximize value for the Debtors' stakeholders and is a sound exercise of the Debtors' business judgment.  As a result, the Debtors respectfully request that the Court grant the relief requested.

---

[5]    "Restructuring Support Agreement" means the agreement, dated as of February 14, 2020, entered into by and among the Debtors, the consenting Prepetition First Lien Lenders, the Prepetition Second Lien Lenders, H.I.G. Capital, LLC and H.I.G. Middle Market LBO Fund II, L.P., and any person or Entity (as defined in the Plan) that subsequently becomes a party thereto, as it may be amended, supplemented or modified from time to time in accordance with the terms thereof.

[6]    "Plan" means the *Joint Prepackaged Plan of Reorganization of VIP Cinema Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time), filed contemporaneously herewith.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b), 4001-1, 4001-2, and 9013-1(m).

## BACKGROUND

### I.      GENERAL CASE BACKGROUND

7.      The Debtors (together with VIP Cinema Seating International, LTD and HIG Cinema Holdings, Inc., the "Company") comprise a multinational enterprise that is the largest manufacturer, and pioneer, of luxury recliner seating for movie theaters.  The Company also offers an array of movie-theatre services, including seat cleaning and reupholstering, seat and slipcover installation, and the provision of replacement parts.  With headquarters, offices, and services across the United States, the United Kingdom, and Dubai, and the provision of goods and services to

many of the leading movie theatres across the world, the Company has a broad domestic and global reach.

8.      On the date hereof (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

9.      The facts and circumstances supporting the relief requested herein are set forth in greater detail in (a) the *Declaration of Lloyd A. Sprung in Support of the Debtors' Motion for (A) Authorization to (I) Obtain Postpetition Financing, (II) Use Cash Collateral, (III) Grant Liens and Provide Superpriority Administrative Expense Status, (IV) Grant Adequate Protection, (V) Modify the Automatic Stay, and (VI) Schedule a Final Hearing; and (B) Related Relief* (the "<u>Sprung Declaration</u>"); (b) the *Declaration of Stephen Spitzer in Support of the Debtors' Motion for Debtors (A) Authorization to (I) Obtain Postpetition Financing, (II) Use Cash Collateral, (III) Grant Liens and Provide Superpriority Administrative Expense Status, (IV) Grant Adequate Protection, (V) Modify the Automatic Stay, and (VI) Schedule a Final Hearing; and (B) Related Relief* (the "<u>Spitzer Declaration</u>"), and (c) the *Declaration of Stephen Spitzer, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), each filed contemporaneously herewith and incorporated herein by reference.

II.    **PREPETITION INDEBTEDNESS**

   A.  **Prepetition First Lien Term Debt**

10.    Pursuant to that certain First Lien Credit Agreement, dated as of March 1, 2017 (as may be amended, restated, amended and restated, modified or supplemented from time to time, the "Prepetition First Lien Credit Agreement" and, collectively with the Security Agreement (as defined in the Prepetition First Lien Credit Agreement), the other Loan Documents (as defined in the Prepetition First Lien Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, collectively, the "Prepetition First Lien Credit Documents," and the loans thereunder, the "Prepetition First Lien Loans"), among the Borrower, Holdings, the guarantor subsidiaries, the administrative agent and collateral agent (solely in such capacities, the "Prepetition First Lien Agent"), the Revolving Lenders (as defined in the Prepetition First Lien Credit Agreement) party thereto who provided revolving loans (the "Prepetition First Lien Revolving Lenders"), and the Term Lenders (as defined in the Prepetition First Lien Credit Agreement) party thereto who provided term loans (the "Prepetition First Lien Term Lenders" and, together with the Prepetition First Lien Revolving Lenders, the "Prepetition First Lien Lenders," and the claims arising thereunder, the "Prepetition First Lien Claims"). The Prepetition First Lien Term Lenders provided term loans in the principal amount of $144,375,000 (plus accrued and unpaid interest thereon and fees, expenses, costs, charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition First Lien Credit Documents, the "Prepetition First Lien Term Debt"). The Prepetition First Lien Term Debt has a maturity date of March 21, 2023, and interest accrues at LIBOR plus an applicable margin between 5.75% and

6.00% based on the First Lien Leverage Ratio (as that term is defined in the Prepetition First Lien Credit Agreement) for the trailing four quarters.

**B.  Prepetition First Lien Revolving Debt**

11.     The Prepetition First Lien Revolving Lenders provided a revolving loan in the principal amount of $20,000,000 (plus accrued and unpaid interest thereon and fees, expenses, costs, charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition First Lien Credit Documents, the "Prepetition First Lien Revolving Debt").  The Prepetition First Lien Revolving Debt matures on March 21, 2022, and interest accrues at LIBOR plus an applicable margin between 5.75% and 6.00% based on the First Lien Leverage Ratio for the trailing four quarters.

**B.      Prepetition Second Lien Term Debt**

12.     Pursuant to that certain Second Lien Credit Agreement, dated as of March 1, 2017 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Second Lien Credit Agreement" and, collectively with the Security Agreement (as defined in the Prepetition Second Lien Credit Agreement), the other Loan Documents (as defined in the Prepetition Second Lien Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Second Lien Credit Documents", and together with the Prepetition First Lien Credit Documents, the "Prepetition Credit Documents"), among the Borrower, Holdings, the guarantor subsidiaries, the administrative agent and collateral agent (solely in such capacities, the "Prepetition Second Lien Agent"), and the lender party thereto (the "Prepetition Second Lien Lenders" and (x) together with the Prepetition First Lien Lenders, the "Prepetition Secured Lenders"), the Prepetition Second Lien Lenders provided term loans in the principal amount of $45,000,000 (plus accrued and unpaid interest thereon and

9

fees, expenses, costs, charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition Second Lien Credit Documents, the "Prepetition Second Lien Term Debt"). The Prepetition Second Lien Term Debt matures on March 21, 2024, and interest accrues at LIBOR plus an applicable margin of 9.50%.

## RELIEF REQUESTED

### I.    THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS

13.    In anticipation of their immediate need for postpetition financing and the use of Cash Collateral, the Debtors have, in consultation with their proposed financial advisor, AP Services, LLP (together with AlixPartners LLP, "AlixPartners") performed a review and analysis of their projected cash needs. Based upon that review and analysis, the Debtors and AlixPartners have prepared a draft budget (the "Budget") outlining the Debtors' postpetition cash needs, a copy of which is attached hereto as **Exhibit C**; *see also* Spitzer Decl. ¶ 9. The Debtors believe that the Budget is an accurate reflection of their funding requirements and will allow them to meet their obligations, including administrative expenses, in these Chapter 11 Cases. Spitzer Decl. ¶ 9. The Debtors also believe, and therefore submit, that the Budget is fair, reasonable, and appropriate under the circumstances. *Id.*

14.    The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates. *Id.* at ¶ 8. AlixPartners, together with the Debtors' other advisors, undertook a detailed analysis of the Debtors' operations and funding needs. *See id.* at ¶ 9. From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow the Debtors to operate in chapter 11 as they work to consummate the Restructuring. *See id.* at ¶ 10. Specifically, the Debtors' advisors determined that the debtor in possession financing is necessary to ensure (a) payments to employees, third

party vendors, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets; (b) the timely payment of administrative expenses to be incurred; and (c) a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to address the concerns raised by the Debtors' customers, employees, and vendors. *Id.* at ¶ 8. Immediate access to the DIP Facility and Cash Collateral is crucial to the Debtors' efforts to preserve value for their stakeholders during these chapter 11 cases and to prevent immediate and irreparable harm to the value of the Debtors' estates. *See id.* at ¶¶ 8, 10.

15.    Additionally, the Debtors will require access to the Prepetition Collateral, including Cash Collateral currently subject to the liens of the Prepetition Secured Lenders. As discussed in greater detail in the First Day Declaration and the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate their Cash Management System, (II) Maintain Existing Business Forms and Books and Records, and (III) Perform Intercompany Transactions and Granting Administrative Expense Status to Intercompany Payments and (B) Granting Related Relief*, filed contemporaneously herewith, the Debtors operate a centralized cash management system. All of the Debtors' receipts from operations are concentrated in a main concentration account at CIBC Bank USA, and without the ability to access such cash, the Debtors will not be able to continue operations in the ordinary course of business. Such cessation would detrimentally impact the value of the enterprise, including critical relationships with vendors and thousands of the Debtors' customers.

## II.    THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

### A.    The Marketing Process

16.      On June 20, 2019, the Debtors engaged UBS Securities, LLC ("UBS") to act as the Debtors' exclusive investment banker in connection with, among other things, (a) a review of the Company's business, operations, and financial projections, (b) an analysis of the Company's capital structure, debt capacity, and potential valuation, and (c) consideration of, and negotiations to implement, strategic alternatives to address the Company's capital structure and go-forward alternatives.  Sprung Decl. ¶ 8.

17.      Prior to the commencement of these Chapter 11 Cases, in June of 2019 and in response to a default under the Prepetition First Lien Credit Agreement, the Company began negotiating with certain of its stakeholders (including groups of holders of its funded indebtedness in addition to equity holders) on the terms and implementation of an acceptable recapitalization structure.  The Company was unsuccessful in consummating an out-of-court transaction due in part to the loss of a key customer and an attendant drop in projected free cash flow, debt capacity and implied valuation.  *Id.* at ¶ 10.  Nevertheless, the Company, with the assistance of its advisors, continued to engage its stakeholders in negotiations regarding the terms of a new restructuring transaction that would result in a feasible capital structure given the Company's revised business plan and more appropriately reflect the value of the Company.  *Id.* at ¶ 11.

18.      In this case, obtaining access to postpetition financing was difficult because all or nearly all of the Debtors' assets are encumbered under the existing capital structure, which, along with the Debtors' uncertain financial condition, restricts the availability of, and options for, postpetition financing.  *Id.* at ¶ 12.  To avoid a protracted and expensive priming fight, which the Debtors could not afford, the Debtors and their advisors believed that their only alternatives were

to (a) obtain the consent of the Prepetition Secured Lenders to the priming of their liens by a third-party lender, (b) locate a third-party lender willing to provide postpetition financing on an unsecured basis, (c) find lenders willing to refinance out the Prepetition Secured Lenders and provide incremental liquidity, or (d) find junior financing and a new secured lender. *Id.* Indeed, based on a review of the Prepetition Secured Lenders' lien position and UBS' preliminary analysis of the Company's potential enterprise value, the Debtors believed that there was not an equity cushion available for the Debtors to obtain debtor in possession financing based on priming the Prepetition Secured Lenders' liens over their objections, nor would the Company's business be able to sustain its value during a contested priming fight with the Prepetition Secured Lenders. *Id.*

19.    Notwithstanding these considerations, the Debtors, with the assistance of UBS, solicited proposals for third-party debtor in possession financing in parallel with discussions with their Prepetition Secured Lenders. Beginning on January 23, 2020, the Debtors, with the assistance of UBS, reached out to several private credit investors to gauge their interest in providing postpetition financing to the Debtors. UBS approached six potential third-party financing sources that make credit investments in the amount required by the Debtors. Unsurprisingly, none of the private credit investors that UBS reached out to demonstrated serious interest in pursuing a potential financing and executed a confidentiality agreement. *Id.* at ¶ 13.

20.    Due to the Debtors' financial position, their existing leveraged capital structure, and the small size of the financing need (which would not generate sufficient fees to compensate a third-party lender for participating in the financing), the Debtors were unable to find any interested third-party financing parties. *Id.* at ¶ 14. The size of the DIP financing request alone did not meet many of the initial qualifications of larger third-party financing sources. Nor were potential financing parties willing to provide financing junior to the existing Prepetition Secured

Lenders due to the amount of existing secured debt relative to the Debtors' financial position.  In addition, any senior financing that does not include the consent of the Prepetition Secured Lenders would have required non-consensual priming.  For the foregoing reasons, UBS determined that reaching out to additional third party financing sources would be fruitless and unlikely to result in any financing proposals.  *Id.*

> **B.      The DIP Financing Has Been Heavily Negotiated**

21.      Given the lack of interest from third-party lenders, the challenges specific to these Chapter 11 Cases as discussed herein, and the immediate funding need in the interim period, the Debtors began negotiating a consensual, first-lien priming DIP Facility with the Prepetition Secured Lenders.  *Id.* at ¶ 16.  Leading up to the Petition Date, the Debtors and the DIP Lenders exchanged multiple iterations of a term sheet outlining the terms of the proposed DIP Facility.  The Debtors' management team and legal and financial advisors were actively involved throughout the negotiation process.  These negotiations, which were extensive and conducted at arms'-length and in good faith, culminated in the terms of the proposed DIP Financing.  *Id.* at ¶ 23.

22.      The DIP Facility is an integral part of the Restructuring Support Agreement and cannot not be viewed in isolation.  The Prepetition Secured Lenders would not have allowed a third party to prime their liens while also agreeing to support the terms of the Restructuring.  Nor were the Prepetition Secured Lenders willing to lend on terms other than those specifically set forth in the DIP Order and DIP Credit Agreement.  *Id.* at ¶ 24.

23.      The DIP Facility proposal advanced by the Prepetition Secured Lenders provides the Debtors with the best available financing, and represents a negotiated resolution with the Prepetition Secured Lenders, whereby the Debtors are able to obtain a substantial financing

package on market terms, without overly burdensome case controls, without the risk of a priming fight, and with a clear path to expedited emergence. *See id.* at ¶ 25.

## III.    THE DIP RATES AND FEES ARE REASONABLE

24.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Facility Agent and the DIP Lenders. Specifically, the Debtors have agreed to an interest rate of LIBOR plus 6.00% per annum (or if applicable, ABR plus 5.00% per annum) and, upon the occurrence and during the continuation of an event of default, interest at a rate equal to 2.00% per annum *plus* the applicable rate.

25.    In addition, the Debtors have agreed to pay the following fees in connection with the DIP Financing:

(a) *Extension Premium:* An extension premium if the Borrower requests an extension of the DIP Facility maturity date, subject to certain conditions, in an amount equal to 0.50% of the DIP Loans then outstanding.

(b) *OID:* Original issue discount of 3.00% applicable to the New Money DIP Loans.

(c) *Commitment Premium:* A commitment premium where each DIP 1L Lender will receive its pro rata share of 13.00% of the common equity of the reorganized Borrower (or any direct or indirect parent thereof), which shall be payable on the effective date of the Plan (the "Plan Effective Date"); *provided* that if the Termination Date (as defined below) occurs (other than as a result of the Plan Effective Date), such fee shall be payable in cash on the Termination Date in an amount equal to 5.00% of the DIP New Money 1L Commitments on the Closing Date.

(d) *Termination Fee:* The DIP 2L Lenders' termination fee whereby if the Termination Date occurs (other than as a result of the Plan Effective Date), each DIP 2L Lender will receive its pro rata share of a termination fee payable in cash on the Termination Date in an amount equal to 5.00% of the DIP New Money 2L Commitments on the Closing Date.

(e) *Backstop Fee:* A backstop fee whereby (i) each DIP 1L Lender backstop party will receive its pro rata share of a backstop party commitment equal to 10.00% of the aggregate principal amount of the DIP New Money 1L Commitments and DIP New Money 2L Commitments (together, the "DIP New Money Commitments"), which shall be payable in cash on the Closing Date by netting a corresponding amount from the amount funded by the DIP Lenders on the Closing Date, and (ii) the DIP 2L Lenders' backstop party will receive its pro rata share of a backstop party commitment equal to 5.00% of the aggregate principal amount of the DIP New Money 2L Commitments, which shall be payable in cash on the Closing Date by netting a corresponding amount from the amount funded by the DIP Lenders.

(f) *Unused Line Fee:* An unused line fee where each DIP Lender will receive a fee in an amount equal to 0.50% of the average daily unused amount of the Delayed Draw Commitment[7] of such DIP Lender.

(g) *Administrative Agent Fee:* An administrative agent fee as set forth in the administrative agent fee letter annexed hereto as **Exhibit D** (the "Administrative Agent Fee").

---

[7] "Delayed Draw Commitment" shall mean the commitment of such DIP Lenders to make Delayed Draw Loans to the Borrower in an aggregate principal amount not to exceed the amount set forth in the DIP Credit Agreement.

26.    Under the Debtors' circumstances, and particularly in light of the fact that the DIP Facility is provided in connection with the broader Restructuring, the interest rates and fees reflected in the DIP Facility are reasonable. *Id.* at ¶ 20.   Further, the Debtors and the DIP Lenders agree that the interest rates and fees were subject to negotiation and are an integral component of the overall terms of the DIP Facility, and were required by the DIP Facility Agent and the DIP Lenders as consideration for the extension of postpetition financing. *Id.*  This pricing is reasonable and in line with other debtor in possession financings generally. *Id.*

27.    Further, the DIP Facility also contemplates certain milestones (the "Milestones")[8] that the Debtors must meet throughout their Chapter 11 Cases, and the failure to meet any such Milestones would constitute an event of default under the DIP Credit Agreements and the Restructuring Support Agreement.  These Milestones were negotiated and required by the DIP Lenders as a condition to providing the DIP Facility and provide sufficient time for the Debtors to emerge given the prepackaged nature of these Chapter 11 Cases. *Id.* at ¶ 21.   The DIP Facility serves as an important component of the Debtors' overall restructuring efforts because it provides the Debtors with the stability and certainty that they can emerge from the chapter 11 process in a timely and expeditious manner. *Id.* at 22.

28.    The Debtors are entering these Chapter 11 Cases with the support of the Prepetition Secured Lenders.  Their support is contingent on, among other things, meeting the obligations in the DIP Facility. *Id.* at ¶ 26.  The continued and viable operation of the Debtors' business will not be possible absent access to the DIP Facility. *Id.* at ¶ 27.  The DIP Facility will ensure the

---

[8]    The milestones are (a) entry of the Interim Order to occur not later than five days after the Petition Date; (b) entry of the Final Order to occur not later than thirty-five days after the Petition Date; (c) entry of an order by the Court approving the Disclosure Statement (as defined in the Restructuring Support Agreement) to occur not later than thirty-five days after the Petition Date; (d) entry of an order by the Court confirming an Acceptable Plan of Reorganization to occur not later than thirty-five days after the Petition Date; and (e) occurrence of the Plan Effective Date to occur not later than April 13, 2020.

uninterrupted operation of the Debtors' business, the maintenance of ordinary course relationships with vendors and customers, the satisfaction of working capital needs in the ordinary course, and the consummation of the reorganization as contemplated by the Restructuring Support Agreement. *Id.* at ¶ 27.

## IV.    MATERIAL TERMS OF THE DIP FACILITY[9]

29.    The following chart contains a summary of (a) the material terms of the proposed DIP Facility and (b) use of the Prepetition Secured Parties' Cash Collateral, each with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | VIP Cinema Holdings, Inc., as a debtor and debtor in possession. | Preamble to Interim Order<br>Introductory Statement to DIP Credit Agreement |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | (i) Holdings and (ii) all direct and indirect domestic subsidiaries of Holdings (other than the Borrower), each as debtors and debtors in possession. | Preamble to Interim Order<br>Introductory Statement to DIP Credit Agreement |
| **Administrative Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB, a federal savings bank, as administrative agent and collateral agent. | Preamble to Interim Order<br>Introductory Statement to DIP Credit Agreement |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | (i) consenting Prepetition First Lien Lenders that agree to provide the DIP Facility on the terms set forth herein (in such capacities as DIP 1L Lenders); and | Preamble to Interim Order |

---

[9]    The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the relevant DIP Facility Documents and/or the Interim Order, as applicable.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Facility Documents or the Interim Order, the provisions of the Interim Order or the DIP Facility Documents, as applicable, shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Facility Documents and/or the Interim Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein.

|  | (ii) the consenting Prepetition Second Lien Lender having to provide the DIP Facility on the terms set forth herein (in such capacities as DIP 2L Lenders). |  |
|---|---|---|
| **Backstop Parties** | Those members of the ad hoc group of Prepetition First Lien Lenders represented by Davis Polk & Wardwell LLP that have agreed to backstop the DIP Facility pursuant to the terms of the Restructuring Support Agreement (the "<u>Backstop Parties</u>"). | DIP Credit Agreement § 1.01 |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Senior secured superpriority debtor in possession facility in an aggregate principal amount of up to $33 million consisting of (A) $13 million in principal amount of DIP New Money Commitments, $10 million of which is available upon entry of the Interim Order, and (B) a roll-up of $20 million in principal amount of the Prepetition First Lien Loans. | Preamble to Interim Order<br>DIP Credit Agreement § 2.02 |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt**<br>Local Rule 4001-2(a)(i)(E) | Upon entry of the Final Order, an amount of Prepetition First Lien Loans will be automatically substituted and exchanged for (and prepaid by) DIP Loans in an aggregate principal amount of $20 million allocated among the DIP 1L Lenders based on their pro rata share of DIP New Money 1L Commitments on the Closing Date.<br>The Roll-Up Loans shall be junior in right of payment and security to the New Money DIP Loans. | DIP Credit Agreement § 2.01 |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The date (such date, the "<u>Initial Maturity Date</u>") falling 90 days after the Petition Date; *provided* that the Borrower, with the consent of the Required DIP Lenders,[10] shall have the right to extend the Initial Maturity Date for a period of up to 60 days (the "<u>Extended Maturity Date</u>") subject to the following conditions: (i) the Debtors shall have provided the DIP Facility Agent (for distribution to the DIP Lenders) with not less than 5 business days' prior written notice of such extension, (ii) the Debtors shall have filed an Acceptable Plan of Reorganization, (iii) the Borrower shall pay to the DIP Facility Agent, for the account of the DIP Lenders, an extension premium in an amount equal to 0.50% of the DIP Loans then outstanding (the "<u>Extension Premium</u>") and (iv) no default or event of default under the DIP Facility Documents shall have occurred and be continuing. | DIP Credit Agreement § 2.11(a) |

---

[10]    "<u>Required DIP Lenders</u>" shall mean the approval of DIP Lenders holding more than 50% of the sum of all outstanding DIP Loans and unused DIP New Money Commitments at such time; provided that the DIP Loans and unused DIP New Money Commitments held or deemed held by any Defaulting Lender (as defined in the DIP Credit Agreement) shall be excluded for purposes of making a determination of Required DIP Lenders.

| | | |
|---|---|---|
| **Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(6)-(a)(7) | Solely in accordance with the DIP Orders and the Approved Budget[11] (subject to any permitted variances), the proceeds of the DIP Loans will be used (i) to pay certain costs, fees and expenses related to the Chapter 11 Cases, (ii) to fund the Carve-Out from and after the delivery of the Carve-Out Trigger Notice[12] to make payments under the Carve-Out in accordance with the terms of the DIP Orders and (iii) to fund the working capital needs and expenditures of the Debtors during the Chapter 11 Cases, including to roll up the Prepetition First Lien Loans as provided in the "Roll-Up Loans" section above. | DIP Credit Agreement § 6.16<br>Interim Order ¶ 9(a) |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | LIBOR plus 6.00% per annum (or if applicable, ABR plus 5.00% per annum).<br>Upon the occurrence and during the continuation of an event of default, at the election of the Required DIP Lenders (or automatically upon the acceleration of the DIP Loans), all obligations will bear interest at (i) in the case of principal and interest, a rate equal to 2.00% per annum, plus the otherwise applicable rate to the relevant DIP Loans and (ii) in the case of all other amounts, at a rate equal to 2.00% per annum plus the rate applicable to DIP Loans that are ABR loans. | DIP Credit Agreement § 2.06, 2.07 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | (a) *Delayed Draw Commitment Fee*: Each DIP Lender will receive a fee in an amount equal to 0.50% of the average daily unused amount of the Delayed Draw Commitment of such DIP Lender from and including the Closing Date to but excluding the Delayed Draw Commitment Termination Date. The accrued Delayed Draw Commitment Fee shall be payable on the Delayed Draw Borrowing Date.<br>(b) *Administrative Agent Fee*: The Administrative Agent Fee set forth in **Exhibit D** hereto.<br>(c) *DIP 1L Lender Backstop Party Fee*: Each Backstop Party will receive its pro rata share of a backstop party commitment fee equal to 10.00% of the aggregate principal amount of the DIP New Money 1L Commitments on the Closing Date, which shall be payable in cash on the Closing Date by netting a corresponding amount from the amount funded by the DIP Lenders on the Closing Date.<br>(d) *DIP 1L Lender Commitment Premium*: Each DIP 1L Lender will receive its pro rata share of 13% of the common equity of the Reorganized | DIP Credit Agreement § 2.05<br>WSFS Agent Fee Letter |

---

[11]   "Approved Budget" shall mean the approval or deemed approval by the Required DIP Lenders of the Initial DIP Budget (attached hereto as Exhibit C) and each DIP Budget delivered thereafter.

[12]   "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Facility Agent describing the event of default that has occurred and is continuing to occur under the applicable DIP Facility Documents.

Borrower; *provided* that if the Termination Date[13] occurs other than as a result of the Plan Effective Date, the DIP 1L Lenders shall be paid by the Borrower, in lieu of such common equity, in cash on such Termination Date in an amount equal to 5.0% of the each DIP 1L Lenders' committed financing amount.

(e) *DIP 2L Lenders Backstop Fee*: The DIP 2L Lenders will receive, on account of its commitment to fund the DIP 2L Loans, its pro rata share of a fee equal to 5.00% of the aggregate principal amount of the DIP New Money 2L Commitments on the Closing Date, which shall be payable in cash on the Closing Date by netting a corresponding amount from the amount funded by the DIP Lenders on the Closing Date.

(f) *DIP 2L Lender Termination Payment*: If the Termination Date does not occur as a result of the Plan Effective Date occurring, the DIP 2L Lenders will receive on the Termination Date a cash fee in an amount equal to 5.00% of its DIP New Money 2L Commitments (as in effect on the Closing Date).

(g) *Upfront Payment*: The New Money DIP Loans shall be issued at 97.00% of par value, which shall constitute an original issue discount and shall be netted from the amount funded by the DIP Lenders on the Closing Date.

(h) *Extension Premium.* The Borrower agrees to pay to the DIP Facility Agent for the account of each DIP Lender, on the Extension Date, the Extension Premium, if applicable.

(i) *Payment of Fees and Payments.* Payment of the reasonable and documented prepetition and postpetition fees and expenses of the Prepetition Second Lien Agent and the lenders under the Prepetition Second Lien Credit Agreement in accordance with (and subject to limitations set forth in) the Restructuring Support Agreement.

---

[13]  "Termination Date" shall mean the earliest of (a) the Maturity Date (b) the date (i) of acceleration of the DIP Obligations and the termination of the unfunded DIP New Money Commitments in accordance with the terms of the DIP Credit Agreement upon and during the continuance of an Event of Default or (ii) on which a payment in full occurs prior to the Maturity Date (including in connection with a refinancing of the Prepetition First Lien Loans and DIP New Money Commitments), (c) the date of substantial consummation of an Acceptable Plan of Reorganization (as defined in the DIP Credit Agreement) for the Debtors or the date of substantial consummation of any other Reorganized Plan (as defined in the DIP Credit Agreement), (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (e) the date that is thirty-five (35) days after the Petition Date (or such later date as may be agreed by the Required DIP Lenders), unless the Final Order has been entered by the Court on or prior to such date and (f) the date on which there occurs a Material Adverse Effect under clause (a) of the definition under the DIP Credit Agreement.

| | | |
|---|---|---|
| **Repayment Features**<br>Local Rule<br>4001- 2(a)(i)(E) | *Mandatory Prepayments*: Unless otherwise waived by the Required DIP Lenders, mandatory prepayments under the DIP Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness or equity (with exceptions for permitted indebtedness and equity issuances to the Borrower or any subsidiary that is a loan party), (b) sales or other dispositions (including casualty events) of any assets (excluding sales of inventory in the ordinary course of business and other customary exceptions to the mutually agreed) in excess of $150,000 in the aggregate and (c) extraordinary receipts in excess of $150,000 in the aggregate.<br>*Voluntary Prepayments*: Amounts outstanding under the DIP Facility may be voluntarily prepaid at any time without premium or penalty, except as provided under the heading "Fees." | DIP Credit Agreement § 2.12, 2.13 |
| **Priority Under the DIP Facility**<br>Bankruptcy Rule<br>4001(c)(1)(B)(i),<br>4001(c)(1)(B)(ii) | All DIP Obligations, subject to the Carve-Out at all times, will:<br>(a) be entitled to superpriority administrative expense status;<br>(b) be secured by a fully perfected first priority security interest and lien on the DIP Collateral that is not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date or (y) valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code;<br>(c) except as otherwise provided in clause (d) below with respect to the existing liens of the Prepetition Secured Parties with respect to the DIP Collateral of each Loan Party, be secured by a junior perfected security interest and lien on the DIP Collateral to the extent such DIP Collateral is subject to (A) valid, perfected and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Documents and (B) valid and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Documents that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((A) and (B) together, the "Prepetition Permitted Prior Liens"); and<br>(d) be secured by a perfected priming security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the | Interim Order ¶ 11, 12(a)(i)-(iv), |

| | obligations under the Prepetition Credit Documents. | |
|---|---|---|
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Interim Order provides a "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code, appointed in these Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code, including a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Order. | Interim Order ¶ 10 |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | **Prepetition First Lien Lenders**:<br>(a) payment of the reasonable and documented prepetition and postpetition fees and expenses of the Prepetition First Lien Agent and the ad hoc group of lenders under the Prepetition First Lien Credit Agreement, including the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP, as primary counsel, one local counsel, and M-III Partners, LP, as financial advisor, and Wilmer Cutler Pickering Hale and Dorr LLP, as counsel to the Prepetition First Lien Agent;<br>(b) replacement liens on the DIP Collateral to secure the First Lien Secured Party Adequate Protection Claims (as defined below) (the "<u>First Lien Secured Party Adequate Protection Liens</u>"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Prepetition Permitted Prior Liens and (iii) the DIP Liens securing the DIP Facility;<br>(c) allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code;<br>(d) financial reporting and other reports and notices delivered by the Borrower under the DIP Facility; and<br>(e) the Milestones.<br><br>**Prepetition Second Lien Lenders**:<br>(a) replacement liens on the DIP Collateral to secure the Prepetition Second Lien Secured Parties' Adequate Protection Claims (as defined below) (the "<u>Second Lien Secured Party Adequate Protection Liens</u>" and together with the First Lien Secured Party Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Prepetition Permitted Prior Liens, (iii) the DIP Liens securing the DIP Facility, (iv) First Lien Secured Party Adequate Protection Liens and (v) the liens of the Prepetition First Lien Agent on the Prepetition Collateral; | *See generally* DIP Credit Agreement Interim Order ¶ 18 |

| | | |
|---|---|---|
| | (b) allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "Prepetition Second Lien Secured Parties' Adequate Protection Claims"); and<br><br>(c) financial reporting and other reports and notices delivered by the Borrower under the DIP Facility. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | (a) entry of the Interim Order to occur not later than five days after the Petition Date;<br><br>(b) entry of the Final Order to occur not later than thirty-five days after the Petition Date;<br><br>(c) entry of an order by the Court approving the Disclosure Statement (as defined in the Restructuring Support Agreement) to occur not later than thirty-five days after the Petition Date;<br><br>(d) entry of an order by the Court confirming an Acceptable Plan of Reorganization to occur not later than thirty-five days after the Petition Date; and<br><br>(e) occurrence of the Plan Effective Date to occur not later than April 13, 2020. | DIP Credit Agreement § 6.19 |
| **Information/Reporting Covenants**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Facility includes standard and customary covenants that require the Borrower to provide periodic reports to the DIP Lenders regarding the Approved Budget, the status of the Chapter 11 Cases, and certain other matters.  The failure of the Borrower to comply with such reporting obligations will cause an Event of Default (as defined in the DIP Credit Agreement and subject to any applicable cure periods, if any) that may permit the DIP Facility Agent, on behalf of the DIP Lenders, to exercise remedies against the Borrower. | DIP Credit Agreement § 6.01, 6.02, 6.03 Interim Order ¶ 18(d) |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Usual and customary for debtor in possession financings of this type, including (without limitation), events of default related to dismissal or conversion of the Chapter 11 Cases, amending or vacating the DIP Orders, the automatic stay, milestones, the termination of the Restructuring Support Agreement and other bankruptcy-related events of default, as defined in the DIP Credit Agreement. | DIP Credit Agreement § 8.01 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Usual and customary for debtor in possession financings of this type, including (without limitation): (i) no default or event of default, (ii) accuracy of representations and warranties in all material respects, (iii) the Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Lenders, (iv) delivery of a customary notice of borrowing, and (v) the Restructuring Support Agreement shall be in full force and effect. | DIP Credit Agreement § 4.01 |

| | | |
|---|---|---|
| **Indemnification**<br>Bankruptcy Rule<br>4001(c)(1)(B)(ix) | Usual and customary for debtor in possession financings of this type. | DIP Credit Agreement § 9.09 |
| **Budget**<br>Bankruptcy Rule<br>4001(c)(1)(B)<br>Local Rule<br>4001-2(a)(ii) | *Budget*: On or prior to the Petition Date and every four weeks thereafter, the Debtors will deliver to the DIP Facility Agent all budget updates, budget-variance reports, and similar budget-related reporting requirements, as further specified in the DIP Credit Agreement. | DIP Credit Agreement § 6.02(i)<br>Interim Order ¶ 8(h) |
| **Variance Covenant**<br>Bankruptcy Rule<br>4001(c)(1)(B)<br>Local Rule<br>4001-2(a)(ii) | (a)   the negative variance (as compared to the applicable Approved Budget (as defined in the DIP Credit Agreement)) of the aggregate cash receipts of the Debtors shall not exceed (x) 20% for the first Budget Variance Test Date (as defined in the DIP Credit Agreement) following the Petition Date, (y) 20% for the second Budget Variance Test Date following the Petition Date and (z) 15% for each Budget Variance Test Date thereafter; and<br><br>(b) the positive variance (as compared to the applicable Approved Budget) of the operating disbursements made by the Debtors shall not exceed (x) 20% for the first Budget Variance Test Date following the Petition Date, (y) 20% for the second Budget Variance Test Date following the Petition Date and (z) 15% for each Budget Variance Test Date thereafter. | DIP Credit Agreement § 7.11 |
| **Entities with Interest in Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(l)(B)(i) | DIP Facility Agent on behalf of the DIP Lenders. | DIP Security Agreement § 3.01(a)(xiv)<br>Interim Order ¶ 7(k) |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule<br>4001(c)(1)(b) | Subject to the Carve-Out and the DIP Credit Agreement, and only upon entry of the Final Order, fully perfected first priority security interests and liens on the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 and 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law. | DIP Security Agreement § 3.01(a)(xviii)<br>Interim Order ¶ 11, 12 |
| **Challenge Period**<br>Bankruptcy Rule<br>4001(c)(1)(B),<br>4001(c)(1)(B)(viii) | (a)  *Challenge Period:* (a) (i) the Creditors' Committee (if any) within 60 calendar days after entry of the Final Order and (ii) if no Creditors' Committee has been appointed, by any party in interest with requisite standing within 75 calendar days after entry of the Final Order or (b) any such later date as has been agreed to, in writing, by each of the Prepetition First and Second Lien Agents. | Interim Order ¶ 27<br>DIP Credit Agreement§ 8.01(u). |

| | | |
|---|---|---|
| | (b) *Event of Default:* Event of default if any Loan Party challenges, supports or encourages a challenge of any payments made to the DIP Facility Agent or any DIP Lender with respect to the DIP Obligations or the Prepetition First Lien Agent or any Prepetition First Lien Lender with respect to the obligations under the Prepetition First Lien Credit Agreement and related loan documents, other than to challenge the occurrence of a default or event of default. | |
| **Waivers/Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Immediately upon the occurrence and during the continuation of an Event of Default, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lenders to enforce all of their rights under the applicable DIP Facility Documents, including declaring: <br><br> (a) the termination, reduction or restriction of any further DIP Commitment (as defined in the Interim Order) to the extent any such DIP Commitment remains; <br><br> (b) all DIP Obligations to be immediately due, owing and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Credit Parties, notwithstanding anything herein or in any DIP Document to the contrary; and <br><br> (c) the termination of the applicable DIP Documents as to any future liability or obligation of the DIP Facility Agent and the applicable DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations). | Interim Order ¶ 13(d) |
| **Section 506(c), 552(b) "Equities of the Case," and Marshalling Waivers** Bankruptcy Rule 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(C) | *506(c) Waiver:* No costs or expenses of administration of the Chapter 11 Cases shall be charged against or recovered from the collateral pursuant to section 506(c) of the Bankruptcy Code. <br><br> *552(b) Waiver:* Subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties. <br><br> *No Marshaling Waiver:* In no event shall the DIP Facility Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or the DIP Collateral while this Interim Order shall be in effect but without prejudice to any provisions of a Final Order. | Interim Order ¶ 15 Interim Order ¶ 13(f) |

**BASIS FOR RELIEF REQUESTED**

I.      **ENTRY INTO THE DIP FACILITY DOCUMENTS IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGEMENT**

30.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Facility Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

31.      To determine whether the business judgment test is met, the court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).  Bankruptcy courts generally will not second-

27

guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513-514 (Bankr. D. Utah. Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

32.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Facility Documents, the Court should consider the economic terms of the DIP Financing under the totality of circumstances. *See In re Farmland Indus., Inc.* 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered under the proposed postpetition facility. *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . . Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. . . .").

33.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment. As further discussed in the Sprung Declaration, the DIP Facility was market tested and was a product of an arm's length negotiation and a careful evaluation of alternatives.

*See* Sprung Declaration ¶ 13, 23.  Keeping in mind the immediate need for postpetition financing to support their operation and chapter 11 activities, the Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that: (a) the DIP Facility allows the Debtors to avoid a value-destructive priming fight; (b) third-party lenders were unwilling to provide viable unsecured junior financing due to the amount of existing secured debt relative to the Debtors' financial position; (c) many third-party lenders were unwilling to engage with the Debtors due to the small size of the DIP Facility; and (d) the DIP Facility provides a path to emerge from chapter 11 by allowing the Debtors to implement the Restructuring as contemplated by the Restructuring Support Agreement and the Plan.  Ultimately, the Debtors and their advisors determined that the DIP Financing was the most advantageous under the totality of circumstances.  In light of the above, the Debtors believe they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Facility Documents as a reasonable exercise of their business judgment.

## II.    DEBTORS SHOULD BE AUTHORIZED TO GRANT LIENS AND SUPERPRIORITY CLAIMS

34.    The Debtors propose to obtain debtor in possession financing by providing security interests and liens as set forth in the DIP Facility Documents and described above.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.    Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien [.]

11 U.S.C. § 364(c).

35.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable

efforts to satisfy standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected most favorable of two offers it received).

36.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re L.A. Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *see also In re St. Mary Hosp.*, 86 B.R. 393,  401-02 (Bankr. E.D. Pa. 1988).   Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

37.    As described above, the Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates.  *See* Spitzer Decl. ¶ 8.  Due to the Debtors' high level of existing secured debt obligations and relatively small size of the potential debtor in possession financing, none of the third-party sources contacted by UBS during the marketing process were willing or interested in providing financing to the

Debtors on an unsecured basis. *See* Sprung Decl. ¶ 14. The only available avenue for obtaining workable financing was with the Debtors' existing lenders. Given the Debtors' circumstances, the Debtors believe the DIP Facility is fair, reasonable and adequate.

38.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties support the priming or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

39.     Here, the priming is consensual. As described above and in the Sprung Declaration, the Prepetition Secured Parties support the priming of their prepetition liens in connection with the Restructuring. Further, the Debtors are not aware of any financing being available on equal or better terms from the DIP Lenders, without granting first priority liens in the Prepetition Collateral. Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### III.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

40.    Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.  Here, the DIP Lenders and the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral.

41.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

42.    The Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the diminution in value of their collateral, including as a result of the use of Cash Collateral by the Debtors and the imposition of the automatic stay

(collectively, the "Adequate Protection Obligations"), including (and subject in all respects to the Carve-Out) to the extent of any diminution in value of their collateral:

(a) payment of the reasonable and documented prepetition and postpetition professional fees and expenses of the Prepetition First Lien Lenders;[14]

(b) allowed, superpriority administrative claims under sections 503(b) and 507(b) of the Bankruptcy Code (subject to the Carve-Out and the priorities set out in the Interim Order);

(c) the Adequate Protection Liens (subject to the Carve-Out and the priorities set out in the Interim Order);

(d) financial reporting and other reports and notices delivered by the Debtors to the DIP Facility Agent, for the benefit of itself and the DIP Secured Parties; and

(e) with respect to the Prepetition First Lien Lenders, compliance with the Milestones.

43.    The Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential diminution in value of their collateral, including the Cash Collateral.  In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.   Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of the Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

---

[14] The Debtors have additionally agreed to provide the Prepetition Second Lien Lenders with payment of reasonable and documented fees and expenses, subject to a cap, as further set forth in the Restructuring Support Agreement, in connection with the DIP Facilities and as part of the global Restructuring.

## IV.   THE DEBTORS' PROPOSED REPAYMENT OF PREPETITION INDEBTEDNESS SHOULD BE APPROVED

44.   As set forth above, the DIP Credit Agreement provides that upon entry of the Final Order only, an aggregate principal amount of $20 million in Prepetition First Lien Loans will be automatically rolled-up into DIP Loans.  The roll-up is a material component of the structure of the DIP Facility and was a condition precedent to the DIP Lenders' commitment to provide the DIP Facility.   The Debtors were unable to obtain an offer for debtor in possession financing on similar terms that did not provide for the roll-up of the Prepetition First Lien Loans.

45.   The proposed roll-up is also an exercise of the Debtors' sound business judgment. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  The Debtors have determined that the refinancing of these prepetition claims as part of the DIP Facility is necessary to obtain access to the liquidity needed to preserve the value of their business for the benefit of the Debtors' estates. Importantly, because the Debtors are requesting the approval of the roll-up only on a *final* basis, it remains subject to review by parties in interest with requisite standing.  Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to enter into the DIP Facility, including the roll-up of the Prepetition First Lien Loans.

46.   Courts in the Third Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going concern value.  *See, e.g., In re Just For Feet, Inc.,* 242 B.R. 821, 824–25 (D. Del. 1999) (noting that Bankruptcy Code permits courts to "authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor") (citing cases).  Repayment of prepetition debt is a common feature in debtor in possession financing arrangements, particularly when done pursuant to final order only.  Courts in this and other

jurisdictions have approved similar features in other cases.  *See e.g., In re The Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing $725 million DIP facility with a $486 million roll up and payment of the remaining $25 million with cash from proceeds); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Oct. 6, 2015) (authorizing a DIP facility consisting of a $60 million roll up and a $30 million new money loan); *In re Gastar Exploration, Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) (authorizing approximately $383 million DIP that included repayment of approximately $283 million of prepetition debt); *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (authorizing approximately $50 million DIP that included refinancing of $32 million in prepetition debt).[15]

47.    The DIP Lenders' willingness to provide the DIP Facility was expressly conditioned upon the roll-up.  Absent the DIP Facility, the Debtors' operations would be materially at risk to the detriment of all parties in interest.  Further, the Prepetition Secured Parties representing a significant percentage of Debtors' capital structure have consented to the terms of the DIP Facility, including the roll-up.  Thus, the roll-up is reasonable, appropriate and a sound exercise of business judgment.

## V.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES DUE UNDER THE DIP FACILITY DOCUMENTS

48.    As described herein, the Debtors have agreed, subject to Court approval, to pay certain fees (including the commitment fee, backstop fee, and unused line fee) to the DIP Lenders in exchange for their providing, agenting, arranging, and/or backstopping the DIP Facility.  As set forth in the Sprung Declaration, the terms of the DIP Facility Documents, including the fees

---

[15]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

imposed thereunder, constitute the best terms on which the Debtors could obtain the postpetition

financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases

and are an integral component of the overall terms of the DIP Facility.  *See* Sprung Decl. ¶ 20.

Moreover, the fees are customary and usual and in line with debtor in possession financings of this

kind.  The Debtors considered the fees when determining in their sound business judgment

whether the DIP Facility constituted the best terms on which the Debtors could obtain sufficient

debtor in possession financing.  The Debtors believe paying these fees in order to obtain the DIP

Financing is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize

the Debtors to pay the fees.

### VI.    THE DIP LENDERS SHOULD BE DEEMED GOOD FAITH LENDERS

49.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

50.    Here, the Debtors believe the DIP Facility Documents embodies the most favorable

terms on which the Debtors could obtain postpetition financing.  As described in the Sprung

Declaration, all negotiations of the DIP Facility with potential lenders were conducted in good faith

and at arms' length.    *See* Sprung Decl. ¶ 22.  The terms and conditions of the DIP Facility

Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the DIP Orders and the DIP Facility Documents.  Further, no consideration is being provided to any party to the DIP Facility Documents other than as described herein and in the Sprung Declaration. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

### VII.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

51.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things: (a) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and Prepetition Secured Parties, as applicable, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default, subject to any applicable notice periods set forth in the DIP Orders and DIP Credit Agreement, for the Prepetition Secured Parties to exercise any remedies available to them; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Facility Documents.

52.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.  *See, e.g.*, *In re Blackhawk Mining LLC,* No. 19-11595 (LSS); (Bankr. D. Del. July 22, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (modifying

automatic stay as necessary to effectuate the terms of the order); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default).

### BANRUPTCY RULE 4001 SHOULD BE WAIVED

53.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides: "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Facility is essential to prevent irreparable damage to the Debtors' estates.  Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such applies.

54.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

55.     As described herein and in the Spitzer Declaration, the Debtors risk a significant disruption in business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Facility.  The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important customer relationships, meet payroll, and satisfy working capital and operational needs,  all of

which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.  The Debtors cannot maintain the value of their estates during the pendency of the Chapter 11 Cases without access to cash, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest if they are unable to access such cash. *See* Spitzer Decl. ¶ 10.  In short, the Debtors' ability to administer the Chapter 11 Cases through the DIP Financing and use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates, and will enable the Debtors to avoid immediate and irreparable harm.

### REQUEST FOR A FINAL HEARING

56.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the Final Hearing that is as soon as practicable, and in no event more than 35 days after the Petition Date in accordance with the Milestones, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### BANRUPTCY RULE 6004

57.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14 day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14 day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## NOTICE

58.        Notice of this Motion has been provided to the following parties or their respective counsel: (a) the United States Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the agent under the Prepetition First Lien Credit Agreement; (d) counsel to the ad hoc group of certain holders of indebtedness arising under the Prepetition First Lien Credit Agreement; (e) counsel to certain lenders under that certain Prepetition Second Lien Credit Agreement; (f) counsel to the agent under the Prepetition Second Lien Credit Agreement; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the attorneys general for the states in which the Debtors operate; (j) the Cash Management Banks (as defined in *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing the Debtors to (i) Continue to Operate Their Cash Management System, (ii) Maintain Existing Business Forms and Books and Records, and (iii) Perform Intercompany Transactions and Granting Administrative Expense Status to Intercompany Payments and (b) Granting Related Relief*); and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the date hereof.  As this Motion is seeking "first day" relief, within two business days following the hearing on this Motion, copies of this Motion and any order entered in respect to this Motion will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and the Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: February 18, 2020
Wilmington, Delaware

**BAYARD, P.A.**

*/s/ Erin R. Fay*
Erin R. Fay (No. 5268)
Daniel N. Brogan (No. 5723)
Gregory J. Flasser (No. 6154)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:  efay@bayardlaw.com
            dbrogan@bayardlaw.com
            gflasser@bayardlaw.com

- and -

Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (*pro hac vice* pending)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail:  gregg.galardi@ropesgray.com
            cristine.schwarzman@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*