**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VIP CINEMA HOLDINGS, INC., *et al.*,[1] | ) Case No. 20-10345 (MFW) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF STEPHEN SPITZER,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTORS,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Stephen Spitzer, hereby declare under penalty of perjury:

1.      I am a Managing Director at AlixPartners LLP ("AlixPartners"),[2] an affiliate of AP Services, LLP.    AlixPartners was retained by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in December of 2019, and intends to file an application with this Court seeking retention as the Debtors' restructuring advisor in the above-captioned chapter 11 cases (the "Chapter 11 Cases").    I have been the primary person overseeing AlixPartners' engagement with respect to the Debtors' restructuring efforts.    I was appointed as the Chief Restructuring Officer of the Debtors on January 29, 2020.

2.      I received my B.A. in economics from the University of Pennsylvania.    I have more than 20 years of corporate finance, advisory and restructuring experience.    Since joining AlixPartners, I have provided restructuring advice to companies, creditors, shareholders, and other

---

[1]    The Debtors in these Chapter 11 Cases, for which joint administration has been requested, along with the last four digits of their federal tax identification numbers, are as follows:  VIP Cinema Holdings, Inc. (2049); HIG Cinema Intermediate Holdings, Inc. (4710); VIP Components, LLC (4648); VIP Cinema, LLC (7167); and VIP Property Management II, LLC (1421).

[2]    Capitalized terms used but not immediately defined have the meanings ascribed to them elsewhere in this Declaration or the *Joint Prepackaged Plan of Reorganization for VIP Cinema Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

interested parties on restructuring transactions both in the context of a chapter 11 and on an out-of-court basis.

3.      Based on my work as the Chief Restructuring Officer and my oversight of the work that AlixPartners has performed thus far, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs.  I submit this declaration (this "<u>Declaration</u>") in connection with: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") filed on the date hereof (the "<u>Petition Date</u>") and (b) the relief requested by the Debtors pursuant to the pleadings described herein (collectively, the "<u>First Day Motions</u>").

4.      Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon (a) my personal knowledge or opinion, (b) information obtained from members of the Debtors' management team, employees or advisors, boards of directors, or employees of AlixPartners working directly with me or under my supervision, direction, or control, (c) the Debtors' books and records maintained in the ordinary course of their business, or (d) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.

5.      I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

## PRELIMINARY STATEMENT

6.      The Debtors (together with VIP Cinema Seating International, LTD and HIG Cinema Holdings, Inc., the "<u>Company</u>" or "<u>VIP</u>") comprise a multinational enterprise that is one of the largest manufacturers, and a pioneer, of luxury seating products for movie theaters.  Since the end of 2017, however, VIP's revenues have significantly declined as the "penetration"

opportunity for premium recliners started to plateau and movie exhibitors, particularly the larger ones that comprised a major portion of the Company's revenue, slowed down their renovation activities and construction of new locations. Other factors driving the Company's recent revenue decline include increased competition in the luxury movie-theatre seating market, which has put a pressure on price, reduced capital investment spending by the Company's major customers, due to overall poor stock price performance and investor push-back on debt load, and a longer lifecycle for the Company's products than expected, prevented the Company from being able to "fill" the headwinds from declines in new, first-time conversions.

7.       As a result, in August 2019, VIP was unable to meet the maximum total leverage ratio (the "Maximum Total Leverage Ratio") required by the Existing First Lien Credit Agreement (defined below), triggering an event of default (the "Leverage Ratio Event of Default") under the Existing First Lien Credit Agreement. To facilitate restructuring negotiations, on August 20, 2019, the lenders under the Existing First Lien Credit Agreement (the "First Lien Lenders") entered into a forbearance agreement, restricting them from exercising their rights and remedies under the Existing First Lien Credit Agreement (the "Forbearance Agreement"). As negotiations continued, the Forbearance Agreement was subsequently amended several times to lengthen the forbearance period, which currently expires on February 15, 2020.

8.       The Forbearance Agreement provided the Company with the runway to drive consensus towards a comprehensive restructuring transaction. In November 2019, the Debtors and their key stakeholders (the "Stakeholders")—the First Lien Lenders, Second Lien Lender (defined below), and H.I.G. Capital, LLC and H.I.G. Middle Market LBO Fund II, L.P. (together, the "Investor")—had agreed to terms on an out-of-court restructuring transaction (the "Out-of-Court Transaction"). Ultimately, however, due to further reductions in seating orders from a key

customer (discussed further herein), the cash flow generated by the Company was no longer sufficient to support the proposed capital structure on which the Out-of-Court Transaction was based, and the parties abandoned the Out-of-Court Transaction and commenced discussions regarding an in-court restructuring transaction.

9.      After abandoning the Out-of-Court Transaction, the Company continued proactively exploring their options, considering all available strategic alternatives to improve the Debtors' liquidity position and recapitalize their balance sheets.  Given the reduced cash flow of the Company, however, the Debtors' options were limited.  Discussions with the Company's Stakeholders ultimately resulted in the form of the transaction embodied in the restructuring support agreement (attached as **Exhibit A** thereto, the "Restructuring Support Agreement") and the term sheets annexed thereto.

10.     The Restructuring Support Agreement, which was signed by a steering committee of First Lien Lenders representing over 66.6% of the First Lien Facility, the Second Lien Lenders, and the Investor, forms the basis for a consensual chapter 11 prepackaged plan of reorganization (the "Plan").  The restructuring, as detailed in the Restructuring Support Agreement and the Plan, will eliminate approximately $178 million of long-term indebtedness, provide access to $20 million in fresh capital to support the chapter 11 restructuring and go-forward operations, and maintain the Company as a going concern, preserving approximately 373 jobs globally.

11.     Other highlights of the contemplated prepackaged restructuring include:

- The Debtors obtaining a new senior secured superpriority debtor in possession term loan financing facility (the "DIP Facility") in an aggregate principal amount of $33 million, which certain First Lien Lenders (the "Participating First Lien Lenders") have agreed to backstop, consisting of:
  a) $13 million in principal amount of new money term loans provided by (i) the Participating First Lien Lenders in a principal amount of $11 million  (the "DIP New Money 1L Loans") and (ii) the Second Lien Lender in a principal amount of $2 million (the "DIP New Money 2L Loans"); and

b)  $20 million in principal amount of loans under the Existing First Lien Credit Agreement held by each Participating First Lien Lender that roll-up into loans under the DIP Facility (the "Roll-Up Loans"), which Roll-Up Loans shall be junior in right of security and payment to the New Money DIP Loans.

- The Reorganized Debtors obtaining exit financing consisting of:

a)  a senior secured first lien term loan facility (the "First Lien Exit Facility") in an aggregate principal amount of up to $11 million comprised of DIP New Money 1L Loans converted into loans under the First Lien Exit Facility on a dollar-for-dollar basis;

b)  a second lien exit term loan facility comprised of converted Roll-Up Loans;

c)  $2 million of DIP New Money 2L Loans that shall convert into preferred equity and common equity; and

d)  the Investor or some affiliate thereof making a $7 million new money investment in the Reorganized Debtors on the Effective Date and providing management services for a period of four (4) years following the Effective Date for no fee.

- A CEO incentive plan comprised of 1% of Common Equity, and a management incentive plan comprised of (i) 8% of the Common Equity which vests on time-basis and (ii) 15% of performance vested equity subject to certain MOIC targets, on a fully-diluted basis to ensure a seamless transition out of chapter 11.

After the restructuring and recapitalization, VIP will be well-equipped to succeed in the competitive consumer landscape.

12.    To assist the Court and parties-in-interest in understanding the Debtors, their business, the circumstances leading to these Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Motions, I have organized the balance of this Declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to these Chapter 11 Cases;

- **Part IV** describes the Debtors' proposed debtor in possession financing, marketing process, and chapter 11 plan; and

- **Part V** and **Exhibit B** set forth the evidentiary basis for the relief requested in each of the First Day Motions.

\* \* \*

## I.   GENERAL BACKGROUND.

### A.   VIP's Corporate History.[3]

13.     Steve Simons started VIP in 2008 as a residential furniture manufacturer based in New Albany, Mississippi.  Due to the rapid proliferation of alternative movie and viewing experiences, including the development of online streaming services, domestic movie-theatre companies began to experience declines in attendance and started looking for ways to increase revenue and profitability.  VIP recognized this dynamic, and was amongst the first in the U.S. to introduce and sell to exhibitors a premium, reclining movie theatre chair, to replace and upgrade existing low-profile, metal chairs.

14.     Capitalizing on the production under capacity in the market, VIP began ramping up production and created a "first-mover advantage" by working closely with and becoming a key supplier to AMC Theatres ("AMC").  AMC experienced significant returns on investment for their renovated auditoriums, driven by increases in (1) attendance, (2) ticket prices, and (3) concession up-take rates.  Other exhibitors noticed AMC's success with this strategy, including their positive customer feedback, and they began to develop plans to update their auditoriums as well.  Demand for premium recliners increased significantly and VIP quickly expanded and started providing luxury seating to some of the other large movie theatre companies—including Cinemark USA, Inc., Marcus Theatres, and Cineplex Inc.—initially throughout North America and later in Europe. Today, VIP is the largest manufacturer of luxury movie-theatre seating in the U.S. with approximately 70% of the domestic market share.

15.     In March of 2017, in a testament to the growing strength of the VIP brand, the Investor made a $62.5 million investment in VIP.  In connection with that investment, VIP's

---

[3] The Debtors' organizational chart is attached hereto as **Exhibit C**.

executive management team was restructured to better align business units, improve accountability, and drive profitable growth.  The Company continued to grow rapidly throughout 2017 and recorded its highest amount of sales ever in that year.

        **B.**       **VIP's Business Operations.**

      16.     VIP's business focuses on the manufacturing and sale of luxury seating products to movie theatre exhibitors, which comprised ~92% of sales in 2019.  In connection with such sales, VIP offers a growing host of services for its clients, including seat and replacement-part manufacturing, seat installation, seat repair, seat and replacement-part shipping, and the provision of "slip-covers," cleaning solutions, and other maintenance services.

      17.     ***Seating Sales***.  Having sold approximately 1 million luxury seating products to customers, the Company is a leading player across the globe and has been the clear market leader in the U.S.  The Company's seats drive significant value for its customers, as they provide a premium viewing experience that attracts new patrons, thereby increasing tickets sales and ticket prices.  The wide seats with tables have also had a positive effect on concession sales, as theaters were able to expand their menus beyond candy and popcorn to full meals.  The end result for the theater owners was more profit: average returns on theatre renovation investments for exhibitors has been from 25% to over 50%.

      18.     ***Seating Services***.  VIP's seating services enable clients to receive and manage installation and repair services straight from the entity that knows the product best: the manufacturer.  VIP's employees routinely visit the client's movie theatres to ensure proper installation, repair and maintenance of products.  Given its expertise, VIP is able to provide value-added services and consultation, including initial assessments, analyses of seating layouts, product reviews, purchase orders, production, delivery, installation, and other support.

II.    **THE COMPANY'S PREPETITION CORPORATE AND CAPITAL STRUCTURE.**

19.    Each Debtor is a direct wholly-owned subsidiary of HIG Cinema Holdings, Inc. (the "Parent Entity"), which did not commence its own chapter 11 case.[4] The Company's wholly-owned foreign subsidiary has also not commenced a chapter 11 case.

20.    As of the Petition Date, the Debtors have approximately $209 million of funded debt obligations. The following table depicts the Company's prepetition capital structure, exclusive of accrued but unpaid interest and fees:

| Type of Debt | Description | Maturity | Approximate Amount Outstanding |
|---|---|---|---|
| **First Lien Term Loan Facility** | $165 million term loan commitment secured on a first lien basis by substantially all of the Company's assets, equity interests of each subsidiary of Holdings (defined below), and real property. | March 1, 2023 | $144.4 million |
| **First Lien Revolving Facility** | $20 million revolving credit facility secured on a first lien basis by substantially all of the Company's assets, equity interests of each subsidiary of Holdings, and real property. | March 21, 2022 | $20 million |
| **Second Lien Term Loan Facility** | $45 million term loan facility secured on a second lien basis by substantially all of the Company's assets, equity interests of each subsidiary of Holdings, and real property. | March 1, 2024 | $45 million |
| | | **Total** | **$209 million** |

---

[4]    To be as transparent with the Court as possible, the Debtors want to make the Court aware that the Company is considering filing the Parent Entity.

A.      **Existing First Lien Credit Agreement.**

21.      On March 1, 2017, the Company entered into that certain credit agreement by and among HIG Cinema Intermediate Holdings, Inc. ("Holdings"), VIP Cinema Holdings, Inc. ("VIP Inc."), as borrower, guarantors party thereto, the administrative and collateral agent (solely in such capacities, the "Prepetition First Lien Agent"), and the First Lien Lenders (as amended, restated, supplemented, or otherwise modified, the "Existing First Lien Credit Agreement").  The Existing First Lien Credit Agreement governs both a senior secured term loan facility (the "First Lien Term Loan Facility") and a senior secured revolving credit facility (the "First Lien Revolving Credit Facility").  The First Lien Term Loan Facility and the First Lien Revolving Credit Facility are *pari passu* and guaranteed by each of the Debtors.

1.      **The First Lien Term Loan Facility.**

22.      The First Lien Term Loan Facility was issued in an aggregate principal amount of $165 million and has a maturity date of March 21, 2023.  Interest on the First Lien Term Loan Facility accrues at LIBOR plus an applicable margin between 5.75% and 6.00% based on the First Lien Leverage Ratio (as that term is defined in the Existing First Lien Credit Agreement) for the trailing four quarters.  As of the Petition Date, approximately $144 million principal amount remains outstanding on the First Lien Term Loan Facility.

2.      **The First Lien Revolving Credit Facility.**

23.      The First Lien Revolving Credit Facility was issued in the amount of $20 million with a maturity date of March 21, 2022.  Interest on the First Lien Revolving Credit Facility accrues at LIBOR plus an applicable margin between 5.75% and 6.00% based on the First Lien Leverage Ratio for the trailing four quarters.  As of the Petition Date, approximately $20 million principal amount remains outstanding on the First Lien Revolving Credit Facility.

B.   **Existing Second Lien Credit Agreement.**

24.   On March 1, 2017, VIP also entered into that certain credit agreement by and among Holdings, VIP Inc., as borrower, guarantors party thereto, the administrative agent and collateral agent (solely in such capacities, the "Prepetition Second Lien Agent" and, together with the Prepetition First Lien Agent, the "Prepetition Agents"), and the lenders party thereto (such lender, the "Second Lien Lenders" and such agreement, as amended, restated, supplemented, or otherwise modified, the "Existing Second Lien Credit Agreement").  The Existing Second Lien Credit Agreement governs a senior secured second lien term loan facility (the "Second Lien Facility").  The Second Lien Facility was issued in the amount of $45 million with a maturity date of March 21, 2024.  Interest on the Second Lien Facility accrues at LIBOR plus an applicable margin of 9.50%.  As of the Petition Date, approximately $45 million principal amount remains outstanding on the Second Lien Facility.

III.   **EVENTS LEADING TO THE CHAPTER 11 CASES.**

A.   **Industry-Wide and VIP-Specific Headwinds.**

25.   The decline in the Company's performance has been driven by five main factors:

- ***Saturation of premium recliner penetration in the U.S.*** – In 2012, when the Company began growing its premium recliner sales, hardly any theatres in the U.S. had yet to upgrade to these types of seats, which meant the opportunity to sell them was very large.  As exhibitors noticed AMC's early success with the recliner strategy, they all "raced to convert," and drove significant growth in the industry through 2017.  In 2017, the U.S. industry quickly became significantly more penetrated with premium recliners and reached a near "saturation point," given that not all theatres have high return on investment potential.  Since the number of screens in the U.S. has remained relatively flat, the overall annual market opportunity for premium recliners became significantly lower in 2018 and thereafter versus earlier years.

- ***Continued proliferation of online streaming services and alternative viewing experiences, which has led to declining movie attendance, a poor outlook sentiment for the overall U.S. movie theatre industry and particularly put significant pressure on the stock price of AMC, a key customer for the Company*** – After a record box office of $11.9 billion in the U.S. in 2018, attendance and box

office declined approximately 5%, despite a high profile content lineup. This has led AMC and other exhibitors to pull-back on investment due to the long-term uncertainty of the industry.

- ***Increased competition*** – Due to the Company's success between 2012 and 2017, there have been a significant number of new competitors who have emerged and introduced luxury seating products. While VIP remains the clear leader in the domestic market, it has put pressure on both price and market share, particularly with the smaller exhibitors.

- ***Increased company costs*** – The Company's margins have significantly deteriorated due to (1) an increase in raw material costs and tariffs and (2) needed investment in people and infrastructure to position the company for longer-term growth. In order to diversify the business and create growth opportunities, the Company has added a significant amount of operating costs to rebound from current levels.

- ***Increased replacement cycle expectations*** – Given the immaturity of the premium recliner market, how often the seats would be replaced and upgraded was unknown. The Company initially believed seats would need to be replaced every approximately 7 years on average; however, due to some of the industry-wide headwinds mentioned above, the Company expects the replacement cycle to be much longer. Seats sold in 2012 and 2013 were expected to be replaced in 2019 and 2020, but that has not occurred.

**B.    Regal Litigation.**

26.    Compounding VIP's liquidity issues, in August of 2019, Regal Cinemas, Inc. ("Regal") filed a complaint (the "Complaint") in the Chancery Court for Knox County, Tennessee, against VIP Cinema, LLC ("VIP LLC"), alleging, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of express warranty, breach of implied warranty of fitness for particular purpose, negligent representation and fraud in the inducement (the "Regal Action").[5]    In the Complaint, Regal asserts that it has suffered $898,840.54, and up to an additional $7.4 million, in damages associated with repairing or replacing VIP LLC's products.[6]    VIP vigorously disputes Regal's allegation. In response to the

---

[5]    *See Complaint, Regal Cinemas, Inc. v. VIP Cinema, LLC* (Tenn. Ch. July 26, 2019) (No. 198491-1).

[6]    The case was subsequently removed to the District Court for the Eastern District of Tennessee at Knoxville (the "District Court"). *Notice of Removal from Chancery Court for Knox County, Tennessee, Regal Cinemas, Inc. v. VIP Cinema, LLC,* Civil Action No. 3:19-CV-333 (E.D. Tenn. Aug. 27, 2019).

Complaint, VIP LLC filed a motion to dismiss for failure to state a claim on September 13, 2019, asserting that Regal did not allege facially plausible claims.[7]  The District Court has yet to rule on the motion to dismiss, but has scheduled a jury trial to commence on April 13, 2021.[8]  In the event that VIP LLC's motion to dismiss is not granted, the Debtors expect that the cost and expense of defending against the Regal Action could be millions of dollars.

### C.    Capital and Liquidity Constraints.

27.    As a result of the industry-wide and Company-specific headwinds mentioned above, the Company's net revenue and consolidated adjusted EBITDA have materially declined. Revenue and EBITDA declined to $105 million and $23 million respectively in 2019, and further deterioration is expected in 2020.  Additionally, VIP's 13 week cash flow forecast demonstrates an operating cash burn through the week of May 8, 2020 of $7 million, due to a combination of operating losses, capital investment, and working capital needs.  The reduction in client revenues and operating cash burn impacted the Company's liquidity position: as of the Petition Date, the Company has approximately $1 million in liquidity.

28.    Due to the over-saturated marketplace and the longer-than-expected lifecycle of its products, VIP was unable to meet the Maximum Total Leverage Ratio required by Section 7.11 of the Existing First Lien Credit Agreement, triggering the Leverage Ratio Event of Default under Section 8.01(b) of the Existing First Lien Credit Agreement.  Pursuant to Section 8.02 of the Existing First Lien Credit Agreement, the Leverage Ratio Event of Default enabled the Prepetition First Lien Agent, to, among other things, terminate—and demand immediate payment of all amounts owed for—each of the loans under the Existing First Lien Credit Agreement.

---

[7]    *Motion to Dismiss for Failure to State a Claim, Regal Cinemas, Inc. v. VIP Cinema, LLC*, Civil Action No. 3:19-CV-333 (E.D. Tenn. Sep. 13, 2019).

[8]    *Scheduling Order, Regal Cinemas, Inc. v. VIP Cinema, LLC*, Civil Action No. 3:19-CV-333 (E.D. Tenn. Sep. 30, 2019).

**D.      VIP's Discussions with Creditors and First Forbearance Agreement.**

29.      In light of VIP's Leverage Ratio Event of Default under the Existing First Lien Credit Agreement, VIP viewed a comprehensive debt restructuring as the necessary next step to best position the Company to maintain its market dominance in the movie-theatre seating industry. In June of 2019, VIP, with the assistance of its advisors, began negotiations regarding a comprehensive restructuring.

30.      To provide more runway for negotiations, beginning in August 2019, the Company and its advisors engaged with the Company's lenders regarding the Leverage Ratio Event of Default.  On August 20, 2019, VIP Inc., as borrower, the Prepetition First Lien Agent, and the First Lien Lenders (collectively, the "<u>Forbearance Parties</u>") entered into the Forbearance Agreement, whereby the First Lien Lenders agreed to forbear from exercising their rights and remedies under the First Lien Credit Agreement for a limited period expiring on September 25, 2019, which period was subsequently extended to December 13, 2019 (such period of time, the "<u>First Forbearance Period</u>").  Under the Forbearance Agreement, the Debtors were required to comply with a minimum liquidity covenant of $6.5 million (the "<u>Minimum Liquidity Covenant</u>").

**E.      Out-of-Court Transaction.**

31.      During the First Forbearance Period, the First Lien Lenders, the Second Lien Lender, and the Investor reached an agreement on the Out-of-Court Transaction, pursuant to which the Investor and the Second Lien Lender agreed to amend the Existing Second Lien Credit Agreement to collectively provide $10 million in cash to the Company (the "<u>New Debt Funding</u>") in exchange for (a) the incurrence of a new first-out second lien term loan and (b) the issuance of 100,000 shares of newly issued common stock (such issuance, the "<u>New Share Subscription</u>") of a newly formed entity ("<u>New VIP Parent</u>").  The New Share Subscription would have represented 100% of the issued and outstanding shares of capital stock of New VIP Parent upon consummation

of the transaction.  The New Debt Funding and the New Share Subscription would have been conditioned on (a) amendments to the existing first and second lien credit facilities of the Debtors; (b) the conversion of certain convertible promissory notes held at the Parent Entity into equity; and (c) certain steps required to consummate the merger.  Pursuant to the Out-of-Court Transaction, and because of the contemplated value of the Company at the time of the Out-of-Court Transaction, the common stock of the Parent Entity would have been cancelled.  The Company had nearly finalized documentation in connection with the Out-of-Court Transaction and even issued preemptive rights notices, as required by such documentation.

32.    Around the time the Company received responses to the preemptive notices, Odeon informed the Company that it would be reducing the amount of capital it spends on seating for the upcoming year.  The attendant drop in projected revenues resulted in certain parties to the Out-of-Court Transaction electing to terminate the contemplated restructuring.  The First Lien Lenders, recognizing that the value of the Company was lower than the total outstanding amount of First Lien Loan Claims and that the Company's ability to service its debt would be impacted by the further loss of revenues, expressed an interest in rehabilitating the Company through the reduction in outstanding indebtedness, including their own.

**F.    Renewed Negotiations and Continued Forbearance.**

33.    To provide additional runway for the Company to renew discussions regarding a restructuring, the First Lien Lenders agreed to continue to extend the Forbearance Agreement.  On December 24, 2019, the Forbearance Parties agreed to amend the Forbearance Agreement to, among other things, provide for: (a) the continued forbearance of exercising remedies in connection with the Maximum Total Leverage Ratio Breach (the "Second Forbearance Period"), and (b) provide for a waiver of the upcoming December 31, 2019 quarterly amortization payment.

34.     The Forbearance Parties subsequently agreed to further amend the Forbearance Agreement to provide for, among other things, (a) continued forbearance from remedies in connection with the Maximum Total Leverage Ratio Breach being exercised (together with the First Forbearance Period and the Second Forbearance Period, the "Forbearance Periods"), (b) a reduction in the Minimum Liquidity Covenant to $1,000,000, and (c) a grant of a mortgage on certain after-acquired real property.  These amendments provided VIP and its debtholders with the runway needed to drive consensus toward a comprehensive restructuring transaction.

### G.     Development of Revised Business Plan.

35.     Prior to and during the Forbearance Periods, the Company's management, under Michael Blatz's leadership, has undertaken significant efforts to combat the industry-wide headwinds.  In particular, the Company's management has developed a revised, comprehensive transformation strategy focused on bringing to market new seating designs, and reinforcing the client base by prioritizing client service.  VIP has begun implementing its growth strategy, focusing on the development of seating that will appeal to foreign markets and the stabilization of client relationships through increased contact and improved service.  In addition, VIP is investing in its workforce by, among other changes, retaining new heads of engineering to help innovate old products and develop new products, and is investing in more efficient machinery, such as cushion-filling machines.  These systemic changes are part of a long-term strategy that will enable VIP to emerge from chapter 11 with its leading role in the marketplace intact.  Additionally, the Restructuring Support Agreement will provide the capital structure necessary to support the turnaround contemplated in the Revised Business Plan.

IV.     **THE CHAPTER 11 CASES.**

A.     **The Restructuring Support Agreement and Plan.**

36.     VIP and its advisors engaged in extensive restructuring discussions and diligence with the Stakeholders and their respective advisors.  These discussions and diligence took place from December of 2019 through February of 2020 with the aim of driving a consensual, comprehensive restructuring transaction that would materially decrease VIP's leverage and position VIP for success going forward.  To assist in this process, VIP engaged AlixPartners to oversee the management of the restructuring in December of 2019, and appointed Michael E. Foreman as an independent director to make independent business decisions related to VIP's restructuring initiatives, including negotiating with, and making proposals to, the Stakeholders and other parties in interest.

37.     Following significant arm's-length, good faith negotiations, the Stakeholders reached a deal on the key terms of a consensual restructuring, as documented in the Restructuring Term Sheet annexed to the Restructuring Support Agreement as Exhibit A.  On February 14, 2020, VIP, the consenting First Lien Lenders, the Second Lien Lender, and the Investor entered into the Restructuring Support Agreement with respect to the Plan.  On February 15, 2020, VIP launched solicitation of votes of the Plan.

B.     **Solicitation Results and Timeline of Chapter 11 Cases.**

38.     As detailed in the below chart, the Plan has the overwhelming support of voting creditors.  As of February 14, 2020, pursuant to the Restructuring Support Agreement with their critical stakeholders—holders of more than 66.6% in aggregate principal amount of First Lien Claims and the holders of 100% in aggregate principal amount of Second Lien Claims, and the Debtors' Investor, support the Plan.

39.     Pursuant to a scheduling motion filed concurrently herewith, VIP seeks approval of

the following schedule:

| Proposed Solicitation and Confirmation Timeline | |
|---|---|
| Commence Solicitation | February 15, 2020 |
| Petition Date | February 18, 2020 |
| Service of Combined Hearing Notice | February 20, 2020[9] |
| Voting Deadline | February 25, 2020 at 5:00 p.m., prevailing Eastern Time |
| Initial Plan Supplement Deadline | 14 Days Prior to the Combined Hearing, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Objection Deadline | Five (5) Days Prior to the Combined Hearing, at 4:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Deadline to File Reply Brief | Three (3) Business Days Prior to the Combined Hearing, at 4:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Combined Hearing | March 23, 2020, or such other date as the Court may direct |

**C.    Proposed DIP Facility.**

40.     The Debtors also seek approval of the DIP Facility, described more fully in the DIP

Motion.  The DIP Facility will provide the Debtors with the necessary liquidity to fund their

business operations and administrative expenses during the contemplated time-period of these

Chapter 11 Cases.  If approved, the Debtors will use the proceeds of the DIP Facility to, among

other things, honor employee wages and benefits, procure goods and services, and fund general

and corporate operating needs and the administration of these Chapter 11 Cases.  Moreover, access

to the proposed DIP Facility will send a clear signal to the market that VIP's operations can and

will continue on a business-as-usual basis.  The Debtors will suffer immediate and irreparable

---

[9] Subject to the Court's approval of the Combined Hearing Notice.

harm if not permitted to access the financing provided for by the DIP Facility at the outset of these Chapter 11 Cases.

## V.    EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS.

41.    Contemporaneously herewith, the Debtors have filed the First Day Motions seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.  The First Day Motions include the following:

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Maintain Existing Business Forms and Books and Records, and (III) Perform Intercompany Transactions and Granting Administrative Expense Status to Intercompany Payments and (B) Granting Related Relief*

- *Application of the Debtors for Entry of an Order Appointing Omni Agent Solutions, Inc. as Claims and Noticing Agent*

- *Application of the Debtors for Entry of an Order Appointing Omni Agent Solutions, Inc. as Administrative Agent for the Debtors* Nunc Pro Tunc *To The Petition Date*

- *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (III) Redact Certain Personally Identifiable Information for Individual Creditors and Interest Holders and (B) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Honor Certain Prepetition Obligations to Customers and (II) Otherwise Continue Certain Customer Programs in the Ordinary Course of Business and (B) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Supplement, or Purchase Insurance Policies; and (B) Granting Related Relief*

- *Debtors' Motion for Entry of an Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Payment of Certain Prepetition Taxes and Fees and (B) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (A) (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional*

> *Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (IV) Authorizing Fee Payments to the Debtors' Third-Party Utility Service Vendor; and (B) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Compensation, and Benefit Obligations and (II) Continue Employee Compensation and Benefits Programs and (B) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Lien Claimants; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Claims Arising from the Delivery or Receipt of Goods, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Foreign Vendors and Critical Vendors and Service Providers; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief*

- *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (B) Granting Related Relief*

42.    The First Day Motions request authority to pay certain prepetition claims.  I understand that the Federal Rules of Bankruptcy Procedure permit the Court to grant relief where such relief is necessary to avoid immediate and irreparable harm.  The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  I believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  Other relief will be deferred for consideration at a later hearing.

43.    I have reviewed each of the First Day Motions, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  I believe that the relief requested in each of the First Day

Motions is (a) necessary to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases, (b) critical in ensuring the maximization of value of the Debtors' estates and (c) serves the best interests of the Debtors' stakeholders.  A description of the relief requested in and the facts supporting the First Day Motions is set forth in **Exhibit B** attached hereto and incorporated herein by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  February 18, 2020
New York, New York

*/s/ Stephen Spitzer*
Name:  Stephen Spitzer
Title:  Chief Restructuring Officer

**<u>Exhibit A</u>**

Restructuring Support Agreement

EXECUTION VERSION

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## RESTRUCTURING SUPPORT AGREEMENT[1]

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02 hereof, this "**Agreement**") is made and entered into as of February 14, 2020 (the "**Execution Date**"), by and among the following parties (each of the Entities described in sub-clauses (i) through (v) of this preamble and any person or entity that subsequently becomes a party hereto collectively, the "**Parties**" and each, a "**Party**"):

   i.    HIG Cinema Intermediate Holdings, Inc. ("**Holdings**"), VIP Cinema Holdings, Inc. ("**VIP**"), VIP Cinema, LLC, VIP Property Management II, LLC, VIP Components, LLC, and any other direct or indirect subsidiary of VIP (collectively, the "**Company**");

   ii.   Certain holders of First Lien Claims holding more than [66.6]% of the aggregate amount of all outstanding First Lien Claims (collectively, the "**Consenting First Lien Lenders**");

   iii.  Holders of Second Lien Claims holding 100% of the aggregate amount of all outstanding Second Lien Claims (or nominees, investment managers or advisors for the holders of Second Lien Lenders) (collectively, the "**Consenting Second Lien Lender**");

   iv.   H.I.G. Capital, LLC and  H.I.G. Middle Market LBO Fund II, L.P. (together, the "**Investor**"); and

   v.    any person or Entity that subsequently becomes a party hereto that executes and delivers a Restructuring Support Agreement Joinder or a Transfer Agreement.

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

*RECITALS*

**WHEREAS**, the Company and the Consenting Stakeholders (defined below) have in good faith and at arm's length negotiated certain restructuring and recapitalization transactions on the terms set forth in this Agreement, in the term sheet attached hereto as **Exhibit A** (including all exhibits thereto, the "**Term Sheet**") and the other term sheets attached as exhibits hereto (such restructuring and recapitalization transactions, the "**Restructuring**"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed to them in the Term Sheet;

**WHEREAS**, the Company intends to implement the Restructuring by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement and the term sheets attached hereto.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    **Definitions and Interpretation.**

1.01.    <u>Definitions</u>. The following terms shall have the following definitions:

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Existing First Lien Credit Agreement or the Existing Second Lien Credit Agreement, as applicable, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02 (including the Term Sheet) of this Agreement.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from (a) the later of (i) the Agreement Effective Date and (ii) the date such Party becomes a Party to this Agreement, to (b) the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (debt or equity), including any debtor-in-possession financing (other than the DIP Facility) liquidation, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction or series of transactions involving the Company or the debt, equity, or other interests in the Company that is an alternative to the Restructuring transactions.

"**Backstop Commitment**" means the portion of the DIP Facility set forth opposite such Backstop Party's name on **Schedule 1** hereto.

"**Backstop Party**" means each Consenting First Lien Lender party to this Agreement whose name is listed on **Schedule 1** hereto.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any and all actions, causes of action, suits, claims, interests, damages, remedies, demands, rights, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, demands, obligations, liabilities, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, franchises and trespasses of any kind or character, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, matured, unmatured, suspected, unsuspected, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in Law, equity or otherwise. For the avoidance of doubt, "Causes of Action" includes but is not limited to: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest the Claims against, or Interests in, the Company; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar claim.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

3

"**Chosen Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code and, for the avoidance of doubt, includes the First Lien Claims and the Second Lien Claim.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with the Restructuring.

"**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Second Lien Lender**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" means, collectively, the Consenting First Lien Lenders, the Consenting Second Lien Lender, the Investor, and any other person or Entity that subsequently becomes a Party hereto by execution and delivery of a Restructuring Support Agreement Joinder or a Transfer Agreement.

"**Definitive Documents**" means the documents listed in Section 3.01 of this Agreement.

"**DIP Agent**" means Wilmington Savings, as administrative and collateral agent under the DIP Facility, or any successor administrative agents thereunder.

"**DIP Commitment**" means the commitment by a Consenting First Lien Lender to provide a percentage of the DIP Facility in an amount not greater than the pro rata percentage of First Lien Loans held by such Consenting First Lien Lender as of the Agreement Effective Date.

"**DIP Credit Agreement**" means that certain credit agreement evidencing the DIP Facility by and among VIP, as borrower, Holdings and its direct and indirect domestic subsidiaries, as guarantors, the DIP Agent, and the DIP Lenders, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, in each case consistent with the terms and conditions set forth in the DIP Facility Term Sheet, and as may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"**DIP Facility**" means the new senior secured superpriority debtor-in-possession term loan financing facility having terms and conditions set forth in the DIP Facility Term Sheet.

"**DIP Facility Term Sheet**" means that certain term sheet setting forth the principal terms of the DIP Facility annexed as **Exhibit B** to this Agreement.

"**DIP Lenders**" means the Consenting Second Lien Lender and the Consenting First Lien Lenders that agree to provide the DIP Facility on the terms set forth in the DIP Credit Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Effective Date**" means the date that is the first Business Day selected by the Debtors, with the consent of the Consenting Stakeholders, not to be unreasonably withheld, conditioned, or delayed, on which (a) all conditions to the effectiveness of the Plan set forth in Section 8.1 thereof have been satisfied or waived in accordance with the terms of the Plan, and (b) no stay of the Confirmation Order is in effect.

"**Election Date**" means February 24, 2020, at 5:00 p.m., New York Time.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Excluded Claims**" means that any Claims or Causes of Action (a) against Regal Cinemas, Inc. that arise under or in connection with that certain litigation commenced by Regal Cinemas, Inc., by complaint, filed on July 26, 2019, in the Chancery Court for Knox County, Tennessee, against VIP Cinema, LLC, and subsequently removed to the District Court for the Eastern District of Tennessee at Knoxville, styled *Regal Cinemas, Inc. v. VIP Cinema, LLC*, Civil Action No. 3:19-CV-333 (E.D. Tenn. Aug. 27, 2019), or (b) against the stockholders holding a minority share in the Company on the Petition Date who are not Parties to this Agreement or current officers or directors of the Company on such date.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of March 1, 2017 (as may be amended, restated, amended and restated, modified or supplemented from time to time), by and among VIP, as the Borrower, Holdings, the other Guarantors from time to time party thereto, the Lenders party thereto, Wilmington Savings, as successor administrative agent and collateral agent, and the other entities party thereto from time to time.

"**Existing Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of March 1, 2017 (as may be amended, restated, amended and restated, modified or supplemented from time to time), by and among VIP, as the Borrower, Holdings, the other Guarantors party thereto from time to time, the Lenders party thereto, ████████████ ████████████, as administrative agent and collateral agent, and the other entities party thereto from time to time.

"**Exit Facilities Credit Agreements**" means, together, the First Lien Exit Facility Credit Agreement and the Second Lien Exit Facility Credit Agreement, in each case as consistent with the terms set forth in the Exit Facilities Term Sheets, and as may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"**Exit Facilities Term Sheets**" means, together, the First Lien Exit Facility Term Sheet and the Second Lien Exit Facility Term Sheet annexed to this Agreement as **Exhibit C** and **Exhibit D**, respectively.

"**Fiduciary Out**" means the right to terminate this Agreement pursuant to Section 12.05(b).

"**Final DIP Order**" means an order entered by the Bankruptcy Court approving, among other things, the DIP Facility on a final basis.

"**First Lien Claims**" means all Claims against the Company arising under, relating to, or in connection with the Loans (as defined in and arising under the Existing First Lien Credit Agreement).

"**First Lien Exit Agent**" means the administrative and collateral agent for the First Lien Exit Lenders under the First Lien Exit Facility Credit Agreement or any successor agent thereof.

"**First Lien Exit Facility Credit Agreement**" means that certain credit agreement by and among VIP, the other guarantors from time to time party thereto, the First Lien Exit Lenders, the First Lien Exit Agent, and the other Entities party thereto from time to time, consistent with the terms and conditions set forth in the First Lien Exit Facility Term Sheet.

"**First Lien Exit Facility Term Sheet**" means the term sheet annexed to this Agreement as **Exhibit C** setting forth the material terms and conditions of the First Lien Exit Facility Credit Agreement.

"**First Lien Exit Lenders**" means the lenders under the First Lien Exit Facility Credit Agreement.

"**First Lien Loans**" means the loans made pursuant to the Existing First Lien Credit Agreement.

"**Governance Documents**" means the organizational and governance documents for the Reorganized Company, including, without limitation, certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, in each case, consistent with the terms and conditions set forth in this Agreement, including the Governance Term Sheet and the Preferred Equity Term Sheet.

"**Governance Term Sheet**" means the term sheet annexed to this Agreement as **Exhibit F** setting forth the material terms and conditions of the corporate governance of the Reorganized Company.

"**Holdings**" has the meaning set forth in the preamble to this Agreement.

"**Interim DIP Order**" means an order entered by the Bankruptcy Court approving, among other things, the DIP Facility on an interim basis.

"**Interest**" means any common stock, equity security, equity, ownership, profit interest, unit, or share in the Company (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in the Company), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

"**Investor**" has the meaning set forth in the preamble to this Agreement.

"**Joining DIP Commitment Party**" means any Consenting First Lien Lender that elects to make a DIP Commitment.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Management Incentive Plan**" means the management incentive plan and the CEO Incentive plan to be implemented by the Reorganized Company on the Effective Date consistent with the terms and conditions set forth in the Management Incentive Plan Term Sheet annexed hereto as **Exhibit G**.

"**Management Services Agreement**" means the management services agreement to be entered into by the Reorganized Company and the Investor on the Effective Date.

"**Material Adverse Effect**" means a material adverse effect on the business, operations, assets, liabilities (actual or contingent), operating results or financial condition of the Company, taken as a whole (other than as a result of (i) the events and conditions related and/or leading up to the commencement of the Chapter 11 Cases, (ii) any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases, (iii) any reduction in payment terms by suppliers and (iv) any reclamation Claims).

"**Outside Date**" means that date that is 180 days after the Agreement Effective Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Claim against, or Interest in, the Company who meets the requirements of Section 9.01 of this Agreement.

"**Petition Date**" has the meaning set forth in Section 4.01 of this Agreement.

"**Plan**" means the joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, including all exhibits and schedules to the Plan, and any Plan Supplement, all of which must be consistent with the terms and conditions of this Agreement, in each case as they may be amended, supplemented or modified from time to time in accordance with the terms of this Agreement.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company with the Bankruptcy Court.

"**Preferred Equity Term Sheet**" means the term sheet annexed to this Agreement as **Exhibit E** setting forth the material terms and conditions of the Preferred Shares (as defined therein).

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers any Claim against, or Interest in, the Company (or enter with customers into long and short positions in the Claims against, or Interests in, the Company), in its capacity as a dealer or market maker in Claims or Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Parties**" means, with respect to any entity, such entity's predecessors, successors, assigns, and affiliates (whether by operation of Law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current equity holders, officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case acting in such capacity, including in their capacity as directors of the Company, as applicable.

"**Release**" means the releases described in Section 14 hereof.

"**Released Party**" means, collectively, (a) each of the Consenting Stakeholders, (b) the Company, and (c) the Related Parties of each of the foregoing entities in clauses (a) through (b) of this definition.

"**Releasing Party**" means collectively, (a) each of the Consenting Stakeholders, (b) the Company, and (c) such entity's predecessors, successors, and assigns. For the avoidance of doubt, each of the Releasing Parties hereby grants the Release in all of its capacities, in accordance with the terms and conditions set forth in this Agreement.

8

"**<u>Reorganized Company</u>**" means the Company upon consummation of the Restructuring.

"**<u>Requisite Consenting First Lien Lenders</u>**" means, as of the date of determination, Consenting First Lien Lenders holding at least a majority in aggregate principal amount outstanding of all First Lien Claims held by the Consenting First Lien Lenders as of such date.

"**<u>Restructuring</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Restructuring Support Agreement Joinder</u>**" means a joinder to this Agreement substantially in the form attached hereto as **<u>Exhibit I</u>**.

"**<u>Rules</u>**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**<u>Second Lien Claims</u>**" means all Claims against the Company arising under, relating to, or in connection with the Term Loans (as defined in and arising under the Existing Second Lien Credit Agreement).

"**<u>Second Lien Exit Facility Agent</u>**" means the administrative and collateral agent for the Second Lien Exit Lenders under the Second Lien Exit Facility Credit Agreement, or any successor agent thereof.

"**<u>Second Lien Exit Facility Credit Agreement</u>**" means that certain credit agreement by and among VIP, the other guarantors from time to time party thereto, the Second Lien Exit Lenders, the Second Lien Exit Facility Agent, and the other Entities party thereto from time to time, consistent with the terms and conditions set forth in the Second Lien Exit Facility Term Sheet.

"**<u>Second Lien Exit Facility Term Sheet</u>**" means the term sheet annexed to this Agreement as **<u>Exhibit D</u>** setting forth the material terms and conditions of the Second Lien Exit Facility Credit Agreement.

"**<u>Second Lien Exit Lenders</u>**" means the lenders under the Second Lien Exit Facility Credit Agreement.

"**<u>Second Lien Loans</u>**" means the loans made pursuant to the Existing Second Lien Credit Agreement.

"**<u>Securities Act</u>**" means the Securities Act of 1933, as amended.

"**<u>Solicitation Materials</u>**" means all solicitation materials in respect of the Plan.

"**<u>Term Sheet</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Termination Date</u>**" means, as to a Party, the date on which termination of this Agreement as to such Party is effective in accordance with Section 12 of this Agreement.

"**Termination Period**" means the three (3) Business Day period prior to the effective date of the Company's termination of this Agreement pursuant to Section 12.05(b) hereof.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement Joinder**" means an executed form of the transfer agreement joinder providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit H**.

"**VIP**" has the meaning set forth in the preamble to this Agreement.

"**Wilmington Savings**" means Wilmington Savings Fund Society, FSB, a federal savings bank.

1.02.    <u>Interpretation</u>. For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(c)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)    the use of "include" or "including" is without limitation, whether stated or not; and

(i)    the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 16.11 other than counsel to the Company.

**Section 2.    Effectiveness of this Agreement.**    This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    the Company shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Stakeholders;

(b)    the following shall have executed and delivered to the Company counterpart signature pages of this Agreement:

(i)    the Consenting First Lien Lenders;

(ii)    the Consenting Second Lien Lender; and

(iii)    the Investor; and

(c)    counsel to the Company shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 16.11 of this Agreement (by email or otherwise) that the conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.    Definitive Documents.**

3.01.    The Definitive Documents governing the Restructuring shall consist of this Agreement and the following: (a) the Governance Documents; (b) the Management Services Agreement; (c) the Management Incentive Plan; (d) the Exit Facilities Credit Agreements and any related documentation; (e) the Plan; (f) the Confirmation Order; (g) the Disclosure Statement; (h) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (i) the Plan Supplement; (j) the DIP Credit Agreement and any related documentation; (k) the Interim DIP Order and the Final DIP Order; (l) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by this Agreement, the Term Sheet, and the Plan, including all "first day" motions and orders; (m) to the extent not included in (a) through (l), all financing documents needed to effectuate the Restructuring; and (n) all other material customary documents delivered in connection with transactions of this type (including, without limitation,

any and all other documents implementing, achieving, contemplated by or relating to the Restructuring).

3.02.   The Definitive Documents remain subject to negotiation and completion and shall be in all respects consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company and (a) the Requisite Consenting First Lien Lenders;, (b) the Second Lien Lenders, and (c) with respect to all of the Definitive Documents other than those listed in Sections 3.01(j) and (k) and related documentation, the Investor; *provided* that in each case such consent shall not be unreasonably withheld, conditioned, or delayed.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring shall contain terms, conditions, representations, warranties, and covenants consistent in all respects with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 15.

**Section 4.**    **Milestones**.

4.01.   The following milestones shall apply to this Agreement unless extended or waived in writing by the Company, with the consent of the Requisite Consenting First Lien Lenders and the Consenting Second Lien Lender; *provided* that in each case such consent shall not be unreasonably withheld, conditioned, or delayed:

(a)    commencement of solicitation of acceptances of the Plan to occur not later than February 18, 2020;

(b)    chapter 11 petition date (the "**Petition Date**") to occur not later than February 18, 2020;

(c)    entry of the Interim DIP Order not later than 5 days after the Petition Date;

(d)    entry of the Final DIP Order not later than 35 days after the Petition Date;

(e)    entry of an order by the Bankruptcy Court approving the Disclosure Statement not later than 35 days after the Petition Date;

(f)    entry of an order by the Bankruptcy Court confirming the Plan not later than 35 days after the Petition Date; and

(g)    occurrence of the Effective Date no later than April 13, 2020.

**Section 5.**    **Commitments of the Consenting Stakeholders**.

5.01.   General Commitments, Forbearances, and Waivers.

(a)    During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly and severally, in respect of all of its Claims against, or Interests in, the Company, to:

(i)      timely vote (to the extent required to vote) in favor of the Restructuring and use commercially reasonable efforts to support and exercise any powers or rights available to it (including, subject to the other terms of this Agreement, in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in favor of any matter requiring approval to the extent necessary to effectuate the Restructuring and implement the terms of the Term Sheet in accordance with this Agreement; *provided* that no Consenting Stakeholder shall be obligated to (x) waive (to the extent waivable by such Consenting Stakeholder) any condition to the consummation of any part of the Restructuring set forth in this Agreement or any Definitive Document or (y) approve any Definitive Document that is not in form and substance reasonably acceptable to such Consenting Stakeholder if such Definitive Document is required to be in form and substance reasonably acceptable to such Consenting Stakeholder pursuant to this Agreement, including pursuant to Section 3.02;

(ii)      at the reasonable request of the Company, reasonably cooperate with and assist the Company, at the Company's sole expense but subject in all respects to any caps set forth in the term sheets annexed hereto, in obtaining additional support for the Restructuring from the Company's other stakeholders;

(iii)      negotiate in good faith and, to the extent it is a party thereto, execute and deliver the Definitive Documents; and

(iv)      give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring.

(b)      During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly and severally, in respect of all of its Claims against, or Interests in, the Company, that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(ii)      solicit, propose, file, support, vote for, or consent to any Alternative Restructuring Proposal or engage in any discussions or negotiations with any person related to an Alternative Restructuring Proposal;

(iii)      file any motion, pleadings, or other document with any court (including any modification or amendments to any motion, pleadings, or other document with any court) that, in whole or in part, violates the terms of this Agreement;

(iv)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against, or Interests in, the Company;

(v)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring against the

Company or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

> (vi)    object to, delay, impede, or take any other action to interfere with the Company's ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

> (a)    vote each of its Claims against, or Interests in, the Company to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot, but in no event later than the Election Date, and not "opt out" of any releases under the Plan and affirmatively opt into such releases if required to do so; and

> (b)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any such vote or election; *provided, however*, that nothing in this Agreement shall prevent any party from changing, withdrawing, amending, or revoking (or causing the same) its consent or vote with respect to the Plan if this Agreement has been terminated with respect to such Party.

**Section 6.    <u>Additional Provisions Regarding the Consenting Stakeholders' Commitments</u>.** Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall:

> (a)    affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder or the Company or any other party in interest in the Chapter 11 Cases regarding the Restructuring;

> (b)    impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited by this Agreement in connection with the Restructuring;

> (c)    prevent any Consenting Stakeholder from enforcing this Agreement or any Definitive Document or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document;

> (d)    require any Consenting Stakeholder to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to such Consenting Stakeholder other than as expressly described in this Agreement; or

> (e)    prevent any Consenting Stakeholder from protecting and preserving its rights, remedies and interests, including its Claims against, or Interests in, the Company to the extent not inconsistent with this Agreement.

14

**Section 7.**    **Commitments of the Company.**

7.01.    <u>Affirmative Commitments</u>. Except as set forth in Section 8, during the Agreement Effective Period, the Company agrees to:

(a)    support and take all steps reasonably necessary, desirable or reasonably requested by a Consenting Stakeholder to consummate the Restructuring and Plan in accordance with this Agreement and within the timeframes outlined herein;

(b)    use commercially reasonable efforts to obtain, file, submit or register any and all required governmental, regulatory and/or third-party approvals, filings, registrations or notices that are necessary or advisable for the implementation or consummation of the Restructuring;

(c)    comply with the milestones set forth in Section 4.01 of this Agreement;

(d)    use commercially reasonable efforts to actively and timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, the timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring;

(e)    timely file a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the First Lien Claims to the extent not inconsistent with this Agreement and the Term Sheet;

(f)    timely file a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or seeking avoidance or subordination of, any portion of the Second Lien Claims to the extent not inconsistent with this Agreement and the Term Sheet;

(f)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other agreements necessary or desirable to effectuate and consummate the Restructuring as contemplated by this Agreement;

(g)    use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent;

(h)    upon reasonable request of any Consenting Stakeholder, inform counsel to the Consenting Stakeholder as to: (i) the status and progress of the Restructuring including progress in relation to the negotiations of the Definitive Documents;  and (ii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting

15

Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)        inform the applicable counsel to each of the Consenting Stakeholders as soon as reasonably practicable, but no later than two (2) Business Days, after becoming aware of: (i) any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would permit any Party to terminate, or would result in the termination of, this Agreement; (ii) any matter or circumstance which they know to be a material impediment to the implementation or consummation of the Restructuring; (iii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of the Company; (iv) a breach of this Agreement (including a breach by the Company); (v) any representation or statement made or deemed to be made by the Company under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; (vi) the initiation, institution or commencement of any lawsuit, action or other proceeding by person or entity (A) involving the Company (including any assets, permits, businesses, operations or activities of the Company) or any of their respective current or former officers, employees, managers, directors, members or equity holders (in their capacities as such), or (B) challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (vii) the happening or existence of any fact, event or circumstance that shall have made any of the conditions precedent to any Party's obligations set forth in (or to be set forth in) any of the Definitive Documents incapable of being satisfied prior to the Outside Date, and (viii) the receipt of notice from any person or entity alleging that the consent of such person or entity is or may be required under any contract, agreement, permit, Law or otherwise in connection with the consummation of any part of the Restructuring;

(j)        use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(k)        provide draft copies of all material motions or applications and other documents the Company intends to file with the Bankruptcy Court to counsel to the Consenting Stakeholders, if reasonably practical, at least three (3) Business Days prior to the date when the Company intends to file any such pleading or other document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; *provided*, *however*, that the obligations under this Section 7.01(k) shall in no way alter or diminish any right expressly provided to any Consenting Stakeholder under this Agreement to review, comment on, and/or consent to the form and/or substance of any document to the extent not inconsistent with Section 3.02 hereof;

(l)        subject to applicable laws, use commercially reasonable efforts to (i) preserve intact in all material respects the current business operations of the Company, keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, in each case, having material business dealings with the

Company (other than terminations for cause or consistent with applicable fiduciary duties); (ii) maintain their respective books and records on a basis consistent with prior practice; (iii) maintain their physical assets, equipment, properties and facilities in their condition and repair as of the Agreement Effective Date; (iv) maintain all of their respective licenses and permits in full force and effect (including by filing all reports, notifications and filings with, and paying all fees to, the applicable governmental entities necessary to maintain all such licenses and permits in full force and effect); and (v) maintain all necessary insurance policies, or suitable replacements therefor, in full force and effect;

(m)    operate their business in the ordinary course in a manner that is consistent with past practices and in compliance with applicable law; and

(n)    if the Company receives an Alternative Restructuring Proposal, within two (2) Business Days after the receipt of such Alternative Restructuring Proposal, notify the Consenting Stakeholders of the receipt thereof, with such notice to include the material terms thereof (including the identity of the persons or entities involved) and shall thereafter promptly update the Consenting Stakeholders regarding the occurrence and substance of any material discussions, negotiations, changes or other developments related to such Alternative Restructuring Proposal.

The Company acknowledges, agrees, and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the extent legally possible, the applicability of the automatic stay to the giving of such notice); *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

7.02.    Negative Commitments. Except as set forth in Section 8 of this Agreement, during the Agreement Effective Period, the Company shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring or otherwise commence any proceeding opposing any of the terms of this Agreement or any of the other Definitive Documents;

(b)    take any action, or encourage any other person or Entity to take any action, that is inconsistent in any material respect with, or is intended or would reasonably be expected to frustrate or impede approval, implementation and consummation of the Restructuring;

(c)    not actively seek, solicit, support, encourage, propose, consent to, vote for, or enter into any agreement regarding any Alternative Restructuring Proposal;

(d)    modify the Plan, if applicable, in whole or in part, in a manner that is not consistent with this Agreement (including the Term Sheet) in any material respect;

(e)    (i) seek discovery in connection with, prepare or commence an avoidance action or other legal proceeding that challenges (A) the amount, validity, allowance, character,

enforceability or priority of any Claims against, or Interests in, the Company of any of the Consenting Stakeholders, or (B) the validity, enforceability or perfection of any lien or other encumbrance securing any Claims against, or Interests in, the Company of any of the Consenting Stakeholders, or (ii) support any third party in connection with any of the acts described in <u>clause (i)</u>;

(f)     execute, deliver and/or file any Definitive Document (including any amendment, supplement or modification of, or any waiver to, any Definitive Document) that, in whole or in part, is not consistent in all material respects with this Agreement or is not otherwise reasonably acceptable to the applicable Consenting Stakeholders (but subject to the limitations set forth in Section 3.02 hereof), or file any pleading seeking authorization to accomplish or effect any of the foregoing;

(g)     other than as set forth in the Management Incentive Plan, grant or agree to grant (including pursuant to a key employee retention or incentive plan or other similar agreement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance or other compensation or benefits (including in the form of any vested or unvested equity interests of any other kind or nature) of any director, manager, or officer of, or any consultant or advisor that is retained or engaged by, the Company; or

(h)     file any motion, pleading, or other document with any court (including any modification or amendments to any motion, pleadings, or other document with any court) that, in whole or in part, is not consistent with this Agreement in any material respect.

**Section 8.** <u>**Additional Provisions Regarding Company's Commitments**</u>.

8.01.   Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 8.02, nothing in this Agreement shall require the Company or the board of directors, board of managers, or similar governing body of the Company to take any action or to refrain from taking any action with respect to the Restructuring to the extent it determines in good faith, upon the advice of outside counsel, that the taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement.

8.02.   Notwithstanding anything to the contrary in this Agreement, the Company and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, discuss, and negotiate unsolicited Alternative Restructuring Proposals; (b) provide access to non-public information concerning the Company to any Entity that (i) provides an unsolicited Alternative Restructuring Proposal; (ii) executes and delivers a confidentiality agreement, which shall be in form and substance reasonably acceptable to the Requisite Consenting First Lien Lenders, the Second Lien Lender, and the Investor; and (iii) requests such information; *provided* that prior to providing such access the Company shall consult with counsel to the Requisite Consenting First Lien Lenders, the Consenting Second Lien Lender, and the Investor regarding such request for access and the nature of the non-public information requested; (c) maintain or

continue discussions or negotiations with respect to any unsolicited Alternative Restructuring Proposal if (i) the board of directors of the Company determines in good faith (upon the advice of outside legal counsel) that failure to take such action would be inconsistent with the directors' fiduciary duties under applicable Law, and (y) the board of directors of the Company has determined (upon the advice of outside legal counsel) that such Alternative Restructuring Proposal is reasonably likely to lead to a transaction that is more favorable to the holders of Claims against, or Interests in, the Company than the Restructuring and is reasonably capable of being completed in accordance with its terms, taking into account all legal, financial, financing, conditionality, timing and other aspects of such Alternative Restructuring Proposal; and (d) enter into or continue discussions or negotiations with holders of Claims against, or Interests in, the Company, or any other Entity regarding the Restructuring.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of the Company to assert or raise any objection permitted under this Agreement in connection with the Restructuring; or (b) prevent the Company from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.** **Transfer of Interests and Securities**.

9.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Claims against, or Interests in, the Company to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:  (i) the transferee executes and delivers to counsel to the Company and counsel to the Consenting First Lien Lenders, the Consenting Second Lien Lender, and the Investor at or before the time of the proposed Transfer, a Transfer Agreement Joinder and provides notice of such Transfer in accordance with 9.02 hereof; or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Claim or Interest Transferred) to counsel to the Company and counsel to the Consenting First Lien Lenders, the Consenting Second Lien Lender, and the Investor at or before the time of the proposed Transfer.

9.02.    Upon compliance with the requirements of Section 9.01 of this Agreement, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Claims against, or Interests in, the Company.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Claims against, or Interests in, the Company; *provided* that (a) such additional Claims against, or Interests in, the Company shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Claim against, or Interest in, the Company acquired) to counsel to the Company and counsel to the Consenting

First Lien Lenders, the Consenting Second Lien Lender, and the Investor promptly following such acquisition.

9.04.    This Section 9 shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Claims against, or Interests in, the Company. Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01 of this Agreement, a Qualified Marketmaker that acquires any Claims against, or Interests in, the Company with the purpose and intent of acting as a Qualified Marketmaker for such Claims against, or Interests in, the Company shall not be required to execute and deliver a Transfer Agreement Joinder in respect of such Claims against, or Interests in, the Company if: (a) such Qualified Marketmaker subsequently transfers such Claims against, or Interests in, the Company (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 9.01; and (c) the Transfer otherwise is permitted under Section 9.01.

**Section 10.    <u>Representations and Warranties of Consenting Stakeholders</u>.** Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement, a Restructuring Support Agreement Joinder, or a Transfer Agreement Joinder:

(a)      it is the beneficial or record owner of the face amount of the Claims against, or Interests in, the Company or is the nominee, investment manager, or advisor for beneficial holders of the Claims against, or Interests in, the Company reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Claims against, or Interests in, the Company other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement Joinder, as applicable;

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, and if applicable Transfer, such Claims against, or Interests in, the Company;

(c)      such Claims against, or Interests in, the Company are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has made no prior assignment, sale, participation, grant, conveyance or other Transfer of, and has not entered into any agreement to assign, sell, participate, grant, convey or

otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any Claims against, or Interests in, the Company;

     (e)     it is a sophisticated party with respect to the subject matter of this Agreement and the transactions contemplated hereby;

     (f)     it (i) has access to adequate information regarding the terms of this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement and (ii) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision with respect hereto;

     (g)     it has not relied upon any other Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement; and

     (h)     (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules); *and* (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

It is understood and agreed that the representations and warranties made by a Consenting Stakeholder that is an investment manager, advisor or subadvisor of a beneficial owner of Claims against, or Interests in, the Company are made with respect to, and on behalf of, such beneficial owner and not such investment manager, advisor or subadvisor, and, if applicable, are made severally (and not jointly) with respect to the investment funds, accounts and other investment vehicles managed by such investment manager, advisor or subadvisor.

**Section 11. Mutual Representations, Warranties, and Covenants**. Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes this Agreement, a Restructuring Support Agreement Joinder, or a Transfer Agreement Joinder:

     (a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

     (b)     except as expressly provided in this Agreement or, if applicable, the Bankruptcy Code, no registration or filing with, consent or approval of, or notice to, or other action is required by any other person or entity in order for it to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

     (c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation

applicable to it or with any of its articles of association, memorandum of association, or other applicable constitutional documents;

(d)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement; and

(e)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

## Section 12.    <u>Termination Events</u>.

12.01. <u>Consenting Stakeholder Termination Events</u>. This Agreement may be terminated (a) with respect to the Consenting First Lien Lenders, by the Requisite Consenting First Lien Lenders, and (b) with respect to any other Consenting Stakeholder, by such Consenting Stakeholder, in each case, by the delivery to the other Parties of a written notice in accordance with Section 16.11 of this Agreement upon the occurrence of any of the following events:

(a)    the breach in any material respect by the Company or any Consenting Stakeholder (other than the terminating Consenting Stakeholder) of any of the representations, warranties, or covenants of the Company or such Consenting Stakeholder set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice to the Company detailing such breach in accordance with Section 16.11 of this Agreement;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for five (5) Business Days after such terminating Consenting Stakeholder delivers a written notice to the Company notifying the Company of such issuance in accordance with Section 16.11 of this Agreement; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)    the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect or enters an order denying Confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order;

(d)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company seeking an order (without the prior written consent of the Requisite Consenting First Lien Lenders, Consenting Second Lien Lender, and the Investor), (i) converting one or more of the Chapter 11 Cases of the Company to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of the Company, or (iii) rejecting this Agreement;

22

(e)  the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $250,000;

(f)  the Company approves an Alternative Restructuring Proposal or enters into a definitive agreement with respect to an Alternative Restructuring Proposal;

(g)  the Company withdraws the Plan or publicly announces its intention to withdraw the Plan;

(h)  the Company executes, delivers, files, amends or modifies, or files a pleading seeking approval of, or authority to amend or modify, any Definitive Document that, in any such case, is not consistent in all material respects with this Agreement or otherwise reasonably acceptable to the applicable Consenting Stakeholders; *provided, however*, for the avoidance of doubt, no Party shall be permitted to terminate under this subsection unless the applicable Definitive Document is required to be reasonably acceptable to such Party pursuant to Section 3.02; or

(i)  the occurrence of a Material Adverse Effect.

12.02.  Investor Termination Events. In addition, without limiting the Investor's rights under Section 12.01 of this Agreement, this Agreement may also be terminated with respect to the Investor, by the Investor, by the delivery to the other Parties of a written notice in accordance with Section 16.11 of this Agreement upon the occurrence of any of the following events:

(a)  termination of this Agreement as to any other Consenting Stakeholder;

(b)  the failure of the Company to have at least $1,500,000 of available, unrestricted cash after payment of, or reserving for the payment of, all outstanding checks and after giving effect to all distributions under the Plan, including but not limited to the payment in full of all fees and expenses related to the Restructuring (including, for the avoidance of doubt, all transactions, amounts, and reserves contemplated by the Exhibits to this Agreement and the Plan);

(c)  Michael Blatz no longer having a role in the Company's management; or

(d)  the failure of the Effective Date to occur within sixty days of the Petition Date.

12.03.  Consenting First Lien Lenders Termination Events. In addition, without limiting any Consenting First Lien Lender's rights under Section 12.01 of this Agreement, this Agreement may also be terminated with respect to any Consenting First Lien Lender, by the Requisite Consenting First Lien Lenders, in each case, by the delivery to the other Parties of a written notice in accordance with Section 16.11 of this Agreement, upon the occurrence of any of the following events:

(a)      the termination of this Agreement as to any other Consenting Stakeholder;

(b)      a Default or Event of Default (as each us defined in the DIP Facility) has occurred and is continuing; or

(c)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the First Lien Claims, the liens securing the First Lien Claims, the DIP Facility, or the liens securing the DIP Facility.

12.04.  Consenting Second Lien Lender Termination Events. In addition, without limiting the Consenting Second Lien Lender's rights under Section 12.01 of this Agreement, this Agreement may also be terminated with respect to the Consenting Second Lien Lender, by the Consenting Second Lien Lender, by the delivery to the other Parties of a written notice in accordance with Section 16.11 of this Agreement, upon the occurrence of any of the following events:

(a)      the termination of this Agreement as to any other Consenting Stakeholder; or

(b)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Second Lien Claims, the liens securing the Second Lien Claims (except to the extent consistent with this Agreement), the DIP Facility, or the liens securing the DIP Facility.

12.05.  Company Termination Events. The Company may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.11 of this Agreement upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement (i) that is materially adverse to the Company and (ii) that remains uncured for a period of five (5) Business Days after the Company delivers to the Consenting Stakeholders a written notice detailing each breach in accordance with Section 16.11 of this Agreement;

(b)      the board of directors, board of managers, or any similar governing body of the Company determines in good faith, upon the advice of outside counsel, (i) that proceeding with any of the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; *provided*, *however*, that in the event the Company desires to exercise its Fiduciary Out pursuant to this Section 12.05(b), the Company shall provide written notice to counsel to the Consenting Stakeholders prior to the Termination Period pursuant to the Fiduciary Out advising such counsel that the Company intends to terminate this Agreement pursuant to the Fiduciary Out and specifying, in reasonable detail, the reasons therefor (including the material facts and circumstances related thereto and, to the extent applicable, the terms, conditions and provisions of any Alternative Restructuring Proposal that the Company may pursue), and during the Termination Period the Company shall, and shall cause their respective directors, managers and representatives to, (x) negotiate with the Consenting Stakeholders in good faith (to the extent

24

the Consenting Stakeholders wish to negotiate) to enable the Consenting Stakeholders to determine whether to propose revisions to the terms of the Restructuring such that it would obviate the need for the Company to exercise its right to terminate this Agreement pursuant to the Fiduciary Out, (y) provide the Consenting Stakeholders with all information and materials reasonably requested by the Consenting Stakeholders relating to the facts and circumstances giving rise to the Fiduciary Out, and (z) consider in good faith any proposal by the Consenting Stakeholders to amend the terms and conditions of the Restructuring in a manner that would obviate the need for the Company to exercise the Fiduciary Out; or

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for seven (7) Business Days after the Company delivers a written notice to the Consenting Stakeholders in accordance with Section 16.11 of this Agreement detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by the Company if it sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

All Consenting Stakeholders reserve all rights, including the right to challenge any exercise of the Fiduciary Out.

12.06.  Outside Date.  Any Party to this Agreement may terminate its obligations under this Agreement upon notice to all other Parties if the Effective Date has not occurred on or prior to the Outside Date.

12.07.  Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Requisite Consenting First Lien Lenders, (b) the Consenting Second Lien Lender, (c) the Investor, and (d) the Company.

12.08.  Automatic Termination. This Agreement shall terminate automatically without any further required action or notice immediately upon the Effective Date.

12.09.  Effect of Termination. After the occurrence of a Termination Date, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall, except as otherwise expressly provided in this Agreement, be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; *provided*, *however*, that in no event shall any such termination relieve a Consenting Stakeholder from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the date of such Termination Date or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement. Nothing in this Agreement shall be construed as prohibiting the Company or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a

Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict: (a) any right of the Company or the ability of the Company to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder; and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against the Company or any other Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 12 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.05(b). Nothing in this Section 12.09 shall restrict the Company's right to terminate this Agreement in accordance with Section 12.05(b).  If this Agreement has been terminated in accordance with this Section 12 at a time when permission of the Bankruptcy Court shall be required for a Consenting Stakeholder to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall consent to any attempt by such Consenting Stakeholder to change or withdraw (or cause to change or withdraw) such vote at such time; *provided*, *however*, that nothing herein shall be deemed a waiver of the Company's right to challenge the validity of such termination.

**Section 13.    DIP Commitment.**

13.01.  Each Consenting First Lien Lender party hereto whose name is listed on **Schedule 1** hereto (such Consenting First Lien Lender, a "**Backstop Party**") commits, severally and not jointly, to provide the portion of the DIP Facility set forth opposite such Backstop Party's name on Schedule 1 hereto on the terms and conditions set forth in the DIP Term Sheet and otherwise subject to relevant Definitive Documents (such commitment, the "**Backstop Commitment**"); *provided* that any Consenting First Lien Lender that executes a Restructuring Support Agreement Joinder to this Agreement on or before February 24, 2020, at 5:00 p.m., New York Time (such date, the "**Election Date**"), may, by making the appropriate election on such Restructuring Support Agreement Joinder, commit to provide a percentage of the DIP Facility in an amount not greater than the pro rata percentage of First Lien Loans held by such Consenting First Lien Lender as of the Agreement Effective Date (such commitment, a "**DIP Commitment**"), on the terms and conditions consistent with the DIP Term Sheet (any Consenting First Lien Lender that elects to make such commitment, a "**Joining DIP Commitment Party**"); *provided*, *further*, that each Backstop Party's commitment to provide its portion of the DIP Facility shall be reduced, pro rata, based on the percentages set forth on Schedule 1 hereto, for the share of the DIP Facility to be provided by each Joining DIP Commitment Party (provided that in no event shall a Backstop Party's Backstop Commitment in respect of the DIP Facility be reduced to an amount that would result in such Backstop Party's share of the DIP Facility being less than the pro rata percentage of First Lien Loans held by such Backstop Party as of the Agreement Effective Date, and any such reduction of the Backstop Commitments shall be allocated pro rata among the Backstop Parties that have committed to backstop more than the pro rata percentage of First Lien Loans held by such Backstop Parties as of the Agreement Effective Date (such Backstop Parties, the "**Oversubscribed Backstop Parties**"); *provided, further*, that if any Joining DIP Commitment Party elects to provide its DIP Commitment following the Effective Date (but on or before the Election Date), such Joining DIP Commitment Party shall purchase via assignment from the Oversubscribing Backstop Parties on

26

pro rata basis (and the Oversubscribed Backstop hereby agree to sell to such Joining DIP Commitment Party (subject to the immediately preceding proviso)) outstanding DIP New Money 1L Loans and unfunded DIP New Money 1L Commitments (each as defined in Exhibit B) for the full amount of such loans and commitments (after taking into account any original issue discount or upfront fees payable to all DIP Lenders) pursuant to the assignment provisions in the DIP Credit Agreement and at dates and times required by such Oversubscribing Backstop Parties; *provided*, *further*, that upon a termination of this Agreement as to the Consenting First Lien Lenders in accordance with the provisions hereof prior to the funding of the DIP Facility, the commitment of any Backstop Party or Joining DIP Commitment Party to provide its portion of the DIP Facility as set forth in this paragraph shall also terminate. Each Backstop Party and Joining DIP Commitment Party may participate in the DIP Facility on behalf of some or all accounts and funds managed by such Backstop Party or Joining DIP Commitment Party and some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Backstop Party or Joining DIP Commitment Party, and may allocate its participation in the DIP Facility among such funds in its sole discretion.

13.02. The Consenting Second Lien Lender (whose name is listed on **Schedule 1** hereto) commits to provide the portion of the DIP Facility set forth opposite such Party's name on **Schedule 1** hereto on the terms and conditions set forth in the DIP Term Sheet and otherwise subject to relevant Definitive Documents; *provided* that upon a termination of this Agreement as to the Consenting Second Lien Lender in accordance with the provisions hereof prior to the funding of the DIP Facility, the commitment of the Consenting Second Lien Lender to provide its portion of the DIP Facility as set forth in this paragraph shall also terminate.

**Section 14.    Release.**

14.01. On the Effective Date, each Releasing Party shall expressly and generally release, acquit, and discharge each Released Party as set forth below and as shall be provided in the Plan:

**TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE**

**COMPANY, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE FIRST LIEN FORBEARANCE AGREEMENT, THE EXIT FACILITIES DOCUMENTS, OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO (A) ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OR (B) EXCLUDED CLAIMS.**

14.02.  Each of the Releasing Parties shall grant this Release pursuant to and in accordance with the Plan (regardless of whether such Party is entitled to vote under the Plan) and this Agreement knowingly, notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party pursuant to and in accordance with the Plan and this Agreement shall expressly waive any and all rights that such Releasing Party may have under any statute or common law principle which would limit the effect of the Release to those claims actually known or suspected to exist as of before the Effective Date.

14.03.  In connection with their agreement to the foregoing Release pursuant to and in accordance with the Plan and this Agreement, the Releasing Parties shall knowingly and voluntarily waive and relinquish any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE COMPANY.**

**Each of the Releasing Parties hereby represents and warrants that it has access to adequate information regarding the terms hereof, the scope and effect of the Release, and all other matters encompassed by this Agreement to make an informed and knowledgeable decision**

28

**with regard to entering into this Agreement. Each of the Releasing Parties further represents and warrants that it has not relied upon any other Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement.**

**Section 15.    Amendments and Waivers.**

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement hereof may be waived, in any manner except in accordance with this Section 15.

(b)    This Agreement (including, for the avoidance of doubt, all term sheets and exhibits attached hereto) may be modified, amended, or supplemented, or a condition or requirement of this Agreement (including, for the avoidance of doubt, all term sheets and exhibits attached hereto) may be waived, only in a writing signed by the Company, the Requisite Consenting First Lien Lenders, the Consenting Second Lien Lender, and the Investor; *provided* that (i) any modification or amendment to the definition of Requisite Consenting First Lien Lenders shall also require the written consent of each Consenting First Lien Lender, (ii) any modification or amendment to this Section 15 shall require the written consent of each Party, and (iii) with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights or proposed treatment of any Consenting Stakeholder (in its capacity as such) or any other party that becomes a Party to this Agreement, such Consenting Stakeholder or other party, in each case unless otherwise specified in this Agreement.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 16.    Miscellaneous.**

16.01.    Acknowledgement. Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

16.02.    Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signature pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes,

signature pages, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (including the Term Sheet, but without reference to the exhibits, annexes, and schedules thereto) shall govern.  In the event of a conflict between this Agreement and the Term Sheet, the Term Sheet shall control.

16.03.  <u>Publicity</u>. The Company shall submit drafts to counsel to the Consenting Stakeholders of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) Business Days prior to making any such disclosure and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures.  Except as may be required by the Bankruptcy Court, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or other applicable law, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting First Lien Lender), (i) the amount or percentage of any Claims, Backstop Commitment, DIP Commitment, or other interests held by any Consenting First Lien Lender without such Consenting First Lien Lender's prior written consent, including by redacting any such information contained in this Agreement (including on the signature pages and schedules hereto), *provided* that the Company may aggregate the confidential claims information provided to the Company by the Consenting First Lien Lenders and disclose such combined data on an aggregate basis or (ii) the amount or percentage of any Claims, Backstop Commitment, DIP Commitment, or other interests held by the Consenting Second Lien Lender without the Consenting Second Lien Lender's prior written consent, including by redacting any such information contained in this Agreement (including on the signature pages and schedules hereto); *provided*, *however*, that if any such disclosure is required by Law, the disclosing Party shall, or shall cause its advisors to, afford the relevant Consenting Stakeholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure; *provided further* that each disclosing Party shall use commercially reasonable efforts to avoid using the name of any Second Lien Lender.

16.04.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable.

16.05.  <u>Complete Agreement</u>. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, understandings, and agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.06.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES OF THIS AGREEMENT. Each Party

to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Chosen Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of such court; (b) waives any objection to laying venue in any such action or proceeding in such applicable court; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

16.07. <u>TRIAL BY JURY WAIVER</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.08. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.09. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company and the Consenting Stakeholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement. The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.10. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity, except in accordance with Section 9 of this Agreement.

16.11. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to the Company, to:

VIP Cinema Seating, LLC
7955 Manchester Rd, Suite 125
St Louis, MO 63143
Attn: Michael Blatz
Email: blatz@vipcinemaseating.com

with copies to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attn:   Gregg M. Galardi
            Cristine Pirro Schwarzman
Email: Gregg.Galardi@ropesgray.com
            Cristine.Schwarzman@ropesgray.com

(b)     if to the Investor, to:

H.I.G. Capital, LLC
1271 Avenue of the Americas, 23rd Floor
New York, NY 10020
Attn:   Tenno Tsai
Email: ttsai@higcapital.com

with copies to:

McDermott Will & Emery LLP
444 West Lake Street
Chicago, IL 60606
Attn:     Brooks Gruemmer
             Jay Kapp
E-mail:  bgruemmer@mwe.com
             jkapp@mwe.com

(c)     if to the Consenting First Lien Lenders, to:

To each Consenting First Lien Lender at the addresses or e-mail addresses set forth below the Consenting First Lien Lender's signature page to this Agreement (or to the signature page to a Restructuring Support Agreement Joinder or Transfer Agreement Joinder as the case may be).

with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn:   Damian S. Schaible
            Adam L. Shpeen
Email: damian.schaible@davispolk.com
            adam.shpeen@davispolk.com

(d)     if to the Consenting Second Lien Lender, to:

████████████████████████



with copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attn:  Jayme T. Goldstein
Email: jgoldstein@stroock.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.12. <u>Independent Due Diligence and Decision Making</u>. Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company and it has been represented by counsel or other advisors (or has had ample opportunity to seek representation or advice from counsel or other advisors) in connection with this Agreement and the Restructuring.

16.13. <u>Waiver</u>. If the Restructuring is not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims and defenses and the Parties fully reserve any and all of their rights. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.14. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.15. <u>Several, Not Joint, Claims; Relationship Among Parties</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.16. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.17. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect of this Agreement at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy of this Agreement by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.18. <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder has entered into this Agreement on account of all Claims against, or Interests in, the Company that it holds (directly or through discretionary accounts that it manages or advises).

16.19. <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 15, or otherwise, including a written approval by the Company or the Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.20. <u>Survival</u>.  Notwithstanding (a) any Transfer of any Claim against, or interest in, the Company, in accordance with Section 9 of this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in this Section 16.20 and Sections 2, 12, 15, 16.01, 16.02, 16.03, 16.05, 16.06, 16.07, 16.08, 16.09, 16.10, 16.11, 16.12, 16.13, 16.14, 16.15, 16.16, 16.17, 16.18 and 16.19 hereof, and any defined terms used in any of the forgoing Sections, subsections or paragraphs (solely to the extent used therein), shall survive such transfer or termination and shall continue in full force and effect in accordance with the terms hereof.

16.21. <u>Consideration</u>.  Each Party hereby acknowledges that no consideration, other than that specifically described herein or in the Plan, shall be due or paid to any Consenting Stakeholder for its agreement (subsequent to proper disclosure and solicitation) to vote to accept the Plan or to otherwise support and take actions to effectuate the Restructuring in accordance with the terms and conditions of this Agreement, other than each of the Parties' representations, warranties, and agreements with respect to their commitments hereunder regarding the consummation of the Restructuring and the Confirmation and consummation of the Plan.

**IN WITNESS OF THIS AGREEMENT**, the Parties hereto have executed this Agreement on the day and year first above written.

[*Remainder of page intentionally left blank*.]

**Company's Signature Page to**
**the Restructuring Support Agreement**

**HIG CINEMA INTERMEDIATE HOLDINGS, INC.**
**VIP CINEMA HOLDINGS, INC.**
**VIP CINEMA, LLC**
**VIP PROPERTY MANAGEMENT II, LLC**
**VIP COMPONENTS, LLC**

By: _____
Name: Michael E. Foreman

Authorized Signatory

*[Company Signature Page to RSA]*

**CONSENTING FIRST LIEN LENDERS**



*[First Lien Signature Page to RSA]*

**CONSENTING SECOND LIEN LENDER:**

**H.I.G. Capital, LLC**

By:

Name: Richard Siegel
Title: General Counsel


Address:
1450 Brickell Ave 31st Floor
Miami, FL 33131


E-mail address(es): rsiegel@higcapital.com

**H.I.G. MIDDLE MARKET LBO FUND II, L.P.**
By: H.I.G. Middle Market Advisors II, LLC
Its: General Partner
        By: H.I.G.-GPII, Inc.
        Its: Manager


By:

Name:  Richard Siegel
Title:   Vice President and General Counsel


Address:
1450 Brickell Ave 31st Floor
Miami, FL 33131
E-mail address(es): rsiegel@higcapital.com

## Schedule 1

**Backstop Parties and Backstop Commitments**

**[REDACTED]**

**<u>Exhibit A</u>**

**Term Sheet**

**VIP CINEMA HOLDINGS, INC.**
**SUMMARY OF TERMS AND CONDITIONS**
**OF RESTRUCTURING TRANSACTION**

*This Summary of Terms and Conditions (this "Term Sheet") sets forth the principal terms of the Restructuring Transaction (defined and described herein). This Term Sheet is entitled to protection from any use or disclosure pursuant to Federal Rule of Evidence 408 and any other rule of similar import. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Existing First Lien Credit Agreement or the Existing Second Lien Credit Agreement (each as defined herein), as the context requires.*

| | |
|---|---|
| **Certain Defined Terms** | |

| | |
|---|---|
| **Company:** | HIG Cinema Intermediate Holdings, Inc. ("Holdings"), VIP Cinema Holdings, Inc. ("VIP"), VIP Cinema, LLC, VIP Property Management II, LLC, VIP Components, LLC, and any other direct or indirect subsidiary of VIP (collectively, the "Company"). |
| **Existing First Lien Credit Agreement:** | That certain First Lien Credit Agreement, dated as of March 1, 2017 (as may be amended, restated, amended and restated, modified or supplemented from time to time, the "Existing First Lien Credit Agreement"), by and among VIP, as the Borrower, Holdings, the other Guarantors from time to time party thereto, the Lenders party thereto (collectively, the "First Lien Lenders"), Wilmington Savings Fund Society, FSB, as successor administrative agent and collateral agent, and the other entities party thereto from time to time. |
| **Existing Second Lien Credit Agreement:** | That certain Second Lien Credit Agreement, dated as of March 1, 2017 (as may be amended, restated, amended and restated, modified or supplemented from time to time, the "Existing Second Lien Credit Agreement"), by and among VIP, as the Borrower, Holdings, the other Guarantors party thereto from time to time, the Lenders party thereto (collectively, the "Second Lien Lenders"), ████████████████, as successor administrative agent and collateral agent, and the other entities party thereto from time to time. |
| **Investor:** | H.I.G. Capital, LLC and its affiliates (collectively, the "Investor"). |
| **1L Ad Hoc Group:** | The group of First Lien Lenders represented by Davis Polk & Wardwell LLP and M-III Partners LP agreeing to support and facilitate the Restructuring Transaction (as defined herein) (the "1L Ad Hoc Group"). |

| | |
|---|---|
| **Restructuring Transaction – Indicative Key Terms** | |

| | |
|---|---|
| **Means for Implementation:** | The Company will implement a restructuring transaction described in this Term Sheet and the other Exhibits to the RSA (the "Restructuring Transaction") pursuant to a pre-packaged |

chapter 11 plan of reorganization (the "<u>Plan</u>") in accordance with the Restructuring Support Agreement (the "<u>RSA</u>"), to which this Term Sheet is attached as <u>Exhibit A</u>, in chapter 11 cases to be filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). The Company, as restructured pursuant to the Restructuring Transaction, shall be referred to herein as "<u>NewCo</u>".

**Restructuring Milestones:**    The following milestones shall be set forth in the RSA and apply to the Restructuring Transaction (the "<u>Restructuring Milestones</u>"):

(i)    chapter 11 petition date (the "<u>Petition Date</u>") to occur not later than February 18, 2020;

(ii)    entry of an order (the "<u>Interim DIP Order</u>") by the Bankruptcy Court approving the DIP Facility (as defined below), on an interim basis, not later than 5 days after the Petition Date;

(iii)    entry of an order (the "<u>Final DIP Order</u>") by the Bankruptcy Court approving the DIP Facility, on a final basis, not later than 35 days after the Petition Date;

(iv)    entry of an order by the Bankruptcy Court approving the disclosure statement for the Plan not later than 35 days after the Petition Date;

(v)    entry of an order by the Bankruptcy Court confirming the Plan not later than 35 days after the Petition Date; and

(vi)    occurrence of Exit Date (as defined below) no later than April 13, 2020.

**DIP Financing:**    A new senior secured superpriority debtor-in-possession term loan financing facility in an aggregate principal amount of $33 million having terms and conditions set forth on <u>Exhibit B</u> to the RSA (including the Funded Reserve Account, as defined therein) (the "<u>DIP Facility</u>"). The DIP Facility shall consist of (i) $13 million in principal amount of new money term loans to be provided by (a) certain First Lien Lenders (the "<u>Participating First Lien Lenders</u>"), in a principal amount of $11 million (the ("<u>1L New Money DIP Loans</u>") and (b) the Second Lien Lenders, in a principal amount of $2 million (the "<u>2L New Money DIP Loans</u>", and together with the 1L New Money DIP Loans, the "<u>New Money DIP Loans</u>"), of which $10 million (to be provided pro rata from the 1L New Money DIP Loans and 2L New Money DIP Loans) will be available upon entry of the Interim DIP Order and the remainder will be available upon entry of the Final DIP Order, in each case subject to the satisfaction of certain other conditions precedent set forth in <u>Exhibit B</u>, and the Company and (ii) a roll-up of $20 million principal amount of

loans (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans") under the Existing First Lien Credit Agreement held by each Participating First Lien Lender (pro rata), which Roll-Up Loans will be junior in right of security and payment to the New Money DIP Loans.

The DIP Loans shall bear interest at a rate of LIBOR *plus* 6.00% per annum and be paid in cash. The New Money DIP Loans shall be issued at 97% of par, and shall be net funded.

The Participating First Lien Lenders that commit to backstop the 1L New Money DIP Loans shall receive on the initial funding date of the DIP Facility their pro rata share of a cash commitment premium equal to 10% of the principal amount of the 1L New Money DIP Loans provided by such Participating First Lien Lenders.

In addition, Participating First Lien Lenders shall receive, on the Exit Date, their pro rata share of a commitment premium of 13% of the common equity of NewCo (the "Common Equity"), prior to dilution from the Management Incentive Plan.

The Second Lien Lenders that commit to backstop the 2L New Money DIP Loans shall receive on the initial funding date of the DIP Facility their pro rata share of a cash commitment premium equal to 5% of the principal amount of the 2L New Money DIP Loans committed to be provided by such Second Lien Lenders.

Proceeds of the New Money DIP Loans shall be used solely in accordance with a budget (subject to permitted variances) under the DIP Facility as more fully set forth in Exhibit B to the RSA. On the Exit Date the 1L New Money DIP Loans and the Roll-Up Loans shall convert into exit financing and the 2L New Money DIP Loans shall convert into preferred equity in NewCo (such preferred equity, which shall have an initial stated value of $69 million in its entirety, the "Preferred Equity") and Common Equity in Newco, as set forth below under the heading "Exit Financing."

**Exit Financing:**

On the effective date of the Restructuring Transaction (the "Exit Date"), there shall be in place (i) a senior secured first lien term loan facility (the "First Lien Exit Facility") in an aggregate principal amount of $11 million comprised of 1L New Money DIP Loans converted into loans under the First Lien Exit Facility on a dollar-for-dollar basis and (ii) a second lien exit term loan facility (the "Second Lien Exit Facility") comprised of converted Roll-Up Loans in an aggregate principal amount not to exceed $20 million. The terms and conditions of the First Lien Exit Facility and the Second Lien Exit Facility shall be set forth in Exhibit C and Exhibit D to the RSA, respectively.

On the Exit Date, the 2L New Money DIP Loans shall be converted into 25% of the Common Equity, prior to dilution

from the Management Incentive Plan, and Preferred Equity with an initial stated value of $2.0 million.

The terms and conditions of the Preferred Equity shall be set forth on <u>Exhibit E</u> to the RSA.

**New Equity Investment:**

On the Exit Date, the Investor shall (a) provide $7.0 million in equity financing (the "<u>New Money Commitment</u>") and (b) enter into a new management services agreement with NewCo (the "<u>New MSA</u>").  The New MSA shall (i) have a term ending on the earlier of (x) the date the Investor no longer has a controlling interest in, or otherwise controls the Board of, NewCo and (y) the fourth (4th) anniversary of the Exit Date, (ii) provide for a transaction fee (which fee shall be identical to the transaction fee provided to the Investor under the existing professional services agreement between the Investor and the Company) payable after the Aggregate Liquidation Preference Amount (as defined in Exhibit E) has been paid to holders of Preferred Equity regardless of whether the New MSA has been terminated, so long as the Investor remains the controlling shareholder of, or otherwise controls the Board of, NewCo at the time of a Liquidation Event (as defined in Exhibit E) and (iii) otherwise be on substantially the same terms and conditions provided by the Investor under the existing professional services agreement between the Investor and the Company; provided, however, that the New MSA will provide that the Investor will receive no annual fee and no transaction-related fee in connection with the Restructuring Transaction.

The Investor shall receive, on the Exit Date, in exchange for the New Money Commitment and the New MSA, 51% of the Common Equity, prior to dilution from the Management Incentive Plan, and Preferred Equity with an initial stated value of $7.0 million.  The Investor shall have no obligation to consent to any further dilution prior to or on the Exit Date.

Further, the Investor shall only be required to invest if the Company has at least $1,500,000 of available, unrestricted cash on the Exit Date after payment of, or reserving for the payment of, all outstanding checks and after giving effect to all distributions under the Plan, including but not limited to the payment in full of all fees and expenses related to the Restructuring Transaction (including, for the avoidance of doubt, all transactions, amounts, and reserves contemplated by the exhibits thereto).

**Treatment of First Lien Lenders:**

On the Exit Date, existing Loans under the Existing First Lien Credit Agreement will be exchanged pro rata for (i) Preferred Equity with an initial stated value of $60.0 million and (ii) 10% of the Common Equity, prior to dilution from the Management Incentive Plan.

| | |
|---|---|
| **Treatment of Second Lien Lenders:** | On the Exit Date, Loans under the Existing Second Lien Credit Agreement will be discharged and shall receive no distribution on account of such Claims (as defined in the RSA). |
| **Treatment of General Unsecured Claims:** | On the Exit Date, all of the general unsecured claims shall be discharged and will receive no distribution on account of such Claims; *provided* that if a holder of an allowed general unsecured claim opts in to the releases through the form to be provided (the "Opt-In Form"), such holder shall receive the lesser of (A) the allowed amount of its general unsecured claim or (B) $5,000. |
| **Other Creditors Treatment:** | Unless otherwise agreed in the Definitive Documents (as defined in the RSA), all other creditors will receive no distribution on the Exit Date. |
| **Existing Equity Treatment:** | Cancelled and entitled to no distribution. |
| **Governance:** | Governance to be substantially in accordance with the corporate governance term sheet attached to the RSA as Exhibit F. |
| **Management Incentive Plan:** | The new board of directors (or similar governing body) of NewCo (the "New Board") will be authorized to implement a management incentive plan (the "Management Incentive Plan"), substantially in accordance with the terms set forth in the Management Incentive Plan term sheet (the "MIP Term Sheet") attached to the RSA as Exhibit G. |
| **CEO Incentive Plan** | The New Board will be authorized to implement a CEO incentive plan for Michael Blatz consisting of 1% of Common Equity. |
| **Advisors to 1L Ad Hoc Group:** | The reasonable and documented fees and expenses incurred by the 1L Ad Hoc Group in connection with the Restructuring Transaction shall be paid by the Company (including the fees and expenses of Davis Polk & Wardwell LLP, M-III Partners LP and Morris, Nichols, Arsht & Tunnell LLP, as Delaware counsel to the 1L Ad Hoc Group). |
| **Advisors to Second Lien Lenders:** | The reasonable and documented fees and expenses incurred by the Second Lien Lenders (which shall be limited to the reasonable and documented fees and expenses of Stroock & Stroock & Lavan LLP, as primary legal counsel, and Young Conaway Stargatt & Taylor, LLP, as Delaware counsel to the Second Lien Lender) in connection with the Restructuring Transaction (including, but not limited to, the drafting and negotiation of this Term Sheet) shall be paid by the Company in an amount not to exceed: (a) with respect to fees and expenses incurred up until and including the date of execution of the RSA, $350,000, and (b) with respect to fees and expenses incurred after the date of execution of the RSA, $175,000. |
| **Advisors to Investor:** | The reasonable and documented fees and expenses incurred by the Investor in connection with the Restructuring Transaction |

|  | shall be paid by the Company (including the fees and expenses of McDermott Will & Emery LLP, as counsel to Investor) in an amount not to exceed: (a) with respect to fees and expenses incurred up until and including the date of execution of the RSA, $350,000, and (b) with respect to fees and expenses incurred after the date of execution of the RSA, $175,000. |
| --- | --- |
| **Releases:** | The Plan shall provide that all parties to the RSA shall provide and receive mutual releases as set forth in the Plan and the Restructuring Support Agreement. |
|  | The Plan shall permit all holders of general unsecured claims to opt in to the releases pursuant to the Opt-In Form. |
| **Tax Treatment:** | The Restructuring Transaction shall be structured in a tax efficient manner. |
| **Definitive Documentation:** | The identification of the definitive documentation relating to the Restructuring Transaction and financing contemplated thereby shall be set forth in the RSA. |

**Exhibit B**

**DIP Term Sheet**

EXECUTION VERSION

EXHIBIT B

**VIP CINEMA HOLDINGS, INC.**
**DIP FACILITY TERM SHEET**

This term sheet (this "**DIP Facility Term Sheet**") sets forth the principal terms of a senior secured superpriority debtor-in-possession facility (the "**DIP Facility**" and, the loans thereunder, the "**DIP Loans**"; the credit agreement evidencing the DIP Facility, the "**DIP Credit Agreement**" and, together with the other definitive documents governing the DIP Facility, the "**DIP Documents**," each of which shall be in form and substance consistent with this DIP Facility Term Sheet and otherwise reasonably acceptable to the DIP Facility Borrower (as defined herein), the DIP Facility Agent (as defined herein), the Requisite Consenting First Lien Lenders and the Consenting Second Lien Lender (in each case in accordance with the terms of the Restructuring Support Agreement, as applicable)) to be entered into by the DIP Facility Borrower, certain of its subsidiaries and Holdings (as defined herein) in connection with their respective cases (the "**Cases**"; the debtors and debtors-in-possession thereunder, the "**Debtors**" and each, a "**Debtor**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The DIP Facility will be subject to the approval of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and consummated in the Cases in accordance with (i) the DIP Orders (as defined herein) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility and (ii) the other DIP Documents (as defined herein) to be executed by the Debtors. Capitalized terms used herein but not defined have the meanings ascribed to such terms in the Restructuring Support Agreement to which this DIP Facility Term Sheet is attached (the "**Restructuring Support Agreement**", and the Term Sheet attached as Exhibit A thereto, the "**RSA Term Sheet**").

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **DIP Facility Borrower** | VIP Cinema Holdings, Inc., as a debtor and debtor-in-possession (the "**DIP Facility Borrower**" or the "**Company**"). |
| **Guarantors** | (i) HIG Cinema Intermediate Holdings, Inc. ("**Holdings**") and (ii) all direct and indirect domestic subsidiaries of Holdings (other than the DIP Facility Borrower), each as debtors and debtors-in-possession (collectively, the "**Guarantors**" and, together with the DIP Facility Borrower, the "**Loan Parties**"). |
| **DIP Facility Agent** | Wilmington Savings Fund Society, FSB, a federal savings bank, as administrative agent and collateral agent (in such capacities, the "**DIP Facility Agent**"). |
| **DIP Lenders** | (i) Consenting First Lien Lenders that agree to provide the DIP Facility on the terms set forth herein (in such capacities, collectively, the "**DIP 1L Lenders**"); provided that the DIP New Money 1L Commitments (as defined below) will be allocated among DIP 1L Lenders based on their ratable share of the aggregate principal amount of the First Lien Loans and be backstopped by the Backstop Parties in accordance with the Restructuring Support Agreement and (ii) the Consenting Second Lien Lender having to provide the DIP Facility on the terms set forth herein (together with one or more of its affiliates and/or related funds or managed accounts in such capacities, collectively, the "**DIP 2L Lenders**"; the DIP 1L Lenders, together with the DIP 2L Lenders, are collectively referred to herein as the "**DIP Lenders**"). |

| | |
|---|---|
| **Backstop Parties** | Those members of the Ad Hoc Group of Consenting First Lien Lenders represented by Davis Polk & Wardwell LLP that have agreed to backstop the DIP New Money 1L Commitments pursuant to the terms of the Restructuring Support Agreement (the "**Backstop Parties**"). |
| **Amount & Type of DIP Facility** | Senior secured superpriority debtor-in-possession facility in an aggregate principal amount of up to $33 million consisting of (A) $11 million in principal amount of new money term loan commitments from the DIP 1L Lenders (the "**DIP New Money 1L Commitments**" and the term loans thereunder, the "**DIP New Money 1L Loans**"), (B) $2 million in principal amount of new money term loan commitments from the DIP 2L Lenders (the "**DIP New Money 2L Commitments**" and the term loans thereunder, the "**DIP New Money 2L Loans**"; the DIP New Money 1L Loans, together with the DIP New Money 2L Loans, are collectively referred to herein as the "**DIP New Money Loans**") and (C) a roll-up of $20 million in principal amount of the Pre-Petition First Lien Loans held by the DIP 1L Lenders as provided under the "Roll-Up" section below. The borrowing of DIP New Money 1L Loans and the DIP New Money 2L Loans shall automatically and permanently decrease the DIP New Money 1L Commitments and DIP New Money 2L Commitments, respectively, on a dollar-for-dollar basis, and all DIP New Money Loans repaid or prepaid may not be reborrowed. Voluntary and mandatory prepayments of DIP New Money Loans shall be made on a pro rata basis (unless otherwise provided by the DIP Credit Agreement consistent with the Documentation Principles).<br><br>The DIP Lenders shall (on a several but not joint basis) make their DIP New Money Loans available to the DIP Facility Borrower in up to two draws in the following manner (in each case upon the satisfaction (as determined by the Required DIP Lenders) of the conditions precedent described below):<br><br>(a) The DIP Facility Borrower may make a single draw of DIP New Money Loans on the closing date of the DIP Facility (the "**Closing Date**") in an aggregate principal amount of up to $10.0 million (to be allocated pro rata among the DIP New Money 1L Commitments and the DIP New Money 2L Commitments) (such amount, the "**Initial Draw Amount**").<br><br>(b) The DIP Facility Borrower may make a single draw of DIP New Money Loans, on or within 3 business days following the date the Final Order has been entered by the Bankruptcy Court, in an aggregate principal amount of up to $3.0 million (to be allocated pro rata among the remaining DIP New Money 1L Commitments and the DIP New Money 2L Commitments) (such loans, the "**Delayed Draw Loans**"), which amount, for the avoidance of doubt, shall be in addition to the Initial Draw Amount (the date on which the Delayed Draw Loans are borrowed, the "**Delayed Draw Borrowing Date**").<br><br>"**Delayed Draw Commitment**" means the aggregate amount of the DIP Lenders' delayed draw commitments on the Closing Date not to exceed $3.0 million. |

| | The Delayed Draw Commitment will automatically terminate on the earlier to occur of (a) the date immediately following the Delayed Draw Borrowing Date and (b) the DIP Termination Date (as defined below).<br><br>The "**DIP Termination Date**" shall mean the earliest of (a) the Initial Maturity Date (as defined herein) or, if extended as described below, the Extended Maturity Date, (b) the date (i) of acceleration of the DIP Obligations (as defined below) and the termination of the unfunded DIP New Money Commitments in accordance with the terms of the DIP Credit Agreement (including as a result of the termination of the Restructuring Support Agreement) or (ii) on which all outstanding DIP Obligations are prepaid in full prior to the Maturity Date thereof (including in connection with any refinancing thereof), (c) the effective date of any Acceptable Plan of Reorganization (which shall be defined to provide that the Plan (as defined in, and in form and substance required by, the Restructuring Support Agreement) shall be an "Acceptable Plan of Reorganization") (the "**Plan Effective Date**") or any other plan of reorganization, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (e) the date that is thirty-five (35) days after the Petition Date (or such later date as may be agreed by the Required DIP Lenders), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date and (f) the date on which there occurs a material adverse effect on the business, operations, assets, liabilities (actual or contingent), operating results or financial condition of the Loan Parties and their Subsidiaries, taken as a whole (excluding any material adverse effect as a result of (i) the events and conditions related and/or leading up to the commencement of the Cases, (ii) any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Cases, (iii) any reduction in payment terms by suppliers and (iv) any reclamation claims). |
|---|---|
| **Roll-Up Loans** | Upon entry of the Final Order, an amount of Pre-Petition First Lien Loans will be automatically substituted and exchanged for (and deemed prepaid upon the issuance of) DIP Loans (the "**Roll-Up Loans**") in an aggregate principal amount of $20 million allocated among the DIP 1L Lenders based on their pro rata share of DIP New Money 1L Commitments on the Closing Date.<br><br>The Roll-Up Loans shall be junior in right of payment and security to the DIP New Money Loans. |

| Maturity Date | The date (such date, the "**Initial Maturity Date**") falling 90 days after the commencement of the Cases (such commencement date, the "**Petition Date**"); provided that the DIP Facility Borrower, with the consent of the Required DIP Lenders, shall have the right to extend the Initial Maturity Date for a period of up to 60 days (the "**Extended Maturity Date**") subject to the following conditions: (i) the Debtors shall have provided the DIP Facility Agent (for distribution to the DIP Lenders) with not less than 5 business days' prior written notice of such extension, (ii) the Debtors shall have filed an Acceptable Plan of Reorganization, (iii) the DIP Facility Borrower shall pay to the DIP Facility Agent, for the account of the DIP Lenders, an extension premium in an amount equal to 0.50% of the DIP Loans then outstanding and (iv) no default or event of default under the DIP Documents shall have occurred and be continuing. |
|---|---|
| **Plan Effective Date: Equity Distributions; Conversion to Exit Facilities** | On the Plan Effective Date:<br><br>(a)  DIP New Money 1L Loans will convert into the First Lien Exit Facility (as defined in the RSA Term Sheet), on the terms and conditions as more fully set forth in Exhibit C of the Restructuring Support Agreement;<br><br>(b)  Roll-Up Loans will convert into the Second Lien Exit Facility (as defined in the RSA Term Sheet), on the terms and conditions as more fully set forth in Exhibit D of the Restructuring Support Agreement;<br><br>(c)  the DIP 2L Lenders will receive, on account of their DIP New Money 2L Loans, (i) Preferred Equity (as defined in the RSA Term Sheet) with an initial stated value of $2.0 million, on the terms and conditions as more fully set forth in Exhibit E of the Restructuring Support Agreement and (ii) 25.00% (calculated prior to giving effect to any dilution pursuant to the Management Incentive Plan) of the Common Equity (as defined in the RSA Term Sheet), as more fully set forth in the Restructuring Support Agreement and the RSA Term Sheet; and<br><br>(d)  the DIP 1L Lenders will receive the 1L Common Equity Payment described below under the heading "*Fees and Other Payments*."<br><br>If the DIP Termination Date occurs other than as a result of the Plan Effective Date, all DIP Obligations shall be immediately paid in cash, and the DIP Lenders shall receive the payments required to be paid thereon and described below under the heading "*Fees and Other Payments*." |
| **Use of Proceeds** | Solely in accordance with the DIP Orders and the Approved Budget (as defined herein) (subject to any permitted variances), the proceeds of the DIP Loans will be used (i) to pay certain costs, fees and expenses related to the Cases, (ii) to fund the Carve-Out from and after the delivery of the Carve-Out Trigger Notice (as defined herein) to make payments under the Carve-Out in accordance with the terms of the DIP Orders and (iii) to fund the working capital needs and expenditures of the Debtors during the Cases, including (except with respect to the proceeds of DIP New Money Loans) to roll up the First Lien Loans as provided in the "Roll-Up Loans" section above. |

| Interest Rate | LIBOR <u>plus</u> 6.00% per annum (or if applicable, ABR <u>plus</u> 5.00% per annum).<br><br>Interest shall be payable in cash on each Interest Payment Date (as defined below).<br><br>"**Interest Payment Date**" shall mean (a) with respect to any ABR loan, the last business day of each March, June, September and December to occur during any period in which such loan is outstanding, (b) with respect to any Eurodollar loan, the last day of the interest period applicable to the borrowing of which such loan is a part and (c) with respect to any loan, the Maturity Date and, after such maturity, on each date on which demand for payment is made. |
|---|---|
| **Original Issue Discount** | 3.00% applicable to the DIP New Money Loans |
| **Default Interest** | Upon the occurrence and during the continuation of an event of default, unless otherwise waived with respect to all DIP Loans by the Required DIP Lenders, all obligations will bear interest at (i) in the case of principal and interest, a rate equal to 2.00% per annum, <u>plus</u> the otherwise applicable rate to the relevant DIP Loans and (ii) in the case of all other amounts, at a rate equal to 2.00% per annum <u>plus</u> the rate applicable to DIP Loans that are ABR loans.<br><br>All interest accruing at the default rate set forth above shall be payable in cash on demand.  For the avoidance of doubt, cash on deposit in the Funded Reserve Account shall not be used to pay interest on the DIP Loans. |
| **Amortization** | None. |
| **Fees and Other Payments** | **DIP Termination Date Payments**<br>Without limiting anything set forth above under the heading "*Plan Effective Date: Equity Distributions; Conversion to Exit Facilities*" and, in each case, subject to the Plan:<br><br>(a)   If the DIP Termination Date occurs as a result of the Plan Effective Date occurring, each DIP 1L Lender will receive on the Plan Effective Date, on account of its DIP New Money 1L Commitments, its pro rata share of 13.00% (prior to dilution from the Management Incentive Plan) of the Common Equity (the "**1L Common Equity Payment**"); <u>provided</u> that if the DIP Termination Date does not occur as a result of the Plan Effective Date, each DIP 1L Lender will instead receive on the DIP Termination Date a cash fee in an amount equal to 5.00% of its DIP New Money 1L Commitments (as in effect on the Closing Date).<br><br>(b)   If the DIP Termination Date does not occur as a result of the Plan Effective Date occurring, each DIP 2L Lender will receive on the DIP Termination Date a cash payment in an amount equal to 5.00% of its DIP New Money 2L Commitments (as in effect on the Closing Date).<br><br>**Closing Date Payments**: |

|  | (a)  *OID*:  The DIP New Money Loans shall be issued at 97.00% of par value, which shall constitute an original issue discount and shall be netted from the amount funded by the DIP Lenders on the Closing Date (the "**OID**").<br><br>(a)  *DIP 1L Lender Backstop Party Fee*:  Each Backstop Party will receive its pro rata share of a backstop party commitment fee equal to 10.00% of the aggregate principal amount of the DIP New Money 1L Commitments on the Closing Date, which shall be payable in cash on the Closing Date by netting a corresponding amount from the amount funded by the DIP Lenders on the Closing Date.<br><br>(b)  *DIP 2L Lender Backstop Payment*:  Each DIP 2L Lender will receive, on account of its commitment to fund the DIP 2L Loans, its pro rata share of a payment equal to 5.00% of the aggregate principal amount of the DIP New Money 2L Commitments on the Closing Date, which shall be payable in cash on the Closing Date by netting a corresponding amount from the amount funded by the DIP Lenders on the Closing Date.<br><br>**Other Fees**:<br>*Delayed Draw Commitment Fee*:  Each DIP Lender will receive a fee in an amount equal to 0.50% of the average daily unused amount of the Delayed Draw Commitment of such DIP Lender from and including the Closing Date to but excluding the Delayed Draw Commitment Termination Date.  The accrued Delayed Draw Commitment Fee shall be payable on the Delayed Draw Borrowing Date. |
|---|---|
| **Mandatory Prepayments** | Unless otherwise waived by the Required DIP Lenders, mandatory prepayments under the DIP Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness or equity (with exceptions for permitted indebtedness and equity issuances to the DIP Borrower or any subsidiary that is a Loan Party), (b) sales or other dispositions (including casualty events) of any assets (excluding sales of inventory in the ordinary course of business and other customary exceptions to the mutually agreed) in excess of $150,000 in the aggregate and (c) extraordinary receipts in excess of $150,000 in the aggregate. |
| **Voluntary Prepayments** | Outstanding DIP Loans may be voluntarily prepaid at any time without premium or penalty, except as provided under the heading "*Fees and Other Payments*." |

| | |
|---|---|
| **Interim Order** | The interim order of the Bankruptcy Court approving the DIP Facility shall be in form and substance satisfactory to the Required DIP Lenders (the "**Interim Order**") and shall, among other things, authorize and approve (i) the borrowing and making of the DIP New Money Loans in an aggregate principal amount of $13 million, (ii) the granting of the superpriority claims and liens against the Debtors and their assets in accordance with the DIP Documents and as contemplated by this DIP Facility Term Sheet, (iii) the payment of all reasonable and documented fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Facility Agent and the DIP Lenders as described under the heading "*Fees and Expenses & Indemnification*" by the Debtors, (iv) the use of cash collateral; <u>provided</u> that adequate protection shall be granted consistent with the terms set forth in this DIP Facility Term Sheet and (v) the payment of the fees described under the heading "*Fees and Other Payments*," which payment shall not be subject to reduction, setoff or recoupment. |
| **Final Order** | The final order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the DIP Loans (including, without limitation, the Roll-Up Loans) and the transactions contemplated by the DIP Documents, shall be in the form of the Interim Order (subject to the requirements of the Restructuring Support Agreement, with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required DIP Lenders) (subject to the requirements of the Restructuring Support Agreement, as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required DIP Lenders in their sole discretion) as to which no stay has been entered approving the DIP Facility (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"). |
| **Pre-Petition Facilities**[1] | "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of March 1, 2017 (as amended from time to time prior to the date hereof),  by and among the Company, Holdings, the other Guarantors from time to time party thereto, the lenders party thereto (the "**First Lien Lenders**"), Wilmington Savings Fund Society, FSB, a federal savings bank, as successor administrative agent and successor collateral agent (in such capacities, the "**First Lien Agent**"), and the other entities party thereto from time to time. The "Secured Parties" thereunder are referred to herein as the "**First Lien Secured Parties**" and the "Loans" thereunder are referred to herein as the "**First Lien Loans**." <br><br> "**Second Lien Term Loan Agreement**" means that certain Second Lien Credit Agreement, dated as of March 1, 2017 (as amended from time to time prior to the date hereof), by and among the Company, Holdings, the other Guarantors party thereto from time to time, the lenders party thereto, ████████████ ████████████, as successor administrative agent and successor collateral agent (in such capacities, the "**Second Lien Agent**"), and the other entities party thereto from time to time.  The "Secured Parties" thereunder are referred to herein as the "**Second Lien Secured Parties**." |

---

[1] In each case, as amended, restated, supplemented or otherwise modified prior to the date of the Restructuring Support Agreement.

|  | The First Lien Credit Agreement and the Second Lien Term Loan Agreement are referred to herein as the "**Pre-Petition Credit Agreements**" and, the secured obligations thereunder, collectively, the "**Pre-Petition Secured Obligations**"; all "Collateral" securing such Pre-Petition Secured Obligations are referred to herein as the "**Pre-Petition Collateral**."<br><br>The First Lien Secured Parties and the Second Lien Secured Parties are collectively referred to herein as the "**Pre-Petition Secured Parties**."<br><br>The facilities governed by the First Credit Agreement and the Second Lien Term Loan Agreement are collectively referred to herein as the "**Pre-Petition Facilities**."<br><br>The First Lien Agent and the Second Lien Agent are collectively referred to herein as the "**Agents**." |
|---|---|
| **DIP Facility Documents** | The obligations under the DIP Credit Agreement shall be secured and guaranteed pursuant to the DIP Orders and such other security documents as may be reasonably required by the DIP Facility Agent and the Required DIP Lenders.<br><br>The DIP Documents shall be subject to the requirements of Section 3 of the Restructuring Support Agreement and shall reflect the terms and provisions set forth in this DIP Facility Term Sheet and shall otherwise be substantially consistent with the documentation governing the First Lien Credit Agreement; <u>provided</u> that certain provisions, including the representations and warranties, covenants, and events of default shall be modified in a manner appropriate to reflect the debtor-in-possession nature of the DIP Facility (including by deleting or modifying baskets and thresholds applicable to the covenants) (the "**Documentation Principles**"). |
| **DIP Collateral** | All present and after acquired assets and property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including (without limitation) all accounts, all deposit accounts, securities accounts and commodities accounts, inventory, equipment, capital stock of subsidiaries of the Loan Parties, including, for the avoidance of doubt, any equity or other interests in the Loan Parties' non-Debtor and/or jointly-owned subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law ("**Avoidance Actions**") but, subject to entry of the Final Order, including the proceeds thereof ("**Avoidance Proceeds**").  The collateral described above is collectively referred to herein as the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facility are referred to herein as the "**DIP Liens**." |

| | |
|---|---|
| **Priority Under the DIP Facility** | All obligations of the Loan Parties to the DIP Lenders and to the DIP Facility Agent (collectively, the "**DIP Obligations**") shall, subject to the Carve-Out (as defined below), at all times:<br><br>(a)     be entitled to superpriority administrative expense status in the Case of such Loan Party;<br><br>(b)     be secured by a fully perfected first priority security interest and lien on the DIP Collateral that is not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date or (y) valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code;<br><br>(c)     except as otherwise provided in clause (d) below with respect to the existing liens of the Pre-Petition Secured Parties with respect to the DIP Collateral of each Loan Party, be secured by a junior perfected security interest and lien on the DIP Collateral to the extent such DIP Collateral is subject to (A) valid, perfected and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Pre-Petition Credit Agreements and (B) valid and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Pre-Petition Credit Agreements that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((A) and (B) together, the "**Permitted Prior Liens**"); and<br><br>(d)     be secured by a perfected priming security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the obligations under the Pre-Petition Facilities.<br><br>The "**Carve-Out**" shall be in an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000 (without regard to the notice set forth in (iii) below); and (iii) to the extent allowed at any time, whether by interim or final compensation order or any other order of the Bankruptcy Court, all unpaid fees, costs, and expenses (the "**Professional Fees**") incurred or accrued by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and any official committee of unsecured creditors (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first day following delivery by the DIP Facility Agent of a Carve-Out Trigger Notice (defined below), plus Professional Fees incurred after the Carve-Out Trigger Notice in an amount not to exceed $1,000,000; _provided_ that under no circumstances shall any success, completion, or similar fees be payable from the Carve-Out (collectively, the "**Carve-Out Amount**"), in each case subject to the limits imposed by the DIP Orders. |

The Debtors shall establish and fund a segregated account (the "**Funded Reserve Account**") for purposes of funding the Carve-Out. Upon entry of the Interim Order, the Debtors shall deposit in the Funded Reserve Account an amount equal to the aggregate amount of Professional Fees projected in the Initial DIP Budget to accrue from the Petition Date through the Effective Date. To the extent the amount of Professional Fees accrued exceeds the amount in the Funded Reserve Account, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund into the Funded Reserve Account such additional amount.

"**Carve-Out Trigger Notice**" shall mean a written notice delivered by the DIP Facility Agent describing the event of default that has occurred and is continuing under the applicable DIP Documents. Immediately upon delivery of a Carve-Out Trigger Notice, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Facility Agent or the Agents (the "**Carve-Out Account**"), an amount equal to the Carve-Out Amount. The Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Professional Fees.

The funds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Facility Agent and the Agents, each on behalf of themselves and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall have a security interest upon any residual interest in the Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Carve-Out, and the priority of such lien on the residual should be consistent with the DIP Orders.

In addition:
- there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Professional Persons as of the delivery of the Carve-Out Trigger Notice; and
- any payment or reimbursement made for fees and expenses incurred after the delivery of the Carve-Out Trigger Notice to a Professional Person shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis, and to the extent any payment to a Professional Person is subsequently disallowed and/or disgorged, the proceeds of any claim against the Professional Person for amounts so disallowed or disgorged shall constitute DIP Collateral subject to the DIP Liens.

Subject to the terms of the DIP Orders, notwithstanding the foregoing, no portion of the Carve-Out shall be used for the payment of fees, disbursements, costs or expenses incurred by any Professional Person to investigate, challenge, object to, contest, or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Pre-Petition Loan Documents.

None of the DIP Facility Agent, the DIP Lenders, or the Pre-Petition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the cases

| | |
|---|---|
| | under any chapter of the Bankruptcy Code; instead, the Carve-Out shall be paid from the Prepetition Collateral, the DIP Collateral, and proceeds of both. |
| **Adequate Protection** | First Lien Secured Parties:<br><br>(a)   payment of the reasonable and documented prepetition and post-petition fees and expenses of the First Lien Agent and the ad hoc group of lenders under the First Lien Credit Agreement, including the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP, as primary counsel, one local counsel, and M-III Partners, LP, as financial advisor, and Wilmer Cutler Pickering Hale and Dorr LLP, as counsel to the First Lien Agent;<br><br>(b)   replacement liens on the DIP Collateral to secure the First Lien Secured Party Adequate Protection Claims (as defined below) (the "**First Lien Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens and (iii) the DIP Liens securing the DIP Facility;<br><br>(c)   allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**First Lien Secured Party Adequate Protection Claims**");<br><br>(d)   financial reporting and other reports and notices delivered by the DIP Facility Borrower under the DIP Facility; and<br><br>(e)   the Milestones (as defined below) may be amended, modified or extended, in each case, as to the First Lien Secured Parties by the prior written consent of the Required First Lien Secured Parties (which shall mean First Lien Lenders holding greater than 50% of the outstanding principal amount of First Lien Loans).<br><br>Second Lien Secured Parties:<br><br>(a)   payment of the reasonable and documented prepetition and post-petition fees and expenses of the Second Lien Agent and the lenders under the Second Lien Credit Agreement in accordance with (and subject to limitations set forth in) the RSA Term Sheet;<br><br>(b)   replacement liens on the DIP Collateral to secure the Second Lien Secured Party Adequate Protection Claims (as defined below), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the DIP Liens securing the DIP Facility, (iv) First Lien |

|  | Secured Party Adequate Protection Liens and (v) the liens of the First Lien Agent on the Pre-Petition Collateral;<br><br>(c)   allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Second Lien Secured Party Adequate Protection Claims**"); and<br><br>(d)   financial reporting and other reports and notices delivered by the DIP Facility Borrower under the DIP Facility. |
|---|---|
| **Milestones** | To be consistent with the milestones set forth in Section 4 of the Restructuring Support Agreement. |
| **Representations and Warranties** | Customary and appropriate for debtor-in-possession financings of this type consistent with the Documentation Principles, including (without limitation) representations with respect to the DIP Budget (including the Initial DIP Budget) (each as defined herein), the Cases and the DIP Orders.<br><br>"**DIP Budget**" means a rolling 13-week operating budget and cash flow forecast in form and substance reasonably satisfactory to the Required DIP Lenders (as more fully set forth below) delivered on or prior to the Petition Date and every four weeks after the Petition Date, setting forth, among other things, the Debtors' projected cash receipts, operating disbursements (which shall consist of the line items for payroll, inventory purchase, payables, capital expenditures and income taxes), operating cash flow, non-operating disbursements (including restructuring fees and principal and interest) and net cash flow during such 13-week period (i) initially, covering the period commencing on or about the Petition Date and (ii) thereafter, covering the period commencing on the first day of each four-week anniversary thereafter. The DIP Budget delivered on or prior to the Petition Date is referred to herein as the "**Initial DIP Budget**." |

| Information/Reporting Covenants | Customary and appropriate reporting and information covenants for debtor-in-possession financings of this type, including (without limitation): |
|---|---|
| | (a) Not later than 5:00 p.m. (Eastern time) on the last Thursday of every four-week anniversary (commencing with the fourth Thursday following the Thursday of the first forecast week of the Initial DIP Budget) or, to the extent such Thursday is not a business day, the next business day thereafter, a DIP Budget beginning on the Monday of such week, which shall be reasonably acceptable to the Required DIP Lenders (including any changes made in any updated DIP Budget with respect to any periods that were included in a previously delivered Approved Budget; provided that a separate explanation in reasonable detail of such changes shall be provided to the DIP Lenders) and no such DIP Budget shall be effective until so approved; provided that the Required DIP Lenders shall be deemed to have approved a DIP Budget delivered after the Petition Date unless DIP Lenders constituting the Required DIP Lenders (or M-III Partners, LP, on their behalf) shall have objected to such DIP Budget within five (5) business days after delivery thereof.  To the extent any such updated DIP Budget is approved, the line item amounts set forth therein shall only be used to calculate the projected line items commencing with the week in which such updated DIP Budget is approved by the Required DIP Lenders and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable cumulative period shall be calculated using the projected line items set forth in the previously Approved Budget in which such prior weeks were first forecasted (unless otherwise approved by the Required DIP Lenders).  Upon such approval or deemed approval by the Required DIP Lenders, the Initial DIP Budget and each DIP Budget delivered thereafter shall constitute an "**Approved Budget**"; |
| | (b) Not later than 5:00 p.m. (Eastern time) on the Thursday of every week (commencing with the second Thursday following the Thursday of the first forecast week of the Initial DIP Budget) or, to the extent such Thursday is not a business day, the next business day thereafter (such date, a "**Budget Variance Test Date**"), a Budget Variance Report (as defined herein) for the Test Period (as defined herein), which such report shall be certified by a responsible officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein; |
| | (c) Upon request, up to once per week, update calls with the DIP Lenders and their respective advisors covering the DIP Budget and the DIP Variance Reports for the prior week related thereto, the Loan Parties' financial condition, business operations, liquidity, business plan, and the status of the Cases generally; |
| | (d) Monthly unaudited financial statements within 30 days after each fiscal month; |
| | (e) Quarterly unaudited financial statements within 45 days after each fiscal quarter; |

<table>
<tr><td></td><td>

(f)    Audited annual financial statements delivered following year-end within a time period to be agreed;

(g)    Delivery (solely to M-III Partners, LP) of bids for the sale of any material portion of the Loan Parties' assets (including through a plan);

(h)    Additional reporting requirements applicable under the First Lien Credit Agreement as mutually agreed between the Borrower and the Required DIP Lenders; and

(i)    Other information as may be reasonably requested by the DIP Facility Agent or any DIP Lender.

"**Budget Variance Report**" means a variance report in form and detail reasonably satisfactory to the Required DIP Lenders, reconciling the Approved Budget to the actual sources and uses of cash for the Test Period (a) showing, for such periods, actual results for the following items: (i) cash receipts, (ii) operating disbursements, (iii) payroll, (iv) inventory purchase, (v) capital expenditures, (vi) operating cash flow, (vii) non-operating disbursements and (viii) net cash flow, (b) noting a line-by-line reconciliation of variances from values set forth for such periods in the relevant Approved Budget and (c) providing an explanation for all material variances, certified by a responsible officer of the Borrower.

"**Test Period**" means the rolling four-week period (or, if a four-week period has not elapsed since the Petition Date, the cumulative period since the Petition Date) most recently ended on the last Friday prior to the delivery of each Budget Variance Report.

</td></tr>
<tr><td>

**Affirmative Covenants**

</td><td>

Customary and appropriate affirmative covenants for debtor-in-possession facilities of this type, including, but not limited to, the following (subject to certain exceptions and basket amounts to be negotiated pursuant to the Documentation Principles):

-    information and reporting requirements set forth under the heading "Information/Reporting Covenants";

-    certificates and other information;

-    notices;

-    payment of obligations;

-    preservation of existence;

-    maintenance of properties;

-    maintenance of insurance;

-    compliance with laws;

-    books and records;

-    inspection rights;

-    additional collateral and additional guarantors;

</td></tr>
</table>

| | |
|---|---|
| | - compliance with environmental laws; |
| | - further assurances and post-closing conditions; |
| | - commercially reasonable efforts to obtain ratings from either S&P or Moody's; |
| | - use of proceeds; |
| | - control agreements; |
| | - lender conference call; |
| | - milestones; |
| | - customary bankruptcy related matters; and |
| | - priority liens and claims. |
| **Negative Covenants** | Customary and appropriate negative covenants for debtor-in-possession facilities of this type, including but not limited to, the following (subject to certain exceptions and basket amounts to be negotiated pursuant to the Documentation Principles): |
| | - liens; |
| | - investments; |
| | - indebtedness; |
| | - fundamental changes; |
| | - dispositions; |
| | - restricted payments; |
| | - change in business; organizational documents |
| | - transactions with affiliates; |
| | - burdensome agreements; |
| | - financial covenants; |
| | - fiscal year; |
| | - prepayment of certain indebtedness; |
| | - permitted activities; |
| | - subsidiaries; and |
| | - additional customary bankruptcy matters. |

| | |
|---|---|
| **Financial Covenants** | The DIP Facility shall contain the following financial covenants (the "**Financial Covenants**"):<br><br>(a) *Budget Variance Covenant*:  Beginning with the delivery of the initial Budget Variance Report, as of each Budget Variance Test Date, for the most recently ended Test Period:<br><br>    (i)  the negative variance (as compared to the applicable Approved Budget) of the aggregate cash receipts of the Debtors shall not exceed (x) 20% for the first Budget Variance Test Date following the Petition Date, (y) 20% for the second Budget Variance Test Date following the Petition Date and (z) 15% for each Budget Variance Test Date thereafter; and<br><br>    (ii)  the positive variance (as compared to the applicable Approved Budget) of the operating disbursements of the Debtors shall not exceed (x) 20% for the first Budget Variance Test Date following the Petition Date, (y) 20% for the second Budget Variance Test Date following the Petition Date and (z) 15% for each Budget Variance Test Date thereafter.<br><br>For the avoidance of doubt, all fees, charges and expenses incurred in connection with obtaining or maintaining credit ratings are deemed to be permitted in accordance with the applicable Approved Budget (regardless of whether provided for therein) for all purposes.<br><br>(b) *Liquidity*:  Liquidity (as defined below) at any time shall not be less than $4 million.<br><br>"**Liquidity**" means an amount equal to the unrestricted cash and cash equivalents of the Debtors at such time; <u>provided</u> that the amount on deposit in the Funded Reserve Account shall be included for purposes of determining Liquidity. |
| **Events of Default** | Usual and customary for debtor-in-possession financings of this type, including (without limitation), events of default related to dismissal or conversion of the Cases, amending or vacating the DIP Orders, filing of a plan of reorganization that is not an Acceptable Plan, the automatic stay, milestones, the termination of the Restructuring Support Agreement and other bankruptcy-related events of default. |
| **Conditions Precedent to Closing** | Usual and customary for debtor-in-possession financings of this type, including (without limitation): (i) execution and delivery of the DIP Credit Agreement and the other DIP Documents evidencing the DIP Facility, (ii) the Petition Date shall have occurred, and the DIP Facility Borrower and each Guarantor shall be a debtor and a debtor-in-possession, (iii) the entry of the Interim Order not later than five (5) calendar days following the Petition Date, (iv) the delivery of the Initial DIP Budget, (v) the Restructuring Support Agreement shall have become effective and binding in accordance with its terms and (vi) the entry of all "first day" orders and related pleadings with the Bankruptcy Court that are acceptable in form and substance to the Required DIP Lenders. |

| Conditions Precedent to the Extension of each DIP New Money Loan | Usual and customary for debtor-in-possession financings of this type, including (without limitation): (i) no default or event of default, (ii) accuracy of representations and warranties in all material respects, (iii) the Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Lenders, (iv) delivery of a customary notice of borrowing, and (v) the Restructuring Support Agreement shall be in full force and effect. |
|---|---|
| Voting | Amendments and waivers of the DIP Facility will require the approval of DIP Lenders holding more than 50% of the unused DIP New Money Commitments and outstanding DIP Loans in the aggregate (the "**Required DIP Lenders**"), subject to (i) such "sacred rights" as are customary in debtor-in-possession financings of this type and consistent with those contained in the First Lien Credit Agreement, which shall require the consent of each affected DIP Lender or all DIP Lenders, as applicable, for amendments to certain provisions (including changes to the provisions of any DIP Loan Document in a manner that by its terms adversely affects the rights of DIP Lenders holding loans of one class differently from the rights of DIP Lenders holding loans of any other class without the prior written consent of DIP Lenders holding a majority of the loans and/or commitments of such adversely affected class) and (ii) customary protections for the DIP Facility Agent, in each case, subject to the Documentation Principles.<br><br>As of the Closing Date, for all purposes under the DIP Loan Documents, including with respect to the applicable calculations in determining DIP Lenders constituting the Required DIP Lenders, DIP New Money 1L Commitments, DIP New Money 2L Commitments, Delayed Draw Commitments and DIP New Money Loans (in each case held DIP 1L Lenders or DIP 2L Lenders) and Roll-Up Loans shall constitute a single class of loans and commitments. |
| Fees and Expenses & Indemnification | Usual and customary for debtor-in-possession financings of this type and otherwise subject to the Documentation Principles; provided that the DIP 1L Lenders (taken as a whole) and (subject to the terms of, and limitations set forth in, the RSA Term Sheet) the DIP 2L Lenders (taken as a whole) shall each be entitled to retain (and shall be reimbursed for fees and expenses relating to) their own respective counsel in connection with the preparation, negotiation, syndication and execution of the DIP Loan Documents, any amendment, waiver, consent or other modification of the provisions thereof and the consummation and administration of the transactions contemplated thereby; provided, further, that the Loan Parties and their subsidiaries shall not be required to reimburse the fees and expenses of the DIP 2L Lenders in excess of (i) for fees and expenses accrued prior to and including the date of the Restructuring Support Agreement, $350,000 and (ii) for fees and expenses accrued after the date of the Restructuring Support Agreement, $175,000. |
| Assignments and Participations | Usual and customary for debtor-in-possession financings of this type, including assignments of DIP Loans subject to the consent of the DIP Facility Borrower (not to be unreasonably withheld) unless a default or event of default exists (such consent to be deemed given if no objection is provided within 5 business days) and the DIP Facility Agent; provided that the DIP Facility Borrower shall be deemed to have consented to any assignment of DIP New Money 1L Loans and |

| | DIP New Money 1L Commitments by a Backstop Party to a Joining DIP Commitment Party pursuant to Section 13.01 of the Restructuring Support Agreement; provided, further, that no DIP 1L Lender shall have the right to assign all or any portion of its DIP New Money 1L Loans or Roll-Up Loans (except in the case of assignments to affiliates of the DIP 1L Lender) absent a simultaneous assignment of a corresponding proportional amount of Roll-Up Loans (in the case of an assignment of DIP New Money 1L Loans), DIP New Money 1L Loans (in the case of an assignment of Roll-Up Loans) and First Lien Loans. |
|---|---|
| **Governing Law** | The laws of the State of New York and, to the extent applicable, by the Bankruptcy Code. |
| **Counsel to DIP Facility Agent** | Wilmer Cutler Pickering Hale and Dorr LLP |
| **Counsel to the DIP 1L Lenders** | Davis Polk & Wardwell LLP |
| **Counsel to the DIP 2L Lenders** | Stroock & Stroock & Lavan LLP |

**<u>Exhibit C</u>**

**First Lien Exit Facility Term Sheet**

EXECUTION VERSION

EXHIBIT C

## VIP CINEMA HOLDINGS, INC.
## FIRST LIEN EXIT TERM LOAN FACILITY

This term sheet (this "**First Lien Exit Facility Term Sheet**") sets forth the principal terms of a first lien exit term facility to be provided to VIP Cinema Holdings, Inc., as borrower and a reorganized Debtor. Capitalized terms used herein but not defined have the meaning ascribed to such terms in the Restructuring Support Agreement (the "**Restructuring Support Agreement**") to which this First Lien Exit Facility Term Sheet is attached and Exhibit B attached to the Restructuring Support Agreement.

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **Borrower** | VIP Cinema Holdings, Inc., as reorganized pursuant to Cases (the "**Borrower**"). |
| **Guarantors** | (i) An existing or newly formed direct or indirect parent of the Borrower ("**Holdings**") and (ii) all direct and indirect wholly-owned domestic subsidiaries of Holdings (other than the Borrower), as reorganized pursuant to Cases (collectively, the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**"). |
| **Administrative Agent and Collateral Agent** | Wilmington Savings Fund Society, FSB, a federal savings bank, as administrative agent and collateral agent (in such capacities, the "**First Lien Exit Agent**"). |
| **First Lien Exit Lenders** | Initially the lenders under DIP Facility (together with their permitted assignees, the "**First Lien Exit Lenders**"). |
| **Amount & Type of First Lien Exit Term Facility** | A senior secured first lien term loan facility (the "**First Lien Exit Facility**") in an aggregate principal amount of up to $11 million, consisting of the principal amount of the DIP New Money 1L Loans outstanding under the DIP Credit Agreement as of the Emergence Date (as defined below) (the "**First Lien Exit Term Loans**"). <br><br> Once repaid, First Lien Exit Term Loans may not be reborrowed. |
| **Maturity Date** | The First Lien Exit Term Facility will mature on the date that is 5 years following the Emergence Date (the "**First Lien Maturity Date**"). |
| **Use of Proceeds** | The proceeds of the First Lien Exit Term Loans will be used (or deemed to be used) to refinance in full the DIP New Money 1L Loans. |

| | |
|---|---|
| **Interest Rate** | The Borrower may elect that the First Lien Exit Term Loans comprising each borrowing bear interest at a rate per annum equal to (a) ABR (which shall not be less than 2.00% per annum) plus the Applicable Margin (as defined below) or (b) the LIBO rate, which shall not be less than 1.00% per annum, plus the Applicable Margin.<br><br>"**Applicable Margin**" means (a) 5.00% in the case of ABR loans and (b) 6.00% in the case of Eurodollar loans.<br><br>Interest on the First Lien Exit Term Loans shall be payable in cash. |
| **Default Interest** | Upon the occurrence and during the continuation of an event of default, unless otherwise waived by the Required First Lien Lenders, all obligations will bear interest at (i) in the case of principal and interest, a rate equal to 2.00% per annum, plus the otherwise applicable rate to the relevant First Lien Exit Term Loans and (ii) in the case of all other amounts, at a rate equal to 2.00% per annum plus the rate applicable to First Lien Exit Term Loans that are ABR loans. |
| **Amortization** | Annual amortization (payable in equal quarterly installments beginning at the end of the first full quarter after the Closing Date) of the First Lien Exit Term Facility shall be required in an aggregate annual amount equal to 1.0% of the original principal amount of the First Lien Exit Term Facility. The remaining aggregate principal amount of the First Lien Exit Term Loans shall be payable in full on the First Lien Maturity Date. |
| **Incremental Facilities** | None. |
| **Fees** | *First Lien Exit Agent Fees*:  To be set forth in a separate fee letter agreement between the First Lien Exit Agent and the Borrower. |

| | |
|---|---|
| **Mandatory Prepayments** | The following amounts shall be applied to prepay the First Lien Exit Term Loans, in each case consistent with the First Lien Documentation Principles (as defined below): <br><br>(a)  100% of the net cash proceeds of any issuance of any indebtedness (other than the issuance indebtedness permitted under the First Lien Exit Loan Documents); <br><br>(b)  100% of the net cash proceeds of any sales or other disposition of assets (including as a result of casualty or condemnation), except for sales of inventory in the ordinary course of business and other customary exceptions to be mutually agreed and subject to customary reinvestment rights and minimum thresholds to be mutually agreed; <br><br>(c)  100% of certain extraordinary receipts (subject to minimum thresholds to be mutually agreed); and <br><br>(d)  50% of excess cash flow (to be defined in a manner consistent with the First Lien Documentation Principles) in each fiscal year of the Borrower, commencing with the fiscal year ending on December 31, 2020. <br><br>Any First Lien Exit Lender may elect not to accept any mandatory prepayment, but in the case of clause (a) above, solely to the extent not representing a refinancing of the First Lien Exit Term Loans. Any prepayment amount declined by a First Lien Exit Lender shall be re-offered to non-declining First Lien Exit Lenders and to the extent such non-declining First Lien Exit Lenders elect not to accept their pro rata share of such re-offered prepayment amount, such remaining amount shall be offered to the Second Lien Exit Lenders (as defined in Exhibit D to the Restructuring Support Agreement). Any prepayment amount declined by a Second Lien Exit Lender shall be re-offered to non-declining Second Lien Exit Lenders and to the extent such non-declining Second Lien Exit Lenders elect not to accept their pro rata share of such re-offered prepayment amount, such amounts may be retained by the Borrower. <br><br>All proceeds of mandatory prepayments shall be applied to prepay the First Lien Exit Term Loans prior to the prepayment of the Second Lien Exit Term Loans. |
| **Voluntary Prepayments** | The Borrower may prepay the First Lien Exit Term Loans, in whole or in part, in minimum amounts to be agreed, subject to the following: <br><br>(a)  notice requirements to be agreed; and <br><br>(b)  reimbursement of the First Lien Exit Lenders' redeployment costs in the case of a prepayment of Eurodollar loans prior to the last day of the relevant interest period. |

| | |
|---|---|
| **First Lien Exit Term Facility Documentation** | The First Lien Exit Term Facility will be evidenced by (a) a credit agreement (the "**First Lien Exit Credit Agreement**") which shall be in form and substance based on that certain First Lien Credit Agreement, dated as of March 1, 2017 (as amended from time to time prior to the date hereof, the "**Existing First Lien Credit Agreement**"), among VIP Cinema Holdings, Inc., the other guarantors from time to time party thereto, the lenders party thereto, Wilmington Savings Fund Society, FSB, a federal savings bank, as successor administrative agent and successor collateral agent, and the other entities party thereto from time to time (with such modifications as are necessary to reflect the terms set forth in this First Lien Exit Facility Term Sheet and the nature of the First Lien Exit Term Facility and to reflect (i) administrative agency and operational matters of the First Lien Exit Agent, (ii) EU and UK bail-in provisions, (iii) LIBOR replacement provisions, (iv) Delaware limited liability company division provisions, (v) beneficial ownership certification, (vi) QFC stay rules, (vii) the deletion or tightening of baskets, thresholds and carveouts applicable to the covenants in a manner consistent with those negotiated in connection with the proposed first amendment to the Existing First Lien Credit Agreement and reflected in the draft Annex A to such first amendment dated November 21, 2019 and delivered to the Company and (viii) other modifications as may be reasonably agreed among the First Lien Exit Agent, the First Lien Exit Lenders and the Borrower, the "**First Lien Documentation Principles**"), (b) security documents and (c) other legal documentation (collectively, together with the First Lien Exit Credit Agreement and security documents, the "**First Lien Exit Loan Documents**"), which First Lien Exit Loan Documents shall be in form and substance consistent with the First Lien Documentation Principles and otherwise satisfactory to the First Lien Exit Agent, the First Lien Exit Lenders and the Borrower. |
| **Collateral** | The obligations of the Loan Parties with respect to the First Lien Exit Term Facility (including the guarantee obligations of the Guarantors) (the "**First Lien Obligations**") shall be secured by a perfected, first-priority security interest (subject to permitted liens and exceptions to be mutually agreed and consistent with the First Lien Documentation Principles) in all Collateral owned as of the Emergence Date or thereafter acquired.<br><br>"**Collateral**" shall mean all present and after acquired assets and property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including (without limitation) all accounts, all deposit accounts, securities accounts and commodities accounts, inventory, equipment, capital stock of subsidiaries of the Loan Parties, including, for the avoidance of doubt, any equity or other interests in the Loan Parties' jointly-owned subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof (subject to customary exceptions). |
| **Excluded/Unrestricted Subsidiaries** | None. Subsidiaries of the Borrower (or any direct or indirect parent thereof that is a Loan Party) will not be permitted to be designated as "Excluded" or "Unrestricted." |

| | |
|---|---|
| **Intercreditor Agreement** | The lien priority, relative rights and other creditors' rights in respect of the First Lien Exit Term Facility and the Second Lien Exit Term Facility (as defined in Exhibit D to the Restructuring Support Agreement) shall be set forth in an intercreditor agreement (the "**Intercreditor Agreement**") in form and substance satisfactory to the First Lien Exit Agent and the Required First Lien Lenders and shall provide that all amounts received in respect of the obligations under the First Lien Exit Term Facility and the Second Lien Exit Term Facility shall be applied to prepay the First Lien Obligations prior to the prepayment of the obligations in respect of the Second Lien Exit Term Facility. |
| **Representations and Warranties** | Customary and appropriate for facilities of this type consistent with the First Lien Documentation Principles (with qualifications and limitations for materiality consistent with the First Lien Documentation Principles and otherwise mutually agreed between the Required First Lien Lenders and the Borrower), including (without limitation): existence, qualification and power; compliance with laws; authorization; no contravention; governmental authorization and other consents; binding effect; financial statements; no material adverse effect; litigation; compliance with laws; no default; ownership of property, liens and casualty events; environmental matters; taxes; ERISA compliance, etc.; subsidiaries; margin regulations; Investment Company Act; disclosure; labor matters; intellectual property and licenses; solvency; subordination of junior financing; collateral documents; and compliance with anti-terrorism and corruption laws. |
| **Affirmative Covenants** | Customary and appropriate affirmative covenants for exit facilities of this type consistent with the First Lien Documentation Principles (with exceptions and basket amounts to be consistent with the First Lien Documentation Principles and otherwise mutually agreed between the Required First Lien Lenders and the Borrower) , including (without limitation):<br>- information and reporting requirements, including delivery of audited annual financials, quarterly financials for the first three quarters of each fiscal year and monthly financials for the first two months of each fiscal quarter, in each case to be delivered within a time period to be agreed;<br>- certificates and other information;<br>- notices;<br>- payment of obligations;<br>- preservation of existence;<br>- maintenance of properties;<br>- maintenance of insurance;<br>- compliance with laws;<br>- books and records;<br>- inspection rights;<br>- additional collateral and additional guarantors;<br>- compliance with environmental laws;<br>- further assurances and post-closing conditions;<br>- maintenance of ratings;<br>- use of proceeds; |

|  | - control agreements; and |
|  | - lender conference call. |
| **Negative Covenants** | Customary and appropriate negative covenants for exit facilities of this type consistent with the First Lien Documentation Principles (with exceptions and basket amounts to be consistent with the First Lien Documentation Principles and otherwise mutually agreed between the Required First Lien Lenders and the Borrower), including (without limitation):<br><br>- liens;<br><br>- investments;<br><br>- indebtedness;<br><br>- fundamental changes;<br><br>- dispositions;<br><br>- restricted payments;<br><br>- change in business;<br><br>- transactions with affiliates;<br><br>- burdensome agreements;<br><br>- financial covenants;<br><br>- fiscal year;<br><br>- prepayment of certain indebtedness;<br><br>- permitted activities; and<br><br>- subsidiaries. |
| **Financial Covenants** | (a) *Liquidity*: Commencing with the fiscal month following the Emergence Date, the Borrower shall not permit Liquidity (as defined below) within any given fiscal year, (x) as of the last day of each fiscal month of such fiscal year of the Borrower or (y) for a period of 3 consecutive business days or more in any fiscal month of such fiscal year, to be less than the amount set forth below opposite such fiscal year. |

| Fiscal Year | Liquidity |
|---|---|
| 2020 | $ 1 million |
| 2021 | $ 1.5 million |
| 2022 | $ 2 million |
| 2023 | $ 2.5 million |
| 2024 | $ 3 million |
| 2025 | $ 3.5 million |

(b) *Total Leverage Ratio*: Commencing with the fiscal quarter ending September 30, 2021, the Borrower shall not permit the Total Net Leverage Ratio (to be defined in the manner consistent with the First Lien Documentation Principles) as of the last day of each fiscal quarter set forth below to be higher than the amount set forth below opposite such fiscal quarter:

| Fiscal Quarter | Total Net Leverage Ratio |
|---|---|
| September 30, 2021 | 9.00x |
| December 31, 2021 | 9.00x |
| March 31, 2022 | 6.00x |
| June 30, 2022 | 5.50x |
| September 30, 2022 | 5.25x |
| December 31, 2022 | 5.00x |
| March 31, 2023 | 4.75x |
| June 30, 2023 | 4.50x |
| September 30, 2023 | 4.00x |
| December 31, 2023 | 3.75x |
| March 31, 2024 and thereafter | 3.50x |

"**Liquidity**" means an amount equal to the sum of (i) unrestricted cash and cash equivalents of the Loan Parties at such time and (ii) undrawn availability under any revolving credit facility of the Loan Parties (to the extent permitted under the First Lien Exit Loan Documents) at such time.

| | |
|---|---|
| **Events of Default** | Customary and appropriate for facilities of this type (with materiality thresholds, exceptions and grace periods to be mutually agreed between the Required First Lien Lenders and the Borrower). |

| Conditions Precedent to Closing | The closing of the First Lien Exit Term Facility will be subject to satisfaction of the following:<br><br>(a) all of the representations and warranties in the First Lien Exit Loan Documents shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date;<br><br>(b) no default or event of default under the First Lien Exit Term Facility shall have occurred and be continuing or would result from such extension of credit;<br><br>(c) delivery of a customary borrowing notice; and<br><br>(d) the occurrence of those conditions listed on Annex I hereto.<br><br>"**Emergence Date**" shall mean the date on which all conditions listed in this paragraph and in Annex I shall have been satisfied and the First Lien Exit Term Facility shall have been funded (or be deemed to have been funded) in full. |
|---|---|
| Voting/Required First Lien Lenders | Customary and appropriate for facilities of this type consistent with First Lien Documentation Principles. First Lien Exit Term Lenders holding more than 50% of the outstanding principal amount of the First Lien Exit Term Loans are referred to herein as the "**Required First Lien Lenders**." |
| Fees and Expenses & Indemnification | Customary and appropriate for facilities of this type consistent with First Lien Documentation Principles. |
| Assignments and Participations | Customary and appropriate for facilities of this type (including prohibition on assignments to disqualified lenders); provided that (i) the consent of the Borrower (not to be unreasonably withheld or delayed; Borrower consent shall be deemed given unless it objects by written notice to the First Lien Exit Agent within 5 business days after receipt of written notice thereof) shall be required for assignments other than (a) assignments to another First Lien Exit Lender, an affiliate of a First Lien Exit Lender or an approved fund or (b) during an event of default and (ii) the Borrower may purchase First Lien Exit Term Loans through open market purchases on a non-pro rata basis and/or through Dutch auctions open to all First Lien Exit Lenders on a pro rata basis (in accordance with customary procedures) in each case on terms to be agreed, so long as, in each case, such purchased First Lien Exit Term Loans are cancelled and extinguished. |
| Other Provisions | The First Lien Exit Loan Documents shall include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |
| Governing Law | The laws of the State of New York. |
| Counsel to First Lien Exit Agent | Wilmer Cutler Pickering Hale and Dorr LLP |
| Counsel to the Initial First Lien Exit Lenders | Davis Polk & Wardwell LLP |

Annex I

## <u>ADDITIONAL CONDITIONS TO CLOSING</u>

The borrowing (or deemed borrowing) under the First Lien Exit Term Facility shall be subject to the following additional conditions precedent:

1.    A final non-appealable order of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") confirming the plan of reorganization in form and substance satisfactory to the First Lien Exit Agent and the Required First Lien Lenders (the "**Confirmation Order**"), which shall not have been reversed, vacated, amended, supplemented or otherwise modified and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the First Lien Exit Loan Documents shall have been entered and shall have become a final order of the Bankruptcy Court.

2.    The execution and delivery by each of the Loan Parties of (i) the First Lien Exit Loan Documents (including the Intercreditor Agreement (which may be in the form of an acknowledgement by the Loan Parties) (it being understood and agreed that this condition shall be satisfied in the case of the First Lien Exit Credit Agreement if executed by the Loan Parties and the First Lien Exit Agent)), (ii) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) in the jurisdiction of organization of each Loan Party, (iii) a solvency certificate executed by the chief financial officer or other officer of equivalent duties and (iv) all documents and instruments required to create and perfect the First Lien Exit Agent's security interests in the Collateral under the First Lien Exit Term Facility which shall be, if applicable, in proper form for filing (it being understood and agreed that mortgages or amended mortgages may be provided within a number of days to be agreed after the Emergence Date).

3.    The First Lien Exit Agent shall have received (i) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the fiscal years ended December 31, 2019; provided that if the Emergence Date shall have occurred prior to 180 days after December 31, 2019, this clause (i) shall be deemed satisfied by the delivery of unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for the fiscal year ended December 31, 2019, (ii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 45 days before the Emergence Date, (iii) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available and will include each month ended at least 30 days before the Emergence Date, (iv) projected monthly balance sheets, income statements, statements of cash flows of the Borrower and the Guarantors for the period beginning on the Emergence Date through the first anniversary of the Emergence Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Required First Lien Lenders, and an opening pro forma consolidated balance sheet for the Loan Parties in form and substance acceptable to the Required First Lien Lenders, (v) projected quarterly balance sheets, income statements, statements of cash flows and availability of the Borrower and the Guarantors for the period beginning on the first anniversary of the Emergence Date through the fifth anniversary of the Emergence Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Required First Lien Lenders and (vi) any updates or modifications to the projected financial statements of the Borrower and the Guarantors previously received by the First Lien Exit Agent, in each case in form and substance satisfactory to the Required First Lien Lenders.

4.    The First Lien Exit Agent shall have received, at least three (3) business days prior to the Emergence Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without

limitation, the PATRIOT Act and, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower, that has been requested in writing by the First Lien Exit Lenders at least five (5) business days prior to the Emergence Date.

5.    All fees required to be paid to the First Lien Exit Agent and the First Lien Exit Lenders on the Emergence Date and reasonable and documented out-of-pocket expenses (including legal expenses) required to be paid to or for the benefit of the First Lien Exit Agent and the First Lien Exit Lenders on the Emergence Date, to the extent invoiced at least one (1) business days prior to the Emergence Date, shall, upon the initial borrowing (or deemed borrowing) of the First Lien Exit Term Facility, have been paid.

6.    All necessary governmental and third party approvals, consents, licenses and permits in connection with the First Lien Exit Facility and the operation by the Borrower of its business shall have been obtained and remain in full force and effect.

7.    Other than the Cases, as of the Emergence Date, there shall not be any Litigation pending or known by Loan Parties to be threatened against any Loan Party drawing into question any credit transaction contemplated by First Lien Exit Facility, or that could reasonably be expected to have a material adverse effect.

8.    Since the date of approval of the disclosure statement with respect to the Acceptable Plan of Reorganization, other than the Cases, there shall not have occurred any event, change, occurrence or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Loan Parties and their subsidiaries, taken as a whole.

9.    The Second Lien Exit Term Facility shall have become effective and shall be consistent in all respects with the Second Lien Exit Term Facility Term Sheet as reviewed and agreed to by the First Lien Exit Lenders in accordance with the Restructuring Support Agreement.

**<u>Exhibit D</u>**

**Second Lien Exit Facility Term Sheet**

EXECUTION VERSION

EXHIBIT D

**VIP CINEMA HOLDINGS, INC.**
**SECOND LIEN EXIT TERM LOAN FACILITY**

This term sheet (this "**Second Lien Exit Facility Term Sheet**") sets forth the principal terms of a second lien exit term facility to be provided to VIP Cinema Holdings, Inc., as borrower and a reorganized Debtor. Capitalized terms used herein but not defined have the meaning ascribed to such terms in the Restructuring Support Agreement (the "**Restructuring Support Agreement**") to which this Second Lien Exit Facility Term Sheet is attached and Exhibits B and C attached to the Restructuring Support Agreement.

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **Borrower** | Same as the Borrower under Exhibit C. |
| **Guarantors** | The obligations with respect to the Second Lien Exit Facility shall be unconditionally guaranteed by the same entities that are guarantors with respect to the First Lien Exit Facility. |
| **Administrative Agent and Collateral Agent** | Wilmington Savings Fund Society, FSB, a federal savings bank, as administrative agent and collateral agent (in such capacities, the "**Second Lien Exit Agent**"). |
| **Second Lien Exit Lenders** | Initially the First Lien Exit Lenders will act as lenders under the Second Lien Exit Facility (together with their permitted assignees, the "**Second Lien Exit Lenders**"). |
| **Amount & Type of Second Lien Exit Term Facility** | A senior secured second lien term loan facility (the "**Second Lien Exit Facility**" and, the loans thereunder, the "**Second Lien Exit Term Loans**") in an aggregate principal amount of up to $20 million. On the Emergence Date, the aggregate principal amount of the Roll-Up Loans under the DIP Credit Agreement shall be converted into the Second Lien Exit Term Loans.<br><br>Once repaid, Second Lien Exit Term Loans may not be reborrowed. |
| **Maturity Date** | The Second Lien Exit Term Facility will mature on the date that is 6 years following the Emergence Date (the "**Second Lien Maturity Date**"). |
| **Use of Proceeds** | The Second Lien Exit Term Loans will be used to refinance the Roll-Up Loans in full. |
| **Interest Rate** | The Second Lien Exit Term Loans will bear interest at 10.00% per annum and will be payable in kind; provided that if the Borrower's EBITDA is equal to or greater than $20,000,000 as of the most recently ended four fiscal quarter period, a portion of the interest payable on any interest payment date will be payable in cash in an amount equal to 1.50% per annum. |
| **Default Interest** | Upon the occurrence and during the continuation of an event of default, unless otherwise waived by the Required Second Lien Lenders, all obligations will bear interest at (i) in the case of principal and interest, a rate equal to 2.00% per annum, plus the otherwise applicable rate to the relevant First Lien Exit Term Loans and (ii) in the case of all other amounts, at a rate equal to 2.00% per annum plus the rate applicable to First Lien Exit Term Loans that are ABR loans. |
| **Amortization** | None.  The aggregate principal amount of the Second Lien Exit Term Loans shall be payable in full on the Second Lien Maturity Date. |

| | |
|---|---|
| **Incremental Facilities** | None. |
| **Fees** | *Second Lien Exit Agent Fees*:  To be set forth in a separate fee letter agreement between the Second Lien Exit Agent and the Borrower. |
| **Mandatory Prepayments** | Substantially the same as the applicable provisions under the First Lien Exit Loan Documents; <u>provided</u> that no mandatory prepayments with respect to the Second Lien Exit Term Loans shall be permitted or required until after the payment in full of the obligations under the First Lien Exit Facility; <u>provided</u>, <u>further</u> that the Borrower shall use the proceeds declined by the First Lien Exit Lenders to offer to prepay the Second Lien Exit Term Loans, and any prepayment amount declined by a Second Lien Exit Lender shall be re-offered to non-declining Second Lien Exit Lenders.  If any non-declining Second Lien Exit Lenders elect not to accept their pro rata share of such re-offered prepayment amount, such amounts may be retained by the Borrower. |
| **Voluntary Prepayments** | The Borrower may prepay the Second Lien Exit Term Loans, in whole or in part, in minimum amounts to be agreed, subject to notice and other requirements to be agreed; <u>provided</u> that no prepayments of Second Lien Exit Term Loans shall be permitted or required until after payment in full of the obligations under the First Lien Exit Facility. |
| **Second Lien Exit Term Facility Documentation** | The Second Lien Exit Term Facility will be evidenced by a (a) credit agreement (the "**Second Lien Exit Credit Agreement**") based on the First Lien Exit Credit Agreement (with such modifications as are necessary to reflect the terms set forth in this Second Lien Exit Facility Term Sheet (including the fixed interest rate) and the nature of the Second Lien Exit Term Facility as junior lien exit facility and to reflect (i) administrative agency and operational matters of the Second Lien Exit Agent, (ii) EU and UK bail-in provisions, (iii) Delaware limited liability company division provisions, (iv) beneficial ownership certification, (v) QFC stay rules and (vi) other modifications (including (x) adjustments to dollar baskets and dollar thresholds for negative covenants, events of default and other threshold amounts set forth therein to reflect a cushion of at least 15.0% to the corresponding baskets and thresholds under the First Lien Exit Loan Documents and (y) adjustments to baskets and thresholds based on a financial ratio to reflect a cushion to be agreed to the corresponding baskets and thresholds under the First Lien Exit Loan Documents) as may be reasonably agreed among the Second Lien Exit Agent, the Second Lien Exit Lenders and the Borrower the "**Second Lien Documentation Principles**"), (b) security documents and (c) other legal documentation (collectively, together with the Second Lien Exit Credit Agreement and security documents, the "**Second Lien Exit Loan Documents**"), which Second Lien Exit Loan Documents shall be in form and substance consistent with the Second Lien Documentation Principles and otherwise satisfactory to the Second Lien Exit Agent, the Second Lien Exit Lenders and the Borrower. |
| **Collateral/Intercreditor Agreement** | Same as the First Lien Exit Facility but, with respect to lien priority, on a second lien basis.  With respect to guarantee and collateral matters, to the extent any matter requires the exercise of discretion by both the First Lien Exit Agent and the Second Lien Exit Agent, the decision made by the First Lien Exit Agent shall be binding on the Second Lien Exit Agent. |
| **Excluded/Unrestricted Subsidiaries** | Same as the First Lien Exit Facility. |

| | |
|---|---|
| **Representations and Warranties** | Subject to the Second Lien Documentation Principles, same as the applicable provisions under the First Lien Exit Loan Documents. |
| **Affirmative Covenants** | Subject to the Second Lien Documentation Principles, same as the applicable provisions under the First Lien Exit Loan Documents. |
| **Negative Covenants** | Subject to the Second Lien Documentation Principles, same as the applicable provisions under the First Lien Exit Loan Documents.<br><br>The Second Lien Exit Facility shall include a customary anti-layering covenant. |
| **Financial Covenants** | Subject to the Second Lien Documentation Principles, same as the applicable provisions under the First Lien Exit Loan Documents. |
| **Events of Default** | Subject to the Second Lien Documentation Principles, same as the applicable provisions under the First Lien Exit Loan Documents; provided that obligations under the Second Lien Exit Loan Documents shall only cross accelerate, but not otherwise cross default, to the obligations under the First Lien Exit Facility. |
| **Conditions Precedent to Closing** | The closing of the Second Lien Exit Term Facility will be subject to satisfaction of the following:<br><br>(a)  all of the representations and warranties in the Second Lien Exit Loan Documents shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date;<br><br>(b)  no default or event of default under the Second Lien Exit Term Facility shall have occurred and be continuing or would result from such extension of credit;<br><br>(c)  delivery of a customary borrowing notice; and<br><br>(d)  the occurrence of those conditions listed on Annex I hereto.<br><br>"**Emergence Date**" shall mean the date on which all conditions listed in this paragraph and in Annex I shall have been satisfied and the Second Lien Exit Term Facility shall have been funded (or be deemed to have been funded) in full. |
| **Voting/Required First Lien Lenders** | Subject to the Second Lien Documentation Principles, same as applicable provisions under the First Lien Exit Loan Documents. Second Lien Exit Lenders holding more than 50% of the outstanding principal amount of the First Lien Exit Term Loans are referred to herein as the "**Required Second Lien Lenders**." |
| **Fees and Expenses & Indemnification** | Subject to the Second Lien Documentation Principles, same as the applicable provisions under the First Lien Exit Loan Documents. |
| **Assignments and Participations** | Subject to the Second Lien Documentation Principles, same as the applicable provisions under the First Lien Exit Loan Documents; provided that in no event shall the Borrower be permitted to purchase Second Lien Exit Term Loans until after payment in full of the obligations under the First Lien Exit Facility. |
| **Other Provisions** | The First Lien Exit Loan Documents shall include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar |

| | provisions substantially the same as the applicable provisions in the First Lien Exit Loan Documents. |
|---|---|
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law). |
| **Counsel to First Lien Exit Agent** | Wilmer Cutler Pickering Hale and Dorr LLP |
| **Counsel to the Initial Second Lien Exit Lenders** | Davis Polk & Wardwell LLP |

## ADDITIONAL CONDITIONS TO CLOSING

The borrowing (or deemed borrowing) under the Second Lien Exit Term Facility shall be subject to the following additional conditions precedent:

1.    A final non-appealable order of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") confirming the plan of reorganization approved by the proponents of such plan in accordance with the Restructuring Support Agreement (the "**Confirmation Order**"), which shall not have been reversed, vacated, amended, supplemented or otherwise modified and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the Second Lien Exit Loan Documents shall have been entered and shall have become a final order of the Bankruptcy Court.

2.    The execution and delivery by each of the Loan Parties of (i) the Second Lien Exit Loan Documents (including the Intercreditor Agreement (which may be in the form of an acknowledgement by the Loan Parties) (it being understood and agreed that this condition shall be satisfied in the case of the Second Lien Exit Credit Agreement if executed by the Loan Parties and the Second Lien Exit Agent)), (ii) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) in the jurisdiction of organization of each Loan Party, (iii) a solvency certificate executed by the chief financial officer or other officer of equivalent duties and (iv) all documents and instruments required to create and perfect the Second Lien Exit Agent's security interests in the Collateral under the Second Lien Exit Term Facility which shall be, if applicable, in proper form for filing (it being understood and agreed that mortgages or amended mortgages may be provided within a number of days to be agreed after the Emergence Date).

3.    The Second Lien Exit Agent shall have received (i) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the fiscal years ended December 31, 2019; provided that if the Emergence Date shall have occurred prior to 180 days after December 31, 2019, this clause (i) shall be deemed satisfied by delivery of unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for the fiscal year ended December 31, 2019, (ii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 45 days before the Emergence Date, (iii) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available and will include each month ended at least 30 days before the Emergence Date, (iv) projected monthly balance sheets, income statements, statements of cash flows of the Loan Parties and their subsidiaries on a consolidated basis for the period beginning on the Emergence Date through the first anniversary of the Emergence Date, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Required Second Lien Lenders, and an opening pro forma consolidated balance sheet for the Loan Parties in form and substance acceptable to the Required Second Lien Lenders, (v) projected quarterly balance sheets, income statements, statements of cash flows and availability of the Loan Parties and their subsidiaries on a consolidated basis for the period beginning on the first anniversary of the Emergence Date through the fifth anniversary of the Emergence Date, in each case as to the projections, with the results and assumptions set forth in all of such projections and (vi) any updates or modifications to the projected financial statements of the Loan Parties and their subsidiaries previously received by the Second Lien Exit Agent.

4.    The Second Lien Exit Agent shall have received, at least three (3) business days prior to the Emergence Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act and, to the extent the Borrower qualifies as a "legal entity customer" under

the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower, that has been requested in writing by the Second Lien Exit Lenders at least five (5) business days prior to the Emergence Date.

5.    All fees required to be paid to the Second Lien Exit Agent and the Second Lien Exit Lenders on the Emergence Date and reasonable and documented out-of-pocket expenses (including legal expenses) required to be paid to or for the benefit of the Second Lien Exit Agent and the Second Lien Exit Lenders on the Emergence Date, to the extent invoiced at least one (1) business days prior to the Emergence Date, shall, upon the initial borrowing (or deemed borrowing) of the First Lien Exit Term Facility, have been paid.

6.    All necessary governmental and third party approvals, consents, licenses and permits in connection with the Second Lien Exit Facility and the operation by the Borrower of its business shall have been obtained and remain in full force and effect.

7.    Other than the Cases, as of the Emergence Date, there shall not be any Litigation pending or known by Loan Parties to be threatened against any Loan Party drawing into question any credit transaction contemplated by Second Lien Exit Facility, or that could reasonably be expected to have a material adverse effect.

8.    Since the date of approval of the disclosure statement with respect to the Acceptable Plan of Reorganization, other than the Cases, there shall not have occurred any event, change, occurrence or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Loan Parties and their subsidiaries, taken as a whole.

9.    The First Lien Exit Term Facility shall have become effective and shall be consistent in all respects with the First Lien Exit Term Facility Term Sheet as reviewed and agreed by to by the Second Lien Exit Lenders in accordance with the Restructuring Support Agreement.

**<u>Exhibit E</u>**

**Preferred Equity Term Sheet**

EXECUTION VERSION

## VIP CINEMA HOLDINGS, INC.

### Preferred Equity Term Sheet

This term sheet ("***Term Sheet***") describes the principal terms of the preferred equity instrument to be issued in connection with the Restructuring. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement to which this Term Sheet is attached as Exhibit E thereto.

| | |
|---|---|
| **Reorganized Issuer:** | Holdings, or such other type of Delaware entity as is reasonably acceptable to the Requisite Consenting First Lien Lenders and the Consenting Second Lien Lender (it being understood that if such entity is not a Delaware corporation, the organizational documents of such entity will provide that the officers and directors (or persons of a similar nature) of such entity will have the same fiduciary duties as officers and directors of a Delaware corporation) (the "***Company***" and the constituent governance documents of such Company, the "***organizational documents***"). |
| **Security:** | Series A Non-Voting Preferred Stock (non-convertible), par value $0.0001 per share (each such share, a "***Preferred Share***" and collectively, the "***Preferred Shares***", and each holder thereof, a "***Preferred Holder***"). |
| **Liquidation Preference Amount:** | $69.0 million ($[●] per share) (the "***Initial Aggregate Liquidation Preference Amount***", and on a per share basis, the "***Initial Liquidation Preference Amount***"), subject to appropriate adjustment for any stock dividends, splits, combinations and similar events affecting the Preferred Shares. |
| **Seniority:** | With respect to dividends and rights upon a Liquidation Event (as defined below), the Preferred Shares will be senior to (i) all common shares and (ii) all other present and future classes or series of capital stock unless their terms specify otherwise. |
| **Issue Date:** | Preferred Shares will be issued on the effective date of the Restructuring (the "***Issue Date***"). |
| **Issue price per share:** | 100% of the Initial Liquidation Preference Amount. |
| **Maturity:** | The Preferred Shares will be perpetual and redeemable only on the terms set forth herein. |
| **Redemption:** | The Preferred Shares will not be redeemable by a Preferred Holder.<br><br>There will be no mandatory redemptions by the Company, except that in connection with any initial public offering of the Company, the Company shall, upon and as a condition to the closing of such offering, redeem all of the outstanding Preferred Shares at a redemption price per share thereof equal to the Liquidation Preference Amount (as defined below), plus all accrued and unpaid dividends through the redemption date, in cash. |

| | In addition, the Company may redeem Preferred Shares at any time, from time to time, in whole or in part, on a pro rata basis, at a redemption price per share equal to the Liquidation Preference Amount, plus all accrued and unpaid dividends through the redemption date, in cash. |
|---|---|
| **Dividends; Dividend Rate:** | Dividends will accumulate at an annual rate of 6.0% (the "***Dividend Rate***") on a daily basis from the Issue Date and will be payable on a quarterly basis in kind on March 31, June 30, September 30 and December 31 of each year, commencing on the first dividend payment date following completion of the Restructuring (each such date of payment, a "***Dividend Payment Date***").  On each Dividend Payment Date, dividends will be paid by compounding such dividends with the effect that an additional dividend shall accrue on each outstanding Preferred Share at a rate per annum equal to the Dividend Rate on the amount so compounded until such amount is actually paid in full (the Initial Aggregate Liquidation Preference Amount, together with all such compounded dividends, being the "***Aggregate Liquidation Preference Amount***", and on a per share basis, the "***Liquidation Preference Amount***").  Dividends shall be calculated on the basis of the actual days elapsed in a year of 360 days. |
| **Liquidation:** | Upon a Liquidation Event, the Preferred Shares will be entitled to receive, before the payment or distribution of the Company's assets or the proceeds thereof is made to the holders of any junior securities, in respect of each Preferred Share the Liquidation Preference Amount (subject to appropriate adjustment for any stock dividends, splits, combinations and similar events), plus all accrued and unpaid dividends owed with respect to such Preferred Share as of the date of the payment of the Liquidation Preference Amount.<br><br>Any (a) liquidation, dissolution or winding up of the Company, (b) sale of all or substantially all assets of the Company, (c) merger or consummation by the Company of another change in control transaction, in each case in this clause (c), in which the holders of the common shares prior to such transaction own in the aggregate less than 50% of the common shares in the purchasing entity after such transaction, or (d) bankruptcy or insolvency event with respect to the Company (including any material subsidiary) will constitute a "***Liquidation Event***" unless the holders of a majority of the then outstanding Preferred Shares, voting as a separate class, elect not to treat such transaction as a Liquidation Event. |
| **Consent Rights:** | No voting rights except as set forth below.<br><br>Each of the following actions by the Company or any of its subsidiaries (or any agreement or commitment to do so) shall require the affirmative vote or written consent of the Preferred Holders holding more than 50% of the outstanding Preferred Shares at such time, voting as a separate class:<br><br>• any incurrence of indebtedness for borrowed money (other than indebtedness in an amount not to exceed the greater of (i) the maximum amount of borrowings permitted under the Exit Facilities Credit Agreements and (ii) such amount of borrowings as would not result in a |

2

pro forma leverage ratio (based on adjusted EBITDA) at the time of issuance of greater than 5.00:1.00);

- any related party transactions with the Investor or one or more of its affiliates that is not on arm's-length's terms;
- any material change to the nature of the business;
- any change in the entity classification of the Company;
- any Liquidation Event, unless the Preferred Holders would receive an aggregate amount in connection therewith equal to the liquidation preference of the outstanding Preferred Shares at such time (including any accrued and unpaid dividends thereon);
- any dividends or distributions on any equity interests of the Company that are junior to the Preferred Shares, other than dividends or distributions in the form of equity interests that are junior to the Preferred Shares;
- any issuance of any equity interests of the Company ranking senior to, or pari passu with, the Preferred Shares with respect to the right to receive assets of the Company in connection with any dividend or other distribution by the Company or any Liquidation Event;
- any redemption or repurchase of any equity interests of the Company that are junior to the Preferred Shares, other than redemptions of any equity interests of the Company held by any director, officer or employee of the Company or any of its subsidiaries in connection with such individual's termination of employment or service for a purchase price no higher than fair market value and otherwise on terms approved by the board of directors of the Company (the "***Board***"); and
- changes to the preferred stock terms that adversely affect the powers, preferences or rights of the Preferred Holders; provided that neither the creation of a new class or series that is junior to the Preferred Shares or the increase of the number of any existing or new class or series of equity interests of the Company which are junior to the Preferred Shares nor the issuance by the Company of any such series or class of equity interests of the Company shall be deemed to adversely affect the Preferred Holders.

The Dividend Rate then in effect will automatically increase by 2.0% (i.e., to an annual rate of 8.0%) for any period during which an Event of Default (as defined below) has occurred and is continuing; provided the Dividend Rate will immediately and automatically reset to 6.0% after all Events of Defaults have been cured.

"***Event of Default***" means the taking of any action by the Company or any of its subsidiaries that requires the consent of the Preferred Holders as set forth above, if such action was taken without such consent.

| | |
|---|---|
| **Board Representation:** | Preferred Holders will have the right to designate one director to the Board (the "***Preferred Designation Right***"), who will be elected by the affirmative vote or written consent of Preferred Holders holding more than 50% of the outstanding Preferred Shares, voting as a separate class; provided, that the Preferred Designation Right shall irrevocably terminate at such time as the Preferred Shares outstanding have an Aggregate Liquidation Preference Amount equal to less than 50% of the Initial Aggregate Liquidation Preference Amount.<br><br>After the termination of the Preferred Designation Right as set forth in the paragraph above, the holders of at least 66-2/3% of the outstanding common shares (excluding common shares then-held by the Investor) shall have the right to designate one director to the Board in replacement of the director who would have otherwise been designated and elected by the Preferred Holders pursuant to the Preferred Designation Right.<br><br>In addition, shareholders holding more than 4% of the outstanding common shares shall have the right to appoint an observer to the Board; <u>provided</u>, <u>however</u>, that at no time shall the number of board observers designated by holders of common shares in their capacity as such and pursuant to the preceding right exceed two observers. |
| **Other Provisions:** | Preferred Holders have no conversion, exchange, sinking fund, redemption or appraisal rights (except for the mandatory redemption right in connection with any initial public offering of the Company as set forth herein), have no registration rights upon an IPO, and have no rights of first refusal or preemptive rights to subscribe for any securities or indebtedness of the Company. The Preferred Holders will be subject to the restrictions on transfer and drag-along right set forth in the Summary of Principal Terms of Governance and Related Rights. |

**<u>Exhibit F</u>**

**Corporate Governance Term Sheet**

**EXECUTION VERSION**

## Summary of Principal Terms of Governance and Related Rights

      This summary of principal terms (this "Term Sheet") is a description of certain proposed terms for the Stockholders' Agreement (the "Stockholders' Agreement") to be entered into by and among the Company (as defined in the Preferred Equity Term Sheet) and the Company Shareholders (as defined below) effective upon the closing (the "Closing") of the proposed transactions contemplated by the Plan (the "Transaction"). For the purposes of this Term Sheet, "Common Holders" shall mean, collectively, the holders of Common Shares from time to time. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement to which this Term Sheet is attached as Exhibit F thereto.

| | |
|---|---|
| **Parties:** | The Company and the Company Shareholders. |
| **Capital Structure:** | The Company's issued capital stock will initially consist of:<br><br>• one class of common stock, par value $0.0001 per share (each such share, a "Common Share" and collectively, the "Common Shares"); and<br><br>• one class of non-voting preferred stock, par value $0.0001 per share (each such share, a "Preferred Share" and collectively, the "Preferred Shares", and such holders thereof collectively, the "Preferred Holders", and together with the Common Holders, the "Company Shareholders"), on the terms set forth in the Preferred Equity Term Sheet. |
| **Board of Directors:** | The Board of Directors (the "Board") of the Company shall consist of seven (7) members (each, a "Director") and shall consist of (i) four (4) members designated by the Investor, (ii) the Chief Executive Officer of the Company, (iii) one (1) member selected by the Consenting Second Lien Lender; and (iv) one (1) member selected by the Preferred Holders or the Common Holders, as set forth in the Preferred Equity Term Sheet.<br><br>Board designation rights of the Consenting Second Lien Lender shall be transferable by the Consenting Second Lien Lender to any transferee of all of the Common Shares owned by the Consenting Second Lien Lender.<br><br>Subject to certain exceptions to be agreed upon, each committee of the Board and each of the board of directors (or its equivalent) of any subsidiary of the Company (or any committee thereof) will have the same composition as the Board. |

| | |
|---|---|
| | Directors that are not employees of the Company may receive compensation (if any) in respect of their service on the Board or any committee thereof as the Board shall approve from time to time, and each Director shall be entitled to customary reimbursement by the Company of expenses incurred by such Director in connection with attending or participating in Board or committee meetings or otherwise carrying out his or her services as a Director, as determined by the Board. |
| **Governance:** | All decisions of the Board referenced herein shall require the approval of a majority of the Board. The Board may act either at a duly called meeting or by unanimous written consent. Board meetings may be held upon 24 hours' advance notice to all Directors and may be conducted by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Subject to certain approval rights of the Common Holders (described below) and Preferred Holders (as set forth in the Preferred Equity Term Sheet), and except as otherwise required by law, the Board shall have full and complete authority, power and discretion to manage and control the business, affairs, properties and assets of the Company and its subsidiaries, and to make all decisions regarding such matters.<br><br>Notwithstanding the foregoing, the approval of the Investor, so long as it holds a majority of all outstanding Common Shares, shall be required for the following matters:<br><br>• merger, sale of all or substantially all assets of the Company or of any subsidiary, or consummation by the Company of a change in control transaction (a "<u>Sale Transaction</u>") or entry by the Company into any agreement providing for any of the foregoing;<br><br>• registration of any Company securities under the Securities Exchange Act of 1934;<br><br>• an IPO or other registered public offering of the Company's capital stock;<br><br>• listing of any Company securities on a national securities exchange or OTC marketplace;<br><br>• entry into, or a material amendment or renewal of, any agreement, arrangement or transaction with (i) any affiliate of the Company or (ii) any owner of five percent |

|   | (5%) or more of the capital stock of the Company, or an affiliate or related fund of such owner;<br><br>• entry into a new line of business;<br><br>• other than arrangements entered into or amended in the ordinary course of business consistent with past practices, any material acquisition or disposition (in one transaction or a series of related transactions) of any assets or business of the Company or of any of its subsidiaries; and<br><br>• any change in the Company or any of its subsidiaries' tax elections.<br><br>In addition, (A) the Company shall not change its entity classification for tax purposes, and (B) the Company shall not and shall not permit any of its subsidiaries to enter into, or amend or renew, any agreement, arrangement or transaction with (i) any affiliate of the Company or (ii) any owner of five percent (5%) or more of the capital stock of the Company, or an affiliate or related fund of such owner, unless (x) the change in entity classification is approved by the holders of a majority of the Common Shares that are not owned or controlled by the Investor or (y) the agreement, arrangement, transaction, amendment or renewal, as applicable, is approved by the holders of a majority of the Common Shares that are not owned or controlled by any holder of Common Shares that is or is affiliated with or a related fund of the person or entity involved in such agreement, arrangement, transaction, amendment or renewal; <u>provided</u>, that any such agreement, arrangement, transaction, amendment or renewal that is on fair market value terms, as determined by a majority of the disinterested Directors, shall not be subject to such approval.  Any Director that was designated by a holder of Common Shares that is or is affiliated with or a related fund of the person or entity involved in any such agreement, arrangement, transaction, amendment or renewal shall not constitute a disinterested Director for purposes of determining whether such agreement, arrangement, transaction, amendment or renewal is on fair market value terms.<br><br>When determining the percentage of shares owned by the Investor and when determining whether other thresholds under this Term Sheet have been met (e.g., whether a Company Shareholder is a Principal Investor (as defined below)) any shares or other securities issued pursuant to the MIP (or any successor or similar plan) shall be excluded. |
|---|---|

| | |
|---|---|
| **General Transfer Restrictions:** | The capital stock of the Company will be freely transferrable without Company consent, subject to compliance with applicable securities laws and the restrictions described below. The following transfers shall be prohibited:<br><br>• any transfer of capital stock of the Company that would result in the triggering of an SEC reporting obligation by the Company; and<br><br>• any transfer of capital stock of the Company to any direct competitor of the Company or the parties listed on Exhibit A (collectively, the "<u>Prohibited Holders</u>"), other than any such transfer (i) made with the prior written consent of the Board or (ii) pursuant to the tag-along rights or the drag-along rights described below; <u>provided</u>, that no Company Shareholder that is party to the Stockholders' Agreement or any of its affiliates (including affiliated funds) shall be deemed a competitor of the Company. |
| **Tag-Along Rights:** | Each Common Holder owning more than two and one-half percent (2.5%) of the outstanding Common Shares (such Common Holders, the "<u>Principal Investors</u>") shall have the right to sell its Common Shares on a proportionate basis, or "tag-along", in any sale (or series of sales) of Common Shares by one or more Common Holders (so long as such Common Holders, together with its affiliates, own more than fifty percent (50%) of the outstanding Common Shares) (the "<u>Tag-Along Common Sellers</u>") to an unaffiliated third party (a "<u>Common Acquirer</u>"); <u>provided</u>, that such Common Acquirer shall be required to make an offer to purchase from each Principal Investor a portion of such Principal Investor's Common Shares (based on the percentage of outstanding Common Shares to be sold) on the same terms offered to the Tag-Along Common Sellers; <u>provided</u>, <u>further</u>, that such tag-along rights shall not apply to (x) a transfer as part of an underwritten public offering pursuant to an SEC registration statement for which piggyback registration rights apply, (y) a transfer to any affiliate of the transferor or (z) a transfer pursuant to the drag-along rights.<br><br>Each Preferred Holder shall have the right to sell its Preferred Shares on a proportionate basis, or "tag-along", in any sale (or series of sales) by one or more Preferred Holders (so long as such selling Preferred Holders, together with its/their affiliates, own more than fifty percent (50%) of the outstanding Preferred Shares) (the "<u>Tag-Along Preferred Sellers</u>") to an unaffiliated third party (a "<u>Preferred Acquirer</u>"); <u>provided</u>, that such Preferred Acquirer shall be required to make an offer to purchase from each Preferred Holder a portion of such Preferred Holder's Preferred Shares (based on the percentage of outstanding Preferred Shares |

| | |
|---|---|
| | to be sold) on the same terms offered to the Tag-Along Preferred Sellers; <u>provided</u>, <u>further</u>, that such tag-along rights shall not apply to (x) a transfer to any affiliate of the transferor or (y) a transfer pursuant to the drag-along rights. |
| **Drag-Along Rights:** | Subject to the consent rights of the Preferred Holders as set forth in the Preferred Equity Term Sheet, (a) the Investor, so long as it holds more than 25% of all outstanding Common Shares, and (b) Common Holders holding a majority of all outstanding Common Shares, shall each have the right to effect, and to cause the Company and each of the Company Shareholders to consent to and participate in, a sale of the Company to an unaffiliated third party (whether by merger, consolidation or sale of all or substantially all of the assets or equity interests and whether in one or a series of transactions), without the approval of any of the Company Shareholders, subject to customary protections for such Company Shareholders, including that the purchase price for such sale shall be in cash or publicly traded securities not subject to any contractual restrictions on transfer from and after the consummation thereof and no requirement that any of the Company Shareholders enter into, or agree to, any non-competition, non-solicitation or other restrictive covenants. |
| **Preemptive Rights:** | Prior to an IPO, the Principal Investors shall have *pro rata* preemptive rights to acquire capital stock or other equity securities of the Company or any of its subsidiaries issued by the Company or any of its subsidiaries, except for issuances: (i) in connection with the exercise of options or warrants, or conversion of convertible securities, that were issued in compliance with the preemptive rights, (ii) in connection with acquisitions of unaffiliated third parties to the unaffiliated selling entity or equityholders of such unaffiliated third parties; (iii) to lenders that are not affiliates of the Company in connection with the incurrence of debt, (iv) to joint venture partners in connection with a joint venture with parties that are not affiliates of the Company, (v) pursuant to a public offering, (vi) in connection with stock splits, combinations, dividends or similar actions and (vii) to employees and directors of the Company pursuant to a Board approved plan or agreement; <u>provided</u>, that in the case of clauses (i) - (iv), subject to an aggregate cap of ten percent (10%) of the outstanding Common Shares as of such date (unless such issuance is approved by a majority of the Directors not appointed by the Investor). |

| Information Rights: | The Company shall provide each Company Shareholder with customary information and access rights ("Information Rights") so long as such Company Shareholder is not a Prohibited Holder.<br><br>For the Company Shareholders, "Information Rights" shall at a minimum, include the following:<br><br>• For all Company Shareholders, copies of (or access to a virtual data room which includes):<br><br>  ° audited annual financial statements as soon as provided to the Company's lenders and in no event later than 120 days of year-end;<br><br>  ° quarterly financial statements as soon as provided to the Company's lenders and in no event later than 75 days of quarter-end; and<br><br>  ° monthly financial statements as soon as provided to the Company's lenders and in no event later than 60 days of month-end.<br><br>• All Company Shareholders shall receive an invitation to an annual MD&A conference call with members of the Company's senior management.<br><br>• The Principal Investors shall have customary inspection rights over the Company's books and records.<br><br>In addition, Company Shareholders shall be permitted to provide prospective purchasers of the capital stock of the Company with access to Company information previously provided to such Company Shareholder pursuant to the Information Rights set forth in the first bullet point of this section for the purpose of evaluating such acquisition of capital stock of the Company so long as (a) such prospective purchaser is not a Prohibited Holder, (b) such prospective purchaser executes and delivers a confidentiality agreement in form and substance reasonably acceptable to the Company, and (c) each Company Shareholder holding less than 4% of the outstanding Common Shares may only provide such information to two prospective purchasers in any twelve month period. |
| **Indemnification:** | In addition to any indemnification obligations set forth in the Plan, the Company shall indemnify, defend and hold harmless its and its subsidiaries' current or former directors, |

|  | managers and officers (collectively, "<u>Representatives</u>") from any and all losses, costs, claims, liabilities, damages or expenses (including the advancement of legal fees and expenses) arising from stockholder and third party claims relating to such Representatives' service to or on behalf of the Company or its subsidiaries, subject to customary exceptions, including, but not limited to, fraud, willful misconduct, and gross negligence. |
|---|---|
| **IPO Demand Rights:** | Common Holders holding a majority of all outstanding Common Shares shall have the right to effect, and to cause the Company and each other Common Holder to consent to, an IPO resulting in gross proceeds to the Company and the Company Shareholders of at least $200 million and the Common Shares being listed on the NYSE or Nasdaq (a "<u>Qualified IPO</u>"), without the approval of any other Company Shareholders. |
| **Registration Rights:** | Following an initial public offering of the Company's capital stock, the Principal Investors shall have customary demand registration rights, shelf registration rights and piggyback rights, and would be subject to customary lock-up obligations in connection with all offerings. Additionally, the Common Holders who are not Principal Investors also shall have customary piggyback rights. |
| **Corporate Opportunities:** | The Company Shareholders and their respective Board designees and affiliates shall have no obligation to present corporate opportunities to the Company or any of its subsidiaries, nor any obligation to refrain from competing with the Company or any of its subsidiaries. |
| **Termination:** | Upon (i) the closing of a Qualified IPO or (ii) the consummation of a Sale Transaction, the transfer restrictions, drag-along rights, tag-along rights and all special rights provisions in the organizational documents will terminate other than, in the case of the registration rights provisions. |
| **Amendments to Organizational Documents:** | Amendments or waivers to the Stockholders' Agreement shall require the approval of at least three Common Holders that (a) are not affiliated with, or related funds of, one another, (b) that together own at least 55% of the outstanding Common Shares and (c) each of which owns at least 0.5% of the outstanding Common Shares; <u>provided</u>, that amendments or waivers that are materially and disproportionately adverse to one or more Common Holders (each, an "<u>Affected Common Holder</u>") relative to any of the other Common Holders must be approved by Affected Common Holders holding, in aggregate, a majority of all outstanding Common |

| | |
|---|---|
| | Shares owned by the Affected Common Holders.  In addition, the amendments or waivers to the Stockholders' Agreement that affect the rights of the Preferred Holders shall require the approval of Preferred Holders holding at least a majority of the outstanding Preferred Shares. The Company's certificate of incorporation and bylaws, including any amendments thereof or supplements thereto, shall not include any provisions that are inconsistent with the terms of the Stockholders' Agreement. |
| **No Side Letters** | As of the date of the Stockholders' Agreement, the Company Shareholders will represent that other than the transaction documents, there exist no other side letters, agreements or other arrangements relating to an investment in the Company by, among or between (i) the Company or any of its subsidiaries, on the one hand, and any Company Shareholder or any of its affiliates, on the other hand, or (ii) any Company Shareholder or any of its affiliates, on the one hand, and any other Company Shareholder or any of its affiliates, on the other hand. |

**<u>Exhibit G</u>**
**Management Incentive Plan**

# Management Incentive Plan

| Exit EBITDA | | $30.0 | $30.0 | $35.0 | $35.0 | $41.0 | $41.0 | $41.0 | $41.0 | $41.0 |
|---|---|---|---|---|---|---|---|---|---|---|
| Exit Multiple | | 6.2x | 6.2x | 6.4x | 7.0x | 6.5x | 7.0x | 7.3x | 7.5x | 8.0x |
| **Enterprise Value** | | **$184.5** | **$205.0** | **$225.5** | **$246.0** | **$266.5** | **$287.0** | **$300.0** | **$307.5** | **$328.0** |
| | | | | | | | | | | |
| Less: Transaction Fees | | (7.4) | (8.2) | (9.0) | (9.8) | (10.7) | (11.5) | (12.0) | (12.3) | (13.1) |
| Less: Est. New Money Loans | | - | - | - | - | - | - | - | - | - |
| Less: Est. Rollover Loans | | (32.3) | (32.3) | (32.3) | (32.3) | (32.3) | (32.3) | (32.3) | (32.3) | (32.3) |
| Plus: Est. Cash | | 54.2 | 54.2 | 61.0 | 61.0 | 69.3 | 69.3 | 69.3 | 69.3 | 69.3 |
| Less: Preferred Equity | | (92.5) | (92.5) | (92.5) | (92.5) | (92.5) | (92.5) | (92.5) | (92.5) | (92.5) |
| Less: Management Pool | | - | - | - | - | - | - | - | - | - |
| **Common Equity for Distribution** | | **$106.5** | **$126.2** | **$152.7** | **$172.4** | **$200.3** | **$220.0** | **$232.5** | **$239.7** | **$259.3** |

| **Common Equity Breakdown** | **Pre-Dilution** | | | | | **Fully Diluted** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| HIG | 51.0% | 44.8% | 43.8% | 42.5% | 41.6% | 40.3% | 39.5% | 39.2% | 39.2% | 39.2% |
| 1st Lien | 23.0% | 20.2% | 19.8% | 19.2% | 18.7% | 18.2% | 17.8% | 17.7% | 17.7% | 17.7% |
| 2nd Lien | 25.0% | 22.0% | 21.5% | 20.8% | 20.4% | 19.8% | 19.4% | 19.2% | 19.2% | 19.2% |
| Michael Blatz | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Management | - | 12.0% | 14.0% | 16.5% | 18.3% | 20.7% | 22.4% | 23.0% | 23.0% | 23.0% |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

| **1st Lien Lenders** | **At Close** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| New Money Loans + Interest | $11.0 | $13.2 | $13.2 | $13.2 | $13.2 | $13.2 | $13.2 | $13.2 | $13.2 | $13.2 |
| Roll-Up Loans + PIK Interest | $20.0 | 32.3 | 32.3 | 32.3 | 32.3 | 32.3 | 32.3 | 32.3 | 32.3 | 32.3 |
| Preferred Equity | $60.0 | 80.4 | 80.4 | 80.4 | 80.4 | 80.4 | 80.4 | 80.4 | 80.4 | 80.4 |
| Common Equity | | 21.5 | 24.9 | 29.3 | 32.3 | 36.4 | 39.2 | 41.1 | 42.3 | 45.8 |
| **Total** | | **$147.5** | **$150.9** | **$155.2** | **$158.3** | **$162.4** | **$165.1** | **$167.0** | **$168.3** | **$171.8** |
| *Recovery % ($176M)* | | *83.8%* | *85.7%* | *88.2%* | *89.9%* | *92.3%* | *93.8%* | *94.9%* | *95.6%* | *97.6%* |

| **2nd Lien Lenders** | **At Close** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Preferred | $2.0 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 |
| Common Equity | | 23.4 | 27.1 | 31.8 | 35.1 | 39.6 | 42.6 | 44.6 | 46.0 | 49.8 |
| **Total** | | **$26.1** | **$29.8** | **$34.5** | **$37.8** | **$42.3** | **$45.2** | **$47.3** | **$48.7** | **$52.5** |
| *Recovery % ($47M)* | | *55.5%* | *63.4%* | *73.4%* | *80.4%* | *89.9%* | *96.3%* | *100.7%* | *103.6%* | *111.7%* |

| **HIG $ Return** | **At Close** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Preferred | $7.0 | $9.4 | $9.4 | $9.4 | $9.4 | $9.4 | $9.4 | $9.4 | $9.4 | $9.4 |
| Common Equity | | 47.8 | 55.3 | 64.9 | 71.6 | 80.7 | 86.8 | 91.1 | 93.9 | 101.6 |
| **Total** | | **$57.1** | **$64.7** | **$74.3** | **$81.0** | **$90.1** | **$96.2** | **$100.5** | **$103.3** | **$111.0** |
| *Recovery % ($70.5M)* | | *81.0%* | *91.7%* | *105.3%* | *114.9%* | *127.8%* | *136.4%* | *142.4%* | *146.4%* | *157.4%* |
| *MOIC (Original + New)* | | *0.81x* | *0.92x* | *1.05x* | *1.15x* | *1.28x* | *1.36x* | *1.42x* | *1.46x* | *1.57x* |

| **Management** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Value of Management Options | | $12.7 | $17.6 | $25.2 | $31.6 | $41.6 | $49.2 | $53.4 | $55.0 | $59.5 |
| Management Pool | | - | - | - | - | - | - | - | - | - |
| Preferred Equity | | - | - | - | - | - | - | - | - | - |
| **Total** | | **$12.7** | **$17.6** | **$25.2** | **$31.6** | **$41.6** | **$49.2** | **$53.4** | **$55.0** | **$59.5** |
| *Implied Management % of Equity (Pre-Pool)* | | *12.0%* | *14.0%* | *16.5%* | *18.3%* | *20.7%* | *22.4%* | *23.0%* | *23.0%* | *23.0%* |
| *Michael Blatz Common Equity* | | *$1.1* | *$1.3* | *$1.5* | *$1.7* | *$2.0* | *$2.2* | *$2.3* | *$2.4* | *$2.6* |

Note: payout amounts above are presented on a pre-tax basis.

Note: assumes full vesting of time-vesting options.

Note: numbers represent value of the total option pool, which may not necessarily be fully awarded out.

## Commentary

- **Management Options**
  - 8.0% Time-Vested
  - 15.0% Performance-Vested, subject to H.I.G. MOIC targets (based on $70.5M)
    - Performance options "start" at 0.6x
    - Ramp up linearly to 15.0% at 1.4x
  - Targets $55M total pool value at base case ($41M of EBITDA @ 7.5x multiple)
  - 2-year cliff vest

- **"Management Pool"**
  - No management pool

- **Preferred Equity**
  - Management receives no Preferred Equity

- **Other Assumptions**
  - Assumes debt paydown / cash generation
  - Assumes exit transaction fees are 4% of TEV

0

**Exhibit H**

**Provision for Transfer Agreement Joinder**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2020 (the "**Agreement**"),[1] by and among the Company bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Claims against, or Interests in, the Company (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of (or other actions taken in support of the Restructuring by) the Transferor if such vote was cast (or other action taken) before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail:

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Loans | $[●] |
| Second Lien Loans | $[●] |
| Other | $[●] |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to such terms in the Agreement.

**<u>Exhibit I</u>**

**Restructuring Support Agreement
Joinder**

## Restructuring Support Agreement Joinder

This joinder (this "**Restructuring Support Agreement Joinder**") to the Restructuring Support Agreement (the "**Agreement**"), dated as of [_], 2020, by and among: (i) HIG Cinema Intermediate Holdings, Inc., VIP Cinema Holdings, Inc., VIP Cinema, LLC, VIP Property Management II, LLC, VIP Components, LLC, and the (ii) the Consenting Stakeholders, is executed and delivered by [_____] (the "**Joining Party**") as of [_____]. Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.      <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Restructuring Support Agreement Joinder as <u>Annex A</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Consenting Stakeholders, as applicable.

2.      <u>Representations and Warranties</u>. The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the debt or equity interest identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 11 hereof to each other Party.

3.      <u>Governing Law</u>. This Restructuring Support Agreement Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.      <u>DIP Commitment Election</u>.

☐ By checking this box on or before the Election Date, the Joining Party hereby represents and warrants that as of February [14], 2020 it held First Lien Loans in the amount set forth below, and hereby commits to provide a share of the DIP Facility on the terms and conditions consistent with the DIP Term Sheet, as applicable:

(A) Principal Amount of First Lien Loans:               $_____

(B) Principal Amount of First Lien Loans set forth
in (A) above divided by $[ ],[1] expressed as a percentage:

_____

---

[1] Outstanding principal amount of all First Lien Loans.

_____

(C) Percentage of the DIP Facility the Joining Party hereby agrees to commit to, which shall not be greater than the percentage set forth in (B) above:

_____

5.      <u>Notice</u>. All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING
PARTY]
[ADDRESS]
Attn:
Facsimile:
Email:

IN WITNESS WHEREOF, the Joining Party has caused this Restructuring Support Agreement Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

Name:

Title:

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Loans | $[●] |
| Second Lien Loans | $[●] |
| Other | $[●] |

**<u>Exhibit B</u>**

Evidentiary Support for First Day Motions

**Evidentiary Support for First Day Motions**[1]

I.    **DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (II) MAINTAIN EXISTING BUSINESS FORMS AND BOOKS AND RECORDS, AND (III) PERFORM INTERCOMPANY TRANSACTIONS AND GRANTING ADMINISTRATIVE STATUS TO INTERCOMPANY PAYMENTS AND (B) GRANTING RELATED RELIEF (THE "CASH MANAGEMENT MOTION").**

1.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System, as well as honor any prepetition obligations related thereto, (ii) maintain existing Business Forms and Books and Records in the ordinary course of business, and (iii) continue to perform Intercompany Transactions through the Cash Management System and granting administrative expense status to Intercompany Transactions among the Debtors and between the Debtors and their non-Debtor affiliates and (b) granting related relief.

2.    To facilitate the efficient operation of their business, the Debtors operate a centralized cash management system (the "Cash Management System").  I can attest to the summary of the Cash Management System set forth in the Cash Management Motion.

3.    I believe that the continuation of the Cash Management System, including with regard to the continued use of Cash Management Banks to continue using and processing debt, check, wire and ACH transfers, payment of Bank Fees, continuation of the Corporate Cards program, maintenance of their existing Business Forms and Books and Records, and engagement in Intercompany Transactions, is vital to the Debtors ability to operate effectively in these Chapter 11 Cases. The Debtors' ability to collect, transfer, and distribute funds through the Cash Management System without disruption is vital to ensure the Debtors can operate their business in

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

the ordinary course. Due to the complexity of the Cash Management System and the interconnected-nature of the Debtors' operations, any delay in granting the relief requested in the Cash Management Motion would severely disrupt the Debtors' operations at this critical juncture and jeopardize the Debtors' ability to maximize the value of their estates for the benefit of all stakeholders.

4.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

## II.   APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER APPOINTING OMNI AGENT SOLUTIONS, INC. AS CLAIMS AND NOTICING AGENT (THE "<u>CLAIMS AND NOTICING AGENT RETENTION APPLICATION</u>").

5.     Pursuant to the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order appointing Omni Agent Solutions, Inc. ("<u>Omni</u>") as claims and noticing agent in the Debtors' Chapter 11 Cases effective *nunc pro tunc* to the Petition Date.

6.     I believe that the relief requested in the Claims and Noticing Agent Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Claims and Noticing Agent Retention Application.

## III.   APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER APPOINTING OMNI AGENT SOLUTIONS, INC. AS ADMINISTRATIVE AGENT FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE (THE "<u>ADMINISTRATIVE AGENT RENTENTION APPLICATION</u>")

7.     Pursuant to the Administrative Agent Retention Application, the Debtors seek entry of an order appointing Omni Agent Solutions, Inc. ("<u>Omni</u>") as administrative agent in the Debtors' Chapter 11 Cases effective *nunc pro tunc* to the Petition Date.

8.      I believe that the relief requested in the Administrative Agent Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Administrative Agent Retention Application.

**IV.     DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO (I) FILE A CONSOLIDATED LIST OF CREDITORS IN LIEU OF SUBMITTING A SEPARATE MAILING MATRIX FOR EACH DEBTOR, (II) FILE A CONSOLIDATED LIST OF THE DEBTORS' THIRTY LARGEST UNSECURED CREDITORS, AND (III) REDACT CERTAIN PERSONALLY IDENTIFIABLE INFORMATION FOR INDIVIDUAL CREDITORS AND INTEREST HOLDERS AND (B) GRANTING RELATED RELIEF (THE "CREDITOR MATRIX MOTION").**

9.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' 30 largest unsecured creditors, and (iii) redact certain personal identifiable information for the Debtors' individual creditors and interest holders, and (b) granting related relief.

10.      For the reasons set forth in the Creditor Matrix Motion, I believe filing a single consolidated list of the 30 largest unsecured creditors and redacting personally identifiable information of such creditors in these Chapter 11 Cases is appropriate.  I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Creditor Matrix Motion be approved.

**V.      DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS AND (II) OTHERWISE CONTINUE CERTAIN CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS AND (B) GRANTING RELATED RELIEF (THE "<u>CUSTOMER PROGRAMS MOTION</u>").**

11.      Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) honor certain prepetition obligations to customers and (ii) continue certain customer programs in the ordinary course of business consistent with past practices and in the Debtors' sound business judgment and (b) granting related relief.

12.      I believe that the Debtors' ability to continue the Customer Programs and honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, meet competitive market pressures, and ensure Customer satisfaction. Continuing to administer the Customer Programs without interruption during the pendency of these Chapter 11 Cases will help preserve the Debtors' valuable Customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders and their estates.

13.      I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully request that the Customer Programs Motion be approved.

**VI.      DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION AND SATISFY PREPETITION OBLIGATIONS RELATED THERETO AND (II) RENEW, SUPPLEMENT, OR PURCHASE INSURANCE POLICIES AND (B) GRANTING RELATED RELIEF (THE "<u>INSURANCE MOTION</u>").**

14.      Pursuant to the Insurance Motion, the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue insurance coverage entered

into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business and (ii) renew, supplement, or purchase insurance coverage in the ordinary course of business on a postpetition basis, and (b) granting related relief.  I have reviewed and can attest to the facts set forth in the Insurance Motion.

15.     I believe that the failure to receive the requested relief at the outset of these Chapter 11 Cases would expose the Debtors to direct liability for payment of claims otherwise covered by the Insurance Policies, distract the Debtors from the vital task of stabilizing their business through this process, and disrupt the Debtors' operations at this important juncture.  The relief requested in the Insurance Motion is necessary for the Debtors to operate their business in the ordinary course and preserve and maximize the value of the Debtors' operations and their estates for the benefit of all stakeholders.

16.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Insurance Motion be approved.

VII.    **DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES AND (B) GRANTING RELATED RELIEF (THE "<u>JOINT ADMINISTRATION MOTION</u>").**

17.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing joint administration of these Chapter 11 Cases for procedural purposes only and (b) granting related relief.  Given that the Debtors are affiliated entities, I believe joint administration of these Chapter 11 Cases will provide administrative convenience without harming the substantive rights of parties in interest.

18.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to operate their business in chapter 11.  Accordingly, I respectfully request that the Joint Administration Motion be approved.

## VIII.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION TAXES AND FEES AND (II) GRANTING RELATED RELIEF (THE "<u>TAXES MOTION</u>").

19.    Pursuant to the Taxes Motion, the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to remit and pay Taxes and Fees accrued prior to the Petition Date that will become due and payable during the pendency of these Chapter 11 Cases, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date and (b) granting related relief.

20.    Failure to receive the requested relief would expose the Debtors to additional liability to or collection activity by the Authorities, distract the Debtors from the vital task of stabilizing their business through this process, and disrupt the Debtors' operations at this important juncture.  I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Taxes Motion be approved.

## IX.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) (I) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES, (II) APPROVING THE DEBTORS' PROPOSED PROCEDURES FOR RESOLVING ADDITIONAL ASSURANCE REQUESTS, (III) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES, AND (IV) AUTHORIZING FEE PAYMENTS TO THE DEBTORS' THIRD-PARTY UTILITY SERVICE VENDOR AND (B) GRANTING RELATED RELIEF (THE "<u>UTILITIES MOTION</u>").

21.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) (i) approving the Debtors' proposed adequate assurance of payment for future utility services, (ii) approving the Debtors' proposed procedures for resolving requests for adequate assurance, and

(iii) prohibiting utility providers from altering, refusing, or discontinuing services, and (b) granting related relief.

22.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and that any disruption of Utility Services, even for a brief period, would severely affect customer goodwill and employee relations and jeopardize the Debtors' prospects for a successful emergence from bankruptcy.  Therefore, it is critical that Utility Services continue uninterrupted during these Chapter 11 Cases.

23.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Utilities Motion be approved.

## X.     DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, COMPENSATION, AND BENEFIT OBLIGATIONS AND (II) CONTINUE EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS AND (B) GRANTING RELATED RELIEF (THE "WAGES MOTION").

24.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) satisfy certain prepetition wages, compensation, and benefit obligations to their employees, temporary workers, contractors, and certain former employees and (ii) continue employee compensation and benefits programs in the ordinary course of business postpetition, and (b) granting related relief.

25.     The Employees, Temporary Workers and Independent Contractors include highly trained personnel who cannot be replaced easily.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  Additionally, the vast majority of Employees, Temporary Workers and Independent

Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Thus, Employees, Temporary Workers and Independent Contractors will be exposed to significant financial constraints if the Debtors are not permitted to continue paying wages and salaries and providing benefits and other programs in the ordinary course of business. Consequently, the Debtors respectfully submit that the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

26.    I have reviewed and can attest to the facts set forth in the Wages Motion and the need for the relief requested therein in the amounts set forth therein. I believe that paying prepetition compensation, benefits, and similar items to Employees, Temporary Workers, and Independent Contractors, and paying prepetition expenses and fees to third-party administrators of such compensation and benefits will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully request that the Wages Motion be approved.

## XI.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF LIEN CLAIMANTS; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO; AND (III) GRANTING RELATED RELIEF (THE "LIEN CLAIMANTS MOTION").

27.    Pursuant to the Lien Claimants Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, certain prepetition claims of third-party servicers or carriers, including shippers, warehousemen, and other potential lienholders, who are in current possession of the Debtors' property or may have

or assert a lien pursuant to applicable law as a result of services performed by Lien Claimants (as defined below), (ii) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing; and (iii) granting related relief.

28.     In the ordinary course of their business, the Debtors necessarily depend on the uninterrupted flow of inventory and other goods through their worldwide supply chain and distribution network.  Although the Debtors generally make timely payments to the Lien Claimants, as of the Petition Date, certain Lien Claimants will or may not have been paid for services they rendered.  Unless the Lien Claimants are paid amounts outstanding as of the Petition Date, I believe that the Lien Claimants may refuse to provide critical services.  As a result, absent immediate payment of the Lien Claims, the Debtors face a significant immediate risk of disruption to their business operations and the possible loss of Product.

29.     I therefore believe that the relief requested in the Lien Claimants Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Lien Claimants Motion be approved.

## XII.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF FOREIGN VENDORS AND CRITICAL VENDORS AND SERVICE PROVIDERS; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO; AND (III) GRANT RELATED RELIEF (THE "CRITICAL VENDOR MOTION").

30.     Pursuant to the Vendors Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, the prepetition claims of foreign vendors (the "Foreign Vendors," whose claims shall be collectively identified herein as the "Foreign Vendor Claims") and critical vendors and service providers (the "Critical Vendors," whose claims shall be collectively identified herein as the

"Critical Vendor Claims"), (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing; and (iii) granting related relief.

31.     ***Foreign Vendors***.  In the ordinary course of business, the Company does business with Foreign Vendors, including providers of installation services, third-party logistics, and certain goods, that have long-standing relationships with the Debtors and provide unique or customized goods or services that cannot be obtained from other sources without significant delay and cost.  I believe that there is a significant risk that the Foreign Vendors may consider themselves beyond the jurisdiction of the Court, disregard the automatic stay, and engage in conduct that could disrupt the Debtors' operations.  Indeed, the Debtors' Foreign Vendors may, among other things, exercise self-help, which could include reclaiming vital goods already in the Debtors' possession at foreign ports or shutting down the Debtors' access to essential goods and services needed for the Debtors' business.  If the Foreign Vendors refused to provide these services, the Debtors do not have the capabilities to provide these services themselves and do not have other vendors that they could turn to in a short timeframe.  This would cause delays for the customers and possible damages charges to the Debtors for missed deadlines.

32.     ***Critical Vendors.***  In connection with the normal operation of their business, the Debtors purchase or contract for, among other things, Goods and Services necessary for the Debtors' regular operations and the production of their products (collectively, the "Products").  In producing these Products, the Debtors rely on the support of numerous Critical Vendors, including specialty material vendors and service providers, that are unaffiliated with the Debtors without whom the Debtors would either be unable to provide the Products or face significant additional cost and expenses, if forced to finds alternative vendors.  It is within the sound exercise of the

Debtors' business judgment to pay the Critical Vendors their prepetition Critical Vendor Claims and thereby: (a) maintain lower costs of Goods and Services purchased during the postpetition period, (b) ensure delivery of Goods ordered prepetition but not yet delivered, (c) ensure the provision of critical Services, (d) avoid the lengthy certification process required whenever the Debtors alter the Goods used in their products, and (e) avoid disruptions to their operations that might result from the cessation of such essential Goods and Services.

33.    The Debtors will use reasonable efforts where appropriate and practicable to condition payments to Foreign Vendors and Critical Vendors on each vendor's agreement to continue to provide proprietary raw materials and related goods (collectively, the "Goods") and services (the "Services") necessary for the Debtors' regular operations, as applicable, on the Customary Trade Terms.

34.    I believe that the relief requested in the Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Vendors Motion be approved.

**XIII.  DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO RETAIN AND COMPENSATE PROFESSIONALS UTILIZED IN THE ORDINARY COURSE OF BUSINESS AND (B) GRANTING RELATED RELIEF (THE "OCP MOTION").**

35.    Pursuant to the OCP Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to retain and compensate professionals utilized in the ordinary course of business on a postpetition basis in accordance with the procedures set forth herein and without the need for each ordinary course professional to file formal applications for retention and compensation and (b) granting related relief.

36.     The continued employment and compensation of the OCPs is in the best interests of the Debtors' estates, their creditors, and other parties in interest.  The OCPs have significant knowledge, expertise, and familiarity with the Debtors and their operations.  Without such knowledge, expertise, and familiarity that the OCPs have, the Debtors undoubtedly would incur additional and unnecessary expenses in educating and retaining replacement professionals. Accordingly, the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operations of the Debtors' businesses.

37.     I believe that the relief requested in the OCP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the OCP Motion be approved.

## **Exhibit C**

Organization Chart

# VIP Cinema Seating
## Organization Legal Entity Chart



